1 Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
2 Leanne H. Solish (SBN 280297)
Christopher R. Fallon (SBN 235684)
3 **GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
4 Los Angeles, California 90067
Telephone: (310) 201-9150
5 Facsimile:  (310) 201-9160
Email: info@glancylaw.com
6

7 *Lead Counsel for Lead Plaintiffs and the Putative Class*

8
**UNITED STATES DISTRICT COURT**
9 **NORTHERN DISTRICT OF CALIFORNIA**

10 IN RE K12 INC. SECURITIES
LITIGATION                        Master File No. 4:16-cv-04069-PJH
11
**CLASS ACTION**
12
**CONSOLIDATED AMENDED CLASS ACTION**
13 **COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**
14

15 **JURY TRIAL DEMANDED**

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     JURISDICTION AND VENUE ................................................................ 7

III.    PARTIES ................................................................................................... 8

IV.     BACKGROUND ...................................................................................... 11

    A.      The Company and Its Business................................................... 11

    B.      K12's Reliance on Public Education Funding for the Bulk of Its Revenue ............. 12

    C.      K12's Extensive Lobbying Efforts ............................................. 14

    D.      K12's Troubled Academic Past ................................................. 15

    E.      Defendants' Self-Proclaimed New Focus on Academics ........................................... 16

        1.      K12 Begins Publishing Annual Academic Reports ...................................... 17

            a)      The 2013 Academic Report ...................................... 18

            b)      The 2014 Academic Report ...................................... 18

            c)      The 2015 Academic Report ...................................... 20

        2.      Academic Improvements, Measured Via Scantron Test Gains, Are Added as a Performance Metric for Executive Compensation................................. 21

        3.      An Academic Committee Is Formed With Davis Serving as a Member ....... 22

V.      K12'S FOCUS ON ACADEMICS DOES NOT PRODUCE THE DESIRED GAINS DURING THE CLASS PERIOD, RESULTING IN LOSS OF ITS LARGEST MANAGED CONTRACT, A STATE INVESTIGATION AND SUBSEQUENT SETTLEMENT, AND CUTS IN ENROLLMENT................................................................ 23

    A.      Colorado Virtual Academy ........................................................ 23

    B.      Tennessee Virtual Academy ...................................................... 26

    C.      California Virtual Academies ..................................................... 29

        1.      The Lack of True Oversight Over K12's Management of the CAVA Schools.......................................... 30

        2.      K12's CAVA Schools Suffered Academically............................................. 34

    D.      Agora Cyber Charter School........................................................ 36

       1.     Agora's Troubled Past ................................................................ 36

       2.     Academic Results ...................................................................... 37

           a)    Agora's Historic Academic Results ................................... 37

           b)    Agora's Academics Results During the Class Period ...................... 38

       3.     The Agora's Boards Decision to Severely Change Its Relationship with K12 and to Become Self-Managed ................ 40

VI.    THE TRUTH BEGINS TO EMERGE .......................................................... 45

    A.    The National Collegiate Athletic Association April 2014 Decision to Stop Accepting Coursework from Two Dozen K12 Schools ............................. 45

    B.    K12's Largest Revenue Providing School Begins Looking for New Providers ........ 46

    C.    K12's Discloses An Enrollment Cap at TNVA and Agora's "Interest" In Self-Management During Its August 14, 2014 Conference Call ......................... 47

    D.    Agora Confirms Its Intent to Become A Self-Managed School, Resulting in K12 Redefining Its Business Lines .................................................. 48

    E.    K12 Announces Disappointing Costs Due to the Company's Continuing, Yet Unrecognized, Investment in Academics ............................................ 49

    F.    The National Study of Online Charter Schools Publishes Its Findings ............... 50

       1.     Mathematica Policy Research's Analysis of the Current State of Online Charter Schools ................................................................ 51

       2.     CRPE's Analysis of Online Charter School State Policies and Regulations and For-Profit Providers' Influence on State Legislative Action ................ 52

       3.     CREDO'S Analysis of Online Charter School Academic Performance as Compared to Traditional Public School Academic Performance ................ 52

    G.    K12 Announces Its First Quarter of Financial Results after the Loss of the Agora Managed Public School Contract ................................................. 55

    H.    The California Office of Attorney General Launches an Investigation Into K12's Operations in California Subpoena .................................................. 56

    I.    Investors Send a Clear Message of Disappointment in K12's "Efforts" to Improve Academics and Retention ................................................. 56

    J.    The California Office of Attorney General's Investigation Leads to a Settlement In Which K12 Agrees to Significant Reforms and a Public Correction of the 2013-14 School Year Gains in the Scantron Test Results ......................... 57

1.  K12 Removes the 2014 Academic Report, 2015 Academic Report, and Academic Results Page from Its Website ....................................... 60

2.  K12 Corrects Davis's Statement on the October 30, 2014 Earnings Call Regarding the 2013-14 Scantron Results ....................................... 60

3.  K12 Admits that the Errors in Calculating the Academic Gains Using the 2013-14 School Year Scantron Test Results Resulted in an Overpayment in the Individual Defendants' Cash Bonuses for the 2014 Fiscal Year ......... 61

4.  2016 Academic Report Released ....................................... 61

VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................... 63

A.   Defendants' False and Misleading Statements and Omissions Concerning Agora ... 64

1.  Defendants' False and Misleading Statements and Omissions Concerning Agora Prior To K12 Announcing the Agora Board's Election To Use an RFP Process ....................................... 64

2.  Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding the Agora Board's RFP Process and Selection of Providers ....................................... 66

3.  Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding Its Selection of K12's Curriculum ....................................... 69

B.   Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results ....................................... 70

1.  Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results for the 2012-13 School Year ....................................... 72

2.  Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results for the 2013-14 School Year ....................................... 74

C.   Defendants False and Misleading Statements and Omissions Concerning K12 Students' Academic Performance and K12's Service and Offerings ....................................... 77

VIII.  LOSS CAUSATION ....................................... 84

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....................................... 97

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................................... 99

XI.    CLASS ACTION ALLEGATIONS ....................................... 99

XII.    CLAIMS FOR RELIEF ............................................................................................ 101

XIII.   PRAYER FOR RELIEF .......................................................................................... 105

XIV.    JURY DEMAND .................................................................................................... 105

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.      Lead Plaintiffs Babulal Tarapara and Mark Beadle ("Plaintiffs"), by and through their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of K12 Inc. ("K12" or the "Company") from October 10, 2013, through October 27, 2015, inclusive (the "Class Period").

2.      Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP. This investigation included, among other things, a review and analysis of: (i) K12's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of K12's investor calls; (vi) K12's press releases; (vii) interviews with former employees and other potential witnesses with relevant information (some of whom have provided information in confidence, including emails) throughout the course of counsel's investigation; (viii) pertinent court filings; and (ix) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (defined herein) or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      PRELIMINARY STATEMENT

3.      K12 is a for-profit, online education company. The Company's core operations, comprising approximately 85% of its revenues during the Class Period, is its management of virtual public schools for students in kindergarten through high school. For these schools, K12 contracts with a school district or non-profit school board to provide "turnkey" management of the school including: all aspects of academics; teacher and staff recruitment, training, and compensation recommendations;

student marketing and enrollment; financial and regulatory compliance; providing curricula, laptops, software, and other required services and equipment; and all administrative duties.

4.     In a virtual school, students can attend their classes from anywhere simply by logging in. Proponents of online schools tout their ability to provide individualized learning for students and their ease of access, a feature that is especially useful for students living in remote areas, students with special needs, students who have been victims of bullying, and students with unique talents and abilities that typically require such students to frequently be away from a typical classroom. However, online schools also require a high level of commitment from students and their parents to ensure that students are effectively engaging in their education.

5.     Over the last sixteen years since its founding, K12 has become one of the largest for-profit, online educational companies. A large part of this success is due to K12's extensive and successful lobbying: not only has K12 spent millions in lobbying state legislatures to pass favorable laws and regulations allowing K12, and other for-profit educational providers, to service schools in the state, but the Company has "friends" in many high-level educational positions in state governments.

6.     Once K12 is able to provide services in a given state, the Company then looks for a sponsoring school district. In many cases, these school districts tend to be small and in less-populous counties. The authorizing school district tends to receive a small percent of the revenues flowing to the school for their part in overseeing the school. This creates an ideal situation for K12: in most states, a student from anywhere in the state can enroll in the K12-managed charter school, and thus, the state's per-pupil funding is not limited to the population served by the authorizing district; a large portion of this state funding ends up flowing through to K12's top line; and the percentage that the authorizing district receives for "overseeing" K12's management incentivizes the districts to let K12 continue operations, even when academic results may indicate otherwise.

7.     K12 has had its fair share of critics over the years, questioning its tactics to keep both revenues and profits as high as possible, with students' academics falling victim to these practices. K12 has consistently maintained that a large portion of its students come to K12-run schools academically

behind their peers, are the recipients of free or reduced lunches (an indication of poverty), and/or tend to be highly mobile. These characteristics tend to indicate lower academic achievement in state testing.

8. During the Class Period, K12 made clear to investors and the public that it had a renewed focus on academics and improving academic outcomes. For example, on April 29, 2014, Nathaniel Davis, K12's Chief Executive Officer ("CEO") throughout the majority of the Class Period, claimed that K12's "core mission" was "helping students achieve the best possible outcomes."

9. To prove to both investors and the public that K12 was out of the "dark days when people criticized [K12] . . . for [its] educational results[,]" K12 began to "publicly start talking more about the success that [it is] having in academics." Shortly before the start of the Class Period, Defendants' began publishing annual "Academic Reports" which provided a yearly, in-depth report on K12 student academic outcomes. The supposed goal of these reports were transparency. According to K12, state test results were not the best measure of a student's academic gains in a year, and so, in the Academic Reports, K12 provided academic results based on the gains a student made during the year compared to a national mean gain on a "Scantron" test. Defendants reported that for the 2013-14 school year, in all grades tested with the Scantron tests, students exceeded the national norm mean gain.

10. State testing results and other indicators of academic performance however, told a different result in a number of K12-managed schools. As detailed herein, during the Class Period, K12 was internally put on notice that relevant overseeing authorities for some of its schools were disappointed with its management of its schools, and in particular, the academic results of students in these K12-managed schools.

11. Just prior to the start of the Class Period, the school board overseeing the Colorado Virtual Academy opted to end its turnkey management contract with K12 and going forward, the school would only purchase K12's curriculum and other services. This was the result of the board's concern that "promises of improved school performance . . . were not being met." The change in contract was preceded by "difficult negotiations," and, after the school board's hiring of an independent CEO to

receive a clearer understanding of the dire situation of the school's performance, the school board was "thoroughly disenchanted" with K12.

12.     Around this same time, K12, and the Tennessee Virtual Academy that it runs, was being closely watched by the then-current Education Commissioner of Tennessee. In a tell-all letter the Commissioner wrote after he resigned from office, the Tennessee Education Commissioner detailed his years-long saga with K12 regarding the Tennessee school's "unacceptable" results. The Tennessee Education Commissioner had meetings with both K12 lobbyists and the Company's founder to express his concerns. The meeting with the lobbyist was a "disaster" – when presented with state test results showing that the K12-run school "had struggled," the lobbyist instead "pointed to the school's self-administered internal tests, and claimed they were doing fine." Ultimately, prior to his resignation, the Tennessee Education Commissioner was successful in cutting off new enrollments to the school in July 2014.

13.     During the majority of the Class Period, one of K12's two largest schools, was the Agora Cyber Charter School ("Agora") in Pennsylvania. During the Class Period, its contract with K12 was up for renewal. According to former members of Agora's school board (the "Agora Board"), the Agora Board decided not to seek renewal of its Managed Public School contract with K12, which was scheduled to terminate on June 30, 2015. The decision to part from K12's management of Agora were many; among these reasons, according to former Board members, was: disappointing academic improvements; an emphasis on Scantron testing that did not seem to help students; and other various reasons to leave the Agora Board unsatisfied with the various academic services and offerings that come along with a managed contract with K12. Although K12 received proper notice of the Agora Board's decision not to renew the contract, Defendants did not take this notice seriously, and concealed this decision from investors. Instead, Defendants made piecemeal announcements regarding Agora over the course of the Class Period.

14.     K12 also has a significant presence in California and there are currently ten different California Virtual Academies operating in the state. In the 2013-14 school year, these schools served

around 15,000 students and received more than $100 million in state education funding. These K12-run schools similarly produced unimpressive academic outcomes during the Class Period, but as a result of the structure of these schools, there was no real oversight from school boards and authorizing school districts. However, after numerous public articles, reports, and formal teacher complaints written during the Class Period, the California Attorney General took notice. In late September 2015, K12 received a an investigative subpoena from the Attorney General. The receipt of this subpoena was announced to investors on the last day of the Class Period, October 27, 2015, in K12's quarterly financial results.

15.    On July 8, 2016, the California Attorney General ended its investigation and simultaneously entered into a settlement with K12. In the settlement, K12 agreed to pay millions of dollars to the State and to take 60 corrective actions. Among these corrective actions K12 agreed to take were:

- To seek approval for at least two courses that satisfy the University of California's laboratory science and visual and performing arts requirements, along with providing the supplies, materials, and/or venues needed to complete the course requirements;

- To come into compliance with the American with Disabilities Act regulations, including allowing an independent investigation and to resolve accessibility-related complaints, and taking various measures to ensure an accessible learning environment for students; and

- To take numerous actions concerning K12's failure to properly calculate the Scantron Test mean gain scores in its 2015 Academic Report (for the 2013-14 school year), and to correct various statements made by Defendants, and an analyst, in relying on these erroneous Scantron results.

As a result of the settlement, Defendants removed its Academic Reports from K12's website, announced that K12 executives were overpaid bonuses for the year based on the erroneous Scantron results, and admitted that the earlier announced Scantron results were erroneous both on an August 9, 2016 earnings call and in K12's 2016 Academic Report.

16.     Also on October 27, 2015, the results of a comprehensive study undertaken by three institutions, two of which are a part of the University of Washington and Stanford University, were published. The study was a "rigorous analysis of the operations of online charter schools, their policy environments, and their impacts on student achievements." Key takeaways from the study were:

- That "students in the typical online charter school have less synchronous instructional time in a week than students in a brick and mortar school have in a day," and that although online schools offer some one-on-one instructional support to students, the schools that offer one-on-one instructional support reported medians of only 45 to 60 minutes of one-on-one instructional time per week." (All emphasis removed).

- That when comparing virtual twins, *i.e.*, students with identical demographics, the findings "place doubt on the argument that higher pre-online mobility creates widespread, systematic academic deficits for students who eventually switch to online charter schools."

- That both students who left an online school and returned to a traditional school and students who stayed in the online school had stronger growth in their second year than in their first year in an online charter school; however, the growth in the second year was significantly smaller for those students who stayed in an online school for their second year, compared to those students who returned to a traditional public school.

- "[T]hat the majority of online charter students had far weaker academic growth in both math and reading compared to their traditional public school peers. To conceptualize this shortfall, it ***would equate to a student losing 72 days of learning in reading and 180 days of learning in math, based on a 180-day school year***. This pattern of weaker growth remained consistent across racial-ethnic subpopulations and students in poverty." (Emphasis in original).

These industry wide findings cast doubt on K12's frequent explanations for its students' poor academic outcomes when compared to other schools using state test results.

17.     Throughout the Class Period, it slowly became apparent that K12's renewed investment and focus on academic outcomes was not bearing the fruit K12 had broadcasted via its Academic Reports, during earnings calls, in press releases, and in financial reports. Defendants misled Plaintiffs and investors in the statements and omissions made in these reports, calls, and press releases. Generally, Defendants' made materially false and misleading statements and omissions regarding: (1) K12's relationship with Agora, the Agora Board's decision to not renew its contract with K12 for turnkey management services, the true nature of the negotiation process with Agora, and the resultant relationship after negotiations had taken place; (2) student academic and Scantron results; and (3) general statements regarding student academic performance and K12's academic services and offerings.

18.     Indeed, the eventual announcements of (1) Tennessee's halts in enrollment, (2) Agora's decision to not renew its Managed Public School contract with K12 and the effects of this decision on K12's financial results, (3) K12's admission that it seemed that relevant authorities had not yet recognized K12's "work" in improving academic outcomes, (4) the results of the industry-wide report on the online charter school industry, and (5) the announcement of the California Attorney General's investigation into K12 resulted in drops in the Company's stock price: falling from a Class Period high of $25.98 on June 23, 2014, to just $9.71 on October 30, 2015—*an over a 60% fall in price.*

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

21.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including

the dissemination of materially false and/or misleading information occurred in substantial part in this Judicial District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

23.     Lead Plaintiff Tarapara, as set forth in a previously-filed certification (Dkt. No. 22-2 at 2-3), incorporated by reference herein, purchased K12 common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Lead Plaintiff Beadle, as set forth in a previously-filed certification (Dkt. No. 22-2 at 4-5), incorporated by reference herein, purchased K12 common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25.     Defendant K12, is a Delaware corporation with its principal executive offices located at 2300 Corporate Park Drive, Herndon, Virginia. K12 is a technology-based education company that purportedly provides technology-based educational products and solutions to public school districts, public schools, virtual charter schools, private schools, and families. K12's common stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "LRN."

26.     Defendant Ronald J. Packard ("Packard") was the CEO of K12 from 2000, when he founded the company, until December 31, 2013, when he resigned to lead the newly formed Pansophic Learning, a global technology based education company. Packard also served as Executive Chairman of K12, Inc. from 2000 until 2007, and was a director from 2000 until June 13, 2014. Packard is also the founder of, and currently serves as the CEO of Pansophic Learning. Packard also serves as the Managing Partner at Safanad Education Inc., an investment boutique with a focus on investing in education businesses globally. Prior to founding K12, Packard was the Vice President of Knowledge

1   Universe and CEO of Knowledge Schools, one of the nation's largest early childhood education

2   companies. In addition, Packard is currently serving as the Chairman of the Board of Middlebury

3   Interactive Languages, LLC and sits on Digital Learning Council. Previously, he served on the

4   Advisory Board of Department of Defense Schools was a Director of Academy123 Inc. and LearnNow,

5   Inc.

6        27.    Throughout the Class Period, Packard frequently spoke to investors and analysts on

7   conference calls. Packard possessed the power and authority to control the contents of the Company's

8   public filings with the SEC. During the Class Period, Packard certified the accuracy of K12's Form 10-

9   Q for the quarterly period ended September 30, 2013.

10        28.    Defendant Nathaniel A. Davis ("Davis") was Chairman and CEO of K12 from January

11   1, 2014 through the end of the Class Period. Davis relinquished his position as CEO on February 8,

12   2016. Davis has been a K12 director since July 2009, was named Chairman in June 2012, and

13   Executive Chairman in January 2013. After relinquishing his role as CEO, Davis returned to his

14   Executive Chairman role in February 2016. Prior to working at K12, Davis worked for XM Satellite

15   Radio, serving as President and then CEO until the company's merger with Sirius Radio, and serving

16   on the board of directors of XM Satellite Radio from 1999 to 2008. Prior to his roles at XM Satellite

17   Radio, Davis held numerous executive management positions at public and private telecommunications

18   and media firms. He has also served on the board of several public and private firms including Unisys

19   Corporation, Vibrant Solutions, Mutual of America Capital Management Corporation, Charter

20   Communications and Telica Corporation.

21        29.    Throughout the Class Period, Davis frequently spoke to investors and analysts on

22   conference calls. Davis possessed the power and authority to control the contents of the Company's

23   public filings with the SEC. During the Class Period, Davis signed and certified the accuracy of K12's

24   Form 10-K for the fiscal years ended June 30, 2014 and June 30, 2015, and certified the accuracy of

25   K12's Forms 10-Q for each quarterly period from September 30, 2013 through September 30, 2015.

26

27

28

30.     Defendant James J. Rhyu ("Rhyu") has been Chief Financial Officer ("CFO") and Executive Vice President of K12 since June 2013. Rhyu has more than 20 years of financial management experience. Prior to joining K12, Rhyu served as CFO and Chief Administrative Officer of Match.com, as well as Director of Match.com Europe Limited. Prior to his roles at Match.com, Rhyu served as Senior Vice President of Finance at Dow Jones & Company. Rhyu worked with Defendant Davis as Corporate Controller of SIRIUS XM Radio and its predecessor XM Satellite Radio from 2006 to 2009. He has also held positions at Graftech International, Ernst & Young, and Deloitte & Touche. Rhyu is a Certified Public Accountant.

31.     Throughout the Class Period, Rhyu frequently spoke to investors and analysts on conference calls. Rhyu possessed the power and authority to control the contents of the Company's public filings with the SEC. During the class period, Rhyu signed and certified the accuracy of K12's Forms 10-K for the fiscal years ended June 30, 2014 and June 30, 2015, and Forms 10-Q for each quarterly period from September 30, 2013 through September 30, 2015.

32.     Defendant Timothy L. Murray joined K12 in April 2012 as its President and Chief Operating Officer ("COO"). Murray resigned from his position at K12 in September 2015, but entered into a consulting agreement pursuant to which he continued to provide transition services for a period of up to six months. Murray previously served as CEO of Pulsepoint, Inc., a digital media technology company formed by ContextWeb, a top-rated advertising exchange company where he served as CEO since March of 2010. Prior to ContextWeb, Murray served in numerous executive positions, including as COO for Dialogic Inc. and Cross Match Technologies, Inc., where he was also a Director. He was also the CEO Cantata Technology Inc. and RiverSoft Inc., where he served as an Executive Director. Since May 2016, Murray has served as the Executive Chairman of Voxy, an English language learning platform, as well as, the Chairman of Middlebury Interactive Languages.

33.     Throughout the Class Period, Murray frequently spoke to investors and analysts on conference calls.

34.     Defendants Packard, Davis, Rhyu, and Murray are collectively referred to as the "Individual Defendants."

35.     Defendant K12 and the Individual Defendants are collectively referred to as "Defendants."

36.     The Individual Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, possessed the power and authority to control the contents of K12's reports to the SEC, press releases, and presentations to the market. Individual Defendants were aware of, or recklessly disregarded, that materially false and misleading statements and omissions were being issued, and approved, ratified, or directly made these statements and omissions in violation of the federal securities laws.

## IV.   BACKGROUND

### A.   The Company and Its Business

37.     K12 is a technology-based education company offering various educational services and tools to public school districts, public schools, virtual charter schools, private schools, and families for students primarily in kindergarten through 12th grade. In fact, K12's CEO for the majority of the Class Period, Defendant Davis, referred to K12 as a "for-profit company in a not-for-profit world." The Company was founded in 2000 by Defendant Packard and backed by Michael Milken, among others.

38.     K12 operates through three business segments, the definition and classification of which evolved during the Class Period as explained herein. At the beginning of the Class Period, K12 defined these businesses as: (1) Managed Public Schools, turn-key management services sold to public schools on a contractual basis; (2) Institutional Sales, educational products and services sold à la carte to school districts, public schools and other educational institutions that K12 did not manage, such as its Fuel Education or "FuelEd" services; and (3) International and Private Pay Schools, private schools for which K12 charged tuition and made direct consumer sales. In its FY2014 Form 10-K, K12 subdivided its three main businesses in the following chart:

| Managed Public Schools | Institutional Sales | International and Private Pay Schools |
|---|---|---|
| • Virtual public schools | • $K^{12}$ curriculum | • Managed private schools |
| • Blended public schools | • FuelEd Online Courses | —$K^{12}$ International Academy |
| —Hybrid schools | • FuelEd Anywhere Learning System | —George Washington University Online HS |
| —Flex schools | • Middlebury Interactive Languages | —The Keystone School |
| —Passport schools | • Pre-kindergarten | • Independent course sales (Consumer) |

39.     In October 2014, K12 changed the way it presented its revenue and enrollment figures by changing the name of, and the services encompassed by, the Managed Public Schools and Institutional Sales business lines. The three business lines were then broken down as: (1) Public School Programs; (2) Institutional Software and Services, which included K12's educational software and services; and (3) International and Private Pay Schools.

40.     The boards of an increasing number Managed Public Schools decided to reclaim administrative oversight of the schools, and as a result, K12 decided to break down its Public School Programs into Managed Public Schools, and Non-managed programs, where K12 provided curriculum, technology, and/or other educational services on a contractual basis but did not offer primary administrative oversight of a school. The change in presentation was reflected in the chart K12 provided in its FY2015 Form 10-K.

| Public School Programs (Managed and Non-managed) | Institutional Sales | International and Private Pay Schools |
|---|---|---|
| • Virtual public schools | • $K^{12}$ curriculum | • Managed private schools |
| • Blended public schools | • FuelEd Online Courses | —$K^{12}$ International Academy |
| —Hybrid schools | • FuelEd Anywhere Learning System | —George Washington University Online HS |
| —Flex schools | • Middlebury Interactive Languages | —The Keystone School |
| —Passport schools | • Pre-kindergarten | • Independent course sales (Consumer) |

41.     A year later, in October 2015, K12 announced that it would again be changing the presentation of its business lines by moving the Non-managed programs into K12's Institutional business line, as reflected in K12's latest Form 10-K.

| Managed Public School Programs | Institutional | Private Pay Schools and Other |
|---|---|---|
| • Virtual schools | • Non-managed Public School Programs | • Managed private schools |
| • Blended schools | • Institutional software and services | —$K^{12}$ International Academy |
| —Hybrid schools | | —George Washington University Online High School |
| —Passport schools | | —The Keystone School |
| | | • Independent course sales (Consumer) |

As discussed below, both these decisions came at times when K12 was reporting disappointing enrollment figures in its Managed Public Schools.

**B.     K12's Reliance on Public Education Funding for the Bulk of Its Revenue**

42.     The Managed Public Schools comprised the vast majority of K12's revenues during the Class Period– *approximately 85%*. The Managed Public Schools were also Defendants focus during the

Class Period, as Rhyu confirmed in an earnings call on November 7, 2013 when he stated: "we're focused on our managed public schools. We think we've got a strong business still there."

43.    K12 effectively runs its Managed Public Schools: for these schools, a school board contracts with the Company to provide all aspects of school management, including the creation and implementation of the academic plan, monitoring academic achievement, teacher recruitment and training, student enrollment and marketing, compensation recommendations for school personnel, implementation of student support services, financial and regulatory compliance support, and procurement of curriculum, computers and other required services and equipment. In the 2013-14 and 2015-16 school years, K12 had Managed Public Schools in 33 states and the District of Columbia; in the 2014-15 school year, the Company had Managed Public Schools in 32 states and the District of Columbia.

44.    Managed School funding is provided by state governments and is generally awarded on a per pupil basis, making enrollment at and revenue derived from Managed Schools a key indicator of K12's financial success. K12 traditionally received a percentage of these funds as determined by its contract with the district. Because the districts supposedly retain oversight of the K12-managed schools, the districts received a small portion of the Managed Schools' revenues. The remainder of these state-allocated funds went to K12's top line.

45.    The estimated U.S. average expenditures for a fully online school are $6,400 per student according to an October 2013 "Fun Facts" handout published on the International Association for K-12 Online Learning's website. The amount of funding per student can be much higher depending on a state's funding formula for online charter schools which may account for special needs, and in 22 states, the amount of funds per pupil is the same regardless whether a school is virtual or brick-and-mortar. For example, K12 received an average of $11,039 per student in government for its management of Agora Cyber Charter School in Pennsylvania in the 2013-14 school year, according to a November 2014 Bloomberg article entitled *K12 Backed by Milken Suffers Low Scores as States Resist*, and a December 2011 New York Times article entitled *Profits and Questions at Online Charter Schools*

(the "NYT Article"), explained that Pennsylvania spent an average of $10,000 per student enrolled in an online school, but that it cost half of that, at most, to educate those students online. Virtual charter schools collectively receive more than $1 billion in taxpayer funds annually, according to a recent Education Week article entitled *Outsized Influence: Online Charters Bring Lobbying 'A' Game to States* (the "Education Week Article").

46. According to an October 2015 study by the Center on Reinventing Public Education at the University of Washington (the "CRPE") (discussed in more detail in §VI.F, *infra*):

> In 19 states, authorizers are allowed to charge per-pupil oversight fees to the charter schools they oversee. Fees from large online schools can come to represent a large proportion of agency operating revenues and may create a disincentive to regulate and close consistently low-performing online charter schools.

## C. K12's Extensive Lobbying Efforts

47. The Company is the largest, for-profit cyber charter management and curriculum supplier for virtual charter schools in the United States. In a September 12, 2013 BMO Capital Markets Back to School Education Conference, Davis explained that K12's "competition is really the regulation" and that although there are a couple of "small players," "competition is not really our big issue. Regulation is more of our issue in the managed public schools."

48. Defendants have overcome K12's regulation "issue" through extensive lobbying efforts—in fact, the NYT Article reported that Packard considered lobbying state officials a "core competency" of the Company. K12 has spent millions in lobbying state lawmakers or donating to their campaigns and/or political parties since its founding. The Education Week Article reports that during the past decade, K12 spent more than $10.5 million on lobbying in the 25 states that report these expenditures and around $1.8 million on political contributions.

49. In addition, K12 employees sit on state governing bodies. The Education Week Article highlighted a few examples: Byron Ernest, a K12 employee and head of a K12-managed school in Indiana also sits on the Indiana state school board; a K12 lobbyist in Nevada is also a member of Nevada's Charter School Authority; and in Arizona, Mary Gifford, currently K12's senior vice president of Academic Policy and External Relations, was a member of the Arizona State Board for

Charter Schools while also being employed by K12 for eight years. In addition, before California Governor Jerry Brown appointed Michael Kirst as the president of the California State Board of Education, he was a K12 consultant, and one of K12's co-founders and founding chairman of the Board, William Bennett, was the U.S. Secretary of Education in the Reagan administration from 1985 to 1988.

50.    K12 and other similar companies' lobbying efforts have been quite successful: from 2008 to 2016, at least 254 bills were enacted in 47 states that expand online schooling, regulate virtual education, or modify existing regulations, according to a National Conference of State Legislatures database. The NYT Article referred to K12 and other for-profit charter and online schools as a "lobbying juggernaut in state capitals."

**D.    K12's Troubled Academic Past**

51.    Prior to the start of the Class Period, a number of investigative articles, studies, and reports exposed that K12 seeming cared more for its profits than its students. Chief among the observations and conclusions of the onslaught of media concerning K12 was that: (1) K12 had a massive appetite for student enrollments to feed its top-line revenue numbers, but that up to 60% of these students dropped out of K12 schools within the school-year, resulting in incredible churn rates; (2) that K12 had shockingly high student-teacher ratios; (3) there were frequent occurrences of lax grading and attendance policies throughout K12-managed schools; and (4) as a result of these practices and others, K12 students had poor academic performance, even when compared with similar brick and mortar schools.

52.    For example, on December 12, 2011, the NYT Article began with shocking statistics concerning one of K12's largest Managed Public Schools:

> By almost every educational measure, the Agora Cyber Charter School is failing.

> Nearly 60 percent of its students are behind grade level in math. Nearly 50 percent trail in reading. A third do not graduate on time. And hundreds of children, from kindergartners to seniors, withdraw within months after they enroll. By Wall Street standards, though, Agora is a remarkable success that has helped enrich K12 Inc., the publicly traded company that manages the school. And the entire enterprise is paid for by taxpayers.

The article appeared on page A1 of the paper, and detailed months of examination and investigation into the Company's operations, interviews, school finances and academic performances on the paper's part. The NYT Article declared that a "portrait emerges of a company that tries to squeeze profits from public school dollars by raising enrollment, increasing teacher workload and lowering standards."

53.     In July 2012, the National Education Policy Center at the University of Colorado released a report titled, "Understanding and Improving Full-Time Virtual Schools - A Study of Student Characteristics, School Finance, and School Performance In Schools Operated by K12 Inc." The report indicated that only 27.7% of K12 Inc.'s schools reported meeting Adequate Yearly Progress (AYP) standards in the 2010-11 school year, compared to 52% for brick-and-mortar schools in the nation as a whole. The report indicated that 39.9% of K12 students qualify for free or reduced-price lunch, compared with 47.2% for the same-state comparison group. It also noted that when students leave a school after the autumn head count, the funding allocated to the school remains for the school year, even though the students who left return to another school or to a homeschool arrangement.

54.     These are just two of a deluge of articles and studies questioning K12's practices and student results in the 2011 and 2012 timeframe.

E.     **Defendants' Self-Proclaimed New Focus on Academics**

55.     As a result of this onslaught of media, just prior to, and during the Class Period, Defendants doubled-down on their message of focusing on academic performance. At a Credit Suisse Global Services conference held on March 11, 2013, Packard stated: "[w]e have much more than financial objectives. We have moral objectives. And we want to make sure we're delivering a great education for kids and that's more important than anything else we do." Packard explained that the Company was really dedicating its efforts towards academic progress:

> Our strategy, what matters to us, who are we and what's important? First and foremost is the focus on academic performance. I now dedicate a significant portion of my time to that. I'm really going back to the roots of when the model was created 12 years ago. Now, I'm really looking how do we optimize the academic performance. We have several skunkworks efforts going on in K12 today.

56.     Defendants continued this message of primary focus on academic improvements throughout the Class Period. For example on an October 10, 2013 guidance call with investors and

analysts, Davis, in his opening remarks noted that "K12 is not abandoning the goals we laid out earlier this year. Our culture must be about the best possible student academic outcomes[.]" On K12's November 7, 2013 earnings call, Packard commented that "it has been personally rewarding to be able to focus on academics and business development. The academic improvement team convened at K12 recently came up with dozens of suggestions, many of which have been implemented and many more that will be implemented in the coming years." Also on this call Davis noted that:

> Clearly, improving academic outcomes for all of our students is why we exist and is the key to our long-term future. Performing well in this area drives customer demand, allows word-of-mouth referrals, builds brands strength and most importantly delivers on our commitment to state regulators, parents, students and our school partners.

> We've made a number of changes in the last six to nine months to improve in this area. We'll hold our Academic Day and publish our annual academic report in February-March timeframe. At that time, Margie Jorgensen, our Chief Academic Officer; Allison Cleveland, our Executive Vice President of School Operations; and the rest of the management team will give you a complete readout on how we're driving change as well as the results from that change.

> We will cover state accountability test scores[] [and] Scantron results . . . .

57.     On an earnings conference call held on April 29, 2014 to discuss K12's third quarter of 2014 financial results, Davis stated in his opening remarks: "I now want to say a few words about our core mission: helping students achieve the best possible outcomes." Later on this call, Davis explained that legislatures also were focused on academic results of virtual schools:

> [T]hree years ago, two years ago, it was all about cutting rates, cutting rates, cutting rates and because the states were faced with terrible budget situations and a tough economy. Now they have gotten through that process, and now they have said, all right, virtual schools have been around long enough, let's make sure we're focused on the academic results. That is really the kind of environment.

58.     One further example of Defendants' focus on academics came during Davis's closing remarks in the October 9, 2014 financial guidance call:

> [W]e are going to publicly start talking more about the success that we are having in academics because we are pretty proud of that. There were dark days when people criticized us a lot for our educational results, but I am really proud of the way the Company has responded. We have done much better, more schools that are in less trouble.

### 1.     K12 Begins Publishing Annual Academic Reports

59.     To measure a student's learning, Defendants used a Scantron Performance Series® Test (the "Scantron Tests"). Defendants explained that the Scantron Tests were a common measuring tool

for a student's academic growth in a school year across states. Packard explained why K12 used these tests at the March 2013 Credit Suisse Conference:

> [W]hat we did was we found several years ago a test put out by Scantron that allows you to measure a student at the beginning of the year and end of the year. So we can take out those variables and say how much of that student learn in the year. So it doesn't matter where they came in, what we can now do is compare their learning gain over that year they're with us to a national norm group that was created with about 600,000 students. And what you see on that is in Language Arts we're above the norm and significantly above in several cases of what a student would learn in a year. And in math we're learning about what the national norm averages are.

### a)      The 2013 Academic Report

60.      The results of the Scantron Tests were reported to investors and the public in K12's Academic Reports. In February 2013, following extensive media reports of K12's students performing significantly worse than students in traditional brick-and-mortar schools, K12 issued its first annual Academic Report reporting results from the 2011-12 school year. At the March 2013 Credit Suisse Conference, Packard explained what the academic reports were in touting his returning focus on academic performance: "it is an academic annual report which gives the state of all our schools, how they're doing, . . . . and I encourage all of you, if you want to understand what we do and how we benefit children to read that report."

61.      In a press release published on February 7, 2013, K12 announced the results of the 2013 Academic Report, calling the academic results for the 2011-12 school year "solid." In addition, the press release highlighted K12's investment in improving academic outcomes: "K12 is deploying its resources to address the challenges facing individualized learning and to drive continuous improvement through innovation, investment and partnerships. To date, K12 has invested more than $330 million in innovative curriculum, technology, learning systems and teacher training and support[.]"

### b)      The 2014 Academic Report

62.      Davis highlighted the importance of K12's academic reports in K12's February 2, 2014 earnings call, when, before opening the call to questions and answers, he "remind[ed] everyone that [K12] will be publishing our academic report, our annual academic reporting, and holding our Academic Day on March 20."

63.     K12 released its 2014 Academic Report on March 20, 2014. The report highlighted academic results for the 2012-13 school year. In the press release announcing the release of the report, Davis stated "that by publishing this Academic Report K12 is continuing its commitment to accountability and transparency." He continued:

> By regularly analyzing and openly communicating the results of our efforts and those of the schools' governing boards who employ us, we aim to provide transparency and data on the issues we face as well as progress we've made. . . . All this effort is in the service of putting our students first, making their academic success foremost in everything we do.

64.     The press release also explained that lower income students, *i.e.*, those that qualify for free or reduced-price lunches, do not perform as well as other students, and that K12-managed schools have a higher percentage of these students compared to the national average. It also mentioned that K12-managed schools in eight states, including some of its largest states, served a higher percentage of special education students when compared to the percentage of special education students in the total school population in those states.

65.     K12's Chief Academic Officer was also quoted in the press release stating: "the results of the Scantron tests and many of the state-adopted growth measure assessments show a more positive picture on student learning." The 2014 Academic Report further explained the benefits of Scantron testing:

> For the growing body of students entering K12-managed public schools behind grade level, state tests are not necessarily the most accurate measure of what they know and can do. A more revealing method for assessing student performance is what is known as a "growth measure," which tracks the progress a student makes over the course of a school year, and can best be captured by using adaptive testing that assesses students at two points in time during a single school year, typically in a fall to spring assessment cycle. The Scantron testing results included in this Academic Report provide insight into students' academic growth across a single school year.

66.     The 2014 Academic Report included an analysis of student performance on the Scantron Tests in reading and mathematics, administered to students in grades 3-8 in the fall and spring of the 2012-13 school year. K12 explained that it adopted the Scantron Tests to provide a common measure of academic achievement across all K12-managed public schools, since testing varies from state to state. The report indicated that in the 2012-13 school year, K12-managed public schools achieved a 125%

norm group gain in reading and a 102% norm group gain in mathematics across all grades. Nevertheless, in most states, test scores at K12 schools were generally below state averages, which K12 attributed to the large number of students entering below grade level.

67.    K12 noted that the percentage of participation in Scantron Tests for both fall and spring administration was 86% for reading and 87% for mathematics. However, the remaining 13-14% of students were some of K12's most academically at risk students. Because results only included those students who were present in both the fall and the following spring, it excluded K12's most mobile students, who, according to K12, generally performed worse academically.

c)    **The 2015 Academic Report**

68.    On May 4, 2015, K12 released its 2015 Academic Report as announced in a press release the same day. The press release included commentary from Davis:

> Nate Davis, Chairman and CEO of K12 Inc., said this report is another chapter in the story of K12's ongoing commitment to transparency and the academic success of its students. "Our latest Academic Report tells the story of K12's unwavering mission to ensure the success of our students, to have them prepared for their next steps in life," said Davis. "This data is not just a broad scale report card of our students' progress, it is proof positive of the headway we've made as a company in recognizing the issues we face and building upon them to be transparent and provide the finest education to our students."

69.    The press release highlighted that K12-managed schools overall outperformed the mean norm group gain in both reading and mathematics for the Scantron Tests in the 3-8 grades, again explaining that these tests track academic gains in these subjects and allow for comparison of school "performance to the performance of the student population in norming the tests."

70.    In the 2015 Academic Report, which was slightly updated for minor errors in September 2015, K12 reported academic performance for the 2013-14 school year, and included Scantron Tests results in reading and mathematics for students in grades 3-10. The report highlighted that for the year, K-12 managed school students exceeded Scantron's national norm group mean gain in both reading and mathematics: in reading, K12 students overall outperformed the norm group mean gain by 161%, and in mathematics, K12 students overall outperformed the norm group mean gain by 145%.

71.     Although the Scantron Test results demonstrated academic gains, K12 explained that there was a disconnect between the gains shown in the Scantron Tests and the academic performance of K12-managed school students demonstrated in mandatory state testing, which did not similarly reflect academic improvements:

> Because K12 students exceeded the Scantron norm group mean gain, one might expect K12 students to perform well on state tests of mathematics. But for K12 high school students, there is an apparent **disconnect between positive Scantron results and the scores on state tests**. We hypothesize that the disconnect reflects how, in high school, the **content expectations of the Scantron tests diverge from those of state tests**. Scantron assesses a broad range of skills. In high school, however, whether states administer end-of-course exams or high school graduation tests, testing is more narrowly focused on the specific skills and knowledge articulated in each state's standards on topics in algebra, geometry, probability and statistics, etc.

(Emphasis supplied).

### 2.     Academic Improvements, Measured Via Scantron Test Gains, Are Added as a Performance Metric for Executive Compensation

72.     Defendants also began to be compensated based on academic improvement metrics, which previously were limited to the Executive Vice President of School Services. During the Class Period, the compensation packages of Packard, Davis, and Murray were determined based on an assessment of their performance relating to specific financial and individual performance management objectives.

73.     In a proxy statement filed with the SEC on October 28, 2013, for the first time, "Scantron gain improvements" were listed as an individual performance management objective ("PMO") for Packard, Davis, Rhyu, and Murray. So long as the "Scantron gains exceed national norms in majority of grades and subjects" and the "participation rate improved[,]" the objectives were deemed achieved for compensation purposes.

74.     The October 2013 proxy statement also informed investors that the Board's compensation committee added the Scantron gain improvements as a performance objective for more executives (including all Individual Defendants) to "tak[e] into account the unique challenges confronting a publicly-traded company serving public education in the K-12 sector," and "to stress the value and increase the accountability of our executives for improved academic performance at [K12's]

managed schools." The academic achievement performance metric accounted for 15% of an executive's cash bonus, with the potential to receive above target for substantial outperformance.

75.     Academic achievement for FY2014 was measured by Scantron gains at K12's managed schools. If less than 45% of K12's Managed Public Schools had Scantron gains that exceeded national norms, K12 executives would not receive a bonus, but if 55% of K12's managed schools' Scantron gains exceed national norms, Company executives were entitled to receive 100% of the academic achievement component of their target bonus, *i.e.*, 15% of the target bonus. If gains exceed national norms at 70% of K12's managed schools, executives were entitled receive 20% of their target bonus.

76.     For FY2014 (the 2013-14 school year), Scantron gains exceeded national norms at more than 55% of K12 managed schools, and so Packard, Davis, Rhyu, and Murray were rewarded for these gains.

77.     In FY2015, the bonuses of Davis, Rhyu, and Murray were again partially tied to academic achievement at K12's managed schools. Academic achievement was measured based on Scantron gains in reading and math at these schools: to achieve the bonus, 60% of managed public schools showed improved Scantron gains in reading and 55% of managed public schools showed improved Scantron gains in math. Although K12 managed public schools saw Scantron gains in FY2015 (2014-15 school year), the target performance levels were not attained.

### 3.     An Academic Committee Is Formed With Davis Serving as a Member

78.     To further illustrate the Company's renewed focus on academic performance, on May 8, 2014, the Board of Directors established an Academic Committee comprised of three Board members, including Davis, who sat on the committee throughout the Class Period. According to K12's Form 10-K for the 2014 fiscal year ended June 30, 2014 and filed with the SEC on August 15, 2014, the primary role of this committee "is to make recommendations and assist management in discharging its responsibility to ensure continuous improvement in academic outcomes for the public and private schools served by" K12.

79.     The Academic Committee Charter is published on K12's website. The charter states additional responsibilities of the Academic Committee, including: "participating in the meetings of the

Company's Educational Advisory Committee" and "evaluating and implementing as necessary the proposals" of this committee; and "obtaining information, data, and recommendations from the Company's Chief Academic Officer . . . to assist in its decision making[.]" Among the duties of the Academic Committee Members were: to perform any such duties and make recommendation to the Board on any matters or actions necessary "to maximize the Board's ability to provide an effective education to students enrolled in the schools served by the Company and to fulfill the educational mission of the Company[,]" and to evaluate the Committee's "own performance on an annual basis[.]"

**V.  K12'S FOCUS ON ACADEMICS DOES NOT PRODUCE THE DESIRED GAINS DURING THE CLASS PERIOD, RESULTING IN LOSS OF ITS LARGEST MANAGED CONTRACT, A STATE INVESTIGATION AND SUBSEQUENT SETTLEMENT, AND CUTS IN ENROLLMENT**

80.     Although the Company and Defendants publically touted their renewed focus on academics and improving the performance of such for K12-managed school students during the Class Period, key school boards and state authorities questioned and expressed dissatisfaction with K12's administration of its schools, the educational services provided to these schools' students, and the academic outcomes of students attending K12-run schools.

**A.     Colorado Virtual Academy**

81.     Just prior to the start of the Class Period, in their Form 10-K published with the SEC on August 29, 2013 for the fiscal year ended June 30, 2013, Defendants noted that K12's "interests diverged significantly with the governing authority of the Colorado Virtual Academy, who has indicated that it intends to assume management of the school after the 2013-14 school year while continuing to purchase curriculum and other services from us."

82.     The change in the contract between K12 and the Colorado Virtual Academy ("COVA") was the result of "difficult negotiations" between the parties. A brief history of the negotiations and events leading up to that negotiation are detailed in an enclosure to a June 6, 2014 letter to the Colorado Department of Education from the Byers School District 32-J Superintendent to assist the governing board in its decision concerning the Byers School District's application to be COVA's new authorizer.[1]

---

[1]     Available    on    the    Colorado    Board    of    Education    BoardDocs    website, http://www.boarddocs.com/co/cde/Board.nsf/Public, along with another letter from the Byers School

Up until the 2012-13 school year, COVA had been fully managed by K12. When COVA's 2013 authorization renewal was on the horizon, "the COVA Board was very concerned that promises of improved school performance (in multiple dimensions: parent satisfaction, teacher satisfaction, student engagement, student mobility, and student standardized test scores, among others) were not being met."

83.     At the recommendation of K12, COVA applied to the Colorado Charter School Institute for authorization but the staff at the institute recommended denying COVA's application "based on sharp criticism of COVA's performance under K12's management. . . . K12 critiqued the [Colorado Charter School Institute] report —denying or minimizing the [] criticisms[.]" Based on this denial recommendation and "COVA's performance under K12's management[,]" the then-current school district that authorized COVA "seriously contemplat[ed]" not renewing COVA's authorization. At first K12 took the lead in responding to this school district's concerns and criticisms of COVA, but the charter school board overseeing COVA (hereinafter, the "COVA Board") "unanimously agreed that it could not support a K12 response that minimized or deflected the problems at COVA."

84.     An earlier letter from the Byers School District 32-J Superintendent to the Colorado Department of Education, sent on April 16, 2014, explained that the "COVA Board recognized that K12 Inc.'s interests were not always aligned with the interests of COVA students, teachers, and Colorado's taxpayers." The letter continued: "*Put simply, the new COVA Board concluded that K12 Inc. was not managing COVA in an acceptable manner and that K12 Inc. was not capable of providing the necessary leadership and **changes required to improve student academic performance**.*" (italic emphasis in original, bold emphasis supplied).

85.     The June letter enclosure explained that the COVA Board instead attempted to secure a one-year extension of its existing authorization "with the understanding that this would be part of a transition of COVA away from both its original authorizer and away from its . . . relationship with K12." As part of the extension, the COVA Board was required to follow through on its promise to change its relationship with K12, and the agreement between the COVA Board and K12 "must address

District 32-J Superintendent on April 16, 2014 (discussed in ¶84, *infra*) in a search for "Colorado Virtual Academy" (last accessed November 25, 2016).

all aspects of educational, operational, and governance performance, including appropriate allocation of roles, responsibilities, and resources between COVA and K12, to reasonably assure the District of appropriate improvements and ongoing performance."

86.   The COVA Board then began negotiations with K12 armed with its directive from its then-current authorizing school district. The negotiation with K12:

> [W]as difficult and was only concluded, in principle, at the 11th hour, on May 31, 2013. The new agreement contemplated a one-year transition in which K12 would continue to run COVA for 2013-14, while COVA began to exercise new powers and plan for complete self-management from 2014-15 onward. The agreement contemplated (and assured COVA) that after 2013-14, COVA would be able to purchase the K12 learning management system and curriculum in support of the desires of COVA's current students and families —without any other required involvement of K12 in school matters.

87.   After these negotiations were over, the COVA Board hired its own CEO, and, for the first time, the COVA Board received "a view of school performance and school operations that was not filtered through K12[.]" For example, K12 had previously told the COVA Board there was an "excellent likelihood" that COVA would "pull out of" Priority Improvement, a Colorado Department of Education School Plan based off school performance. However, in August 2013, the COVA Board learned, after hiring its own CEO for the school, that COVA's performance was nowhere near "emerging from priority improvement[.]"

88.   In sum, the June 2014 letter enclosure stated:

> The COVA Board, by early fall of 2013, was thoroughly disenchanted. K12 had created a direct, wholly-managed competitor (CPA); failed to deliver any net performance improvement; allowed a valuable application opportunity to pass; and followed the letter, but not the spirit, of the new marketing agreement. While relations with local K12 staff have unquestionably improved, and COVA continues to value parts of the K12 curriculum and certain aspects of its LMS (learning management system), the overall picture remained discouraging and inconsistent with continuing any form of EMO-managed school.

89.   Prior to K12's disclosure in its FY2013 Form 10-K, the Company released one press release on its website in November 2012 stating that K12 had been closely working with the K12 "to address performance issues." The long and intense negotiation process, however, was likely on the Individual Defendants' radar – for example, Packard stated on an August 9, 2013 earnings call with

investors and analysts that he "had the honor of speaking at the graduation of the Colorado Virtual Academy in May."

**B.     Tennessee Virtual Academy**

90.     K12's history in Tennessee began in April 2011 when the state legislature passed a bill allowing public school districts to open and run online schools at their own discretion. According to the Education Week Article, Tennessee's virtual school law "mirrored model legislation written by The American Legislative Exchange Council, or ALEC, an influential conservative think tank." In addition, the article noted that K12 spent between $0.5-1.1 million in hiring lobbyists over the past several years. One of those lobbyists was the chief of staff to Lamar Alexander, the former governor of Tennessee, current U.S. Senator, and chairman of the Senate's education committee.

91.     The Education Week Article continued: "Since then, K12's Tennessee Virtual Academy, whose enrollment at one point ballooned to nearly 2,000 students, has been one of the worst-performing schools in the state ever since, but has so far managed to avoid being shut down." Kevin Huffman, the Commissioner of the Tennessee Department of Education from April 2011 to January 2015, documented his attempts to shut down the school during his tenure in a commentary published December 10, 2015 in user-contributed website called Education News.[2]

92.     Huffman titled the first year of Tennessee's relationship with K12 as an "abject failure," commenting that it was soon evident that K12 was the main beneficiary of the April 2011 bill allowing virtual schools. The Tennessee Virtual Academy ("TNVA") opened soon after the bill was passed and was a K12-managed school authorized in Union County. Union Country, according to the NYT Article, is a "mountainous Appalachian enclave where nearly a quarter of the residents live in poverty." Huffman described Union County as the "perfect host" for K12: the country is "a different world up the road from Knoxville. There is almost no infrastructure in Union County — just a series of small, dying ventures off the highway. The county schools are oddly isolated from the state mainstream." Because lower-wealth schools received more state funding, and, because students from anywhere in the state

---

[2] This commentary is available at http://www.educationviews.org/and-failed-close-worst-school-tennessee/ (last visited November 26, 2016).

could enroll in TNVA, per-pupil dollars were well above the state-funded average. The NYT Article explained, that "[o]ut of the state money, the Union County schools will get an administrative fee of about $400,000. K12 stands to collect almost $10 million to staff and manage the school[,]" or about 4% of education tax revenue as TNVA's fiscal agent. According to Huffman, the Union County school board and district administration were a disaster, and thus had little actual oversight over K12's management of TNVA.

93.     The first school year for TNVA, 2011-12, was a struggle. Huffman explained that the school could not effectively enroll students in school – leaving students dangling between schools. The K12-managed school also had difficulty identifying students with special education needs. When state testing results came in for the 2011-12 school year, Huffman explained that overall, "Tennessee's testing results weren't just good, they were great. Across the state, students made gains in every subject area and at every grade level." However, the Union County school district was designated "in need of improvement," and TNVA "received the lowest possible growth score — a 1 on a 1-to-5 scale for our value-added system, which measures teachers and schools not by students' final scores but by how much they have grown in a year." Additionally, only 16.4% of students in the 3-8 grades scored advanced or proficient in math, and only 39.3% scored advanced or proficient in reading. Huffman explained that Tennessee's:

> Value-added scoring, seen by many as a fairer way to gauge academic progress because it takes into account where the student started, was invented in Tennessee and has been refined over two decades here. The state was one of the first to produce a sophisticated online public report card providing reams of data about schools to parents and the public.

> As the TNVA data became more granular, the extent of the academic disaster came into stark relief. The school's value-added score was dead last – out of more than 1,600 schools with scores – in the state.

94.     Armed with these alarming results, Huffman and the state education department attempted to improve the academic outcomes of the K12-run TNVA. Huffman explained that his first meeting with K12 concerning the school testing results was a disaster:

> K12 brought its lobbyist rather than academic specialists. The lobbyist refused to acknowledge that the school had struggled. ***Instead, he pointed to the school's self-administered internal tests, and claimed that the students were doing fine.***

He disputed the state test results, and didn't understand value-added scores. ***We showed him the official state data, and he just claimed it wasn't valid. The lobbyist brought his own (less reputable) data and refused to concede the obvious point that TNVA was failing.***

(Emphasis supplied).

95.     With K12 turning a blind eye to Huffman's concerns, he spoke honestly about TNVA's "unacceptable" results when asked by the media. This, however, got a response from K12: "K12's high-priced Tennessee lobbyists went into overdrive, complaining bitterly about me to the governor's staff and to legislative leaders." When Huffman attempted to introduce legislation to cull growth in virtual schools if results were bad, K12 increased its lobbying efforts, and in a meeting with K12 lobbyists and "several executives from national headquarters" tried to convince Huffman that he was confused about the data and results. Eventually after much drama, the bill passed: if virtual school results were unacceptable for three years, it could face closure.

96.     At the end of the 2012-13 school year, TNVA again scored a 1 on growth and was near the bottom of state rankings. As the 2013-14 school year took way, Huffman informed K12 that he did not want to speak with lobbyists and instead wanted to actually talk about TNVA's academic performance and ways to improve it. Huffman explained:

> And so, Packard, the CEO of K12 Inc., came to visit me in Nashville without lobbyists — a peace offering of sorts designed to show that K12 was serious about taking on academic improvements. He asked for advice. He took notes. It was a very positive meeting. I maintained hope.
>
> Ultimately, the meeting was irrelevant. Packard resigned his leadership in January 2014. The TNVA proceeded on the same course.

97.     At the close of the 2013-14 school year, TNVA again scored a Level 1 in state testing. Rather than close the whole school, Huffman, based on his "mantra of being data-driven" looked at this data and found that TNVA's students who continued with the school performed a bit better on state testing, and so Huffman, along with the Union County superintendent, agreed to not enroll any new students.

98.     Defendants finally discussed TNVA's ongoing saga with K12 investors and analysts on an August 14, 2014 conference call, announcing this halt in enrollments (*see also* §VI.C, *infra*). But Davis, again spinning the announcement in K12's favor, assured investors that although in total their

scores were low "those students who persisted in the school for two or more years performed at a reasonable level, scoring in three out of five, which is significant improvement from previous years." Davis concluded that "[t]he positive point here is that the Tennessee experience again underscores what we've said repeatedly about persistence. For those students who stay with the K12 program, even for students who come into the program behind grade level, academic results improve each additional year they are in the program."

99.     During the middle of the 2014-15 school year, Huffman resigned after state elections. However, TNVA's results remained abysmal, ranking 1312 out of 1368 for elementary and middle schools in Tennessee. Huffman stated that TNVA was, "over a four-year time, arguably the worst school in Tennessee[,]" and summarized that:

> The K12 saga raises a lot of difficult questions for me. Is it possible for a for-profit company to run schools? Our very best charters all over the country are non-profits, and I see little evidence of for-profits succeeding in the school management business. I may be platform-agnostic, but the data is telling a compelling story on this one.

C.      **California Virtual Academies**

100.    Since 2002, K12 has operated numerous independent publicly funded online charter schools, known as California Virtual Academies (hereinafter "CAVA" or "CAVA Schools"). There are currently 10 CAVA schools operating in California.

101.    California is a large market for K12: in the 2013-14 school year, CAVA Schools served around 15,000 students and received more than $100 million in California state education funding; 50% of that funding then flowed to K12 according to a November 2015 article by the San Jose Mercury News. Another report stated that K12 receives up to 75% of the funds K12-managed schools receive each year, according to The Mercury News's two-part part investigative series into K12 and its management of K12-run schools in California on April 17 & 18, 2016 ("The Mercury News Investigation").

102.    During K12's tenure in California, numerous events have unfolded, that call into question the independence of the school boards overseeing the CAVA Schools (hereinafter the "CAVA School Boards") and authorizing districts, as well as the academic performance of K12-managed

schools in the state. For their part, K12 has consistently and vehemently denied any allegation of wrongdoing or poor academic performance, citing struggles in educating students who characteristically tend to academically perform poorly.

     **1.**  **The Lack of True Oversight Over K12's Management of the CAVA Schools**

  103. In California, K12 has allies on every level of authoritative oversight for the schools the Company manages. For example, Michael Kirst, the president of the California State Board of Education, was a K12 consultant prior to Governor Jerry Brown appointing him to that office in 2011. Thus it is not surprising that when the Board of Education staff recommended shutting down the K12-managed San Francisco Flex Academy in March 2015 due to financial disarray, the State Board of Education ignored their staff's recommendations. According to The Mercury News Investigation, this was unprecedented in the nearly 25 years since charter schools have existed in the state.

  104. Each CAVA School is authorized by a California school district. For their part in overseeing the online charter school, these districts receive between 2 and 4% of the CAVA School's revenue. The Mercury News Investigation exemplified this relationship: the Jefferson Elementary School District oversaw the operations of the California Virtual Academy at San Mateo, and, since 2006, when the small, Daly City-based school system approved the academy's application, it has received more than $1 million in oversight fees; CAVA of Los Angeles, which enrolls quadruple the number of students as CAVA San Mateo, typically pays the West Covina Unified School District more than $1 million a year for its oversight of the school; The CAVA School in San Joaquin County, where Alameda and Contra Costa county students may enroll, has paid $763,000 to its sponsoring district since 2007; and the CAVA School in Sonoma County, which serves students in the North Bay, has paid its sponsor $889,000.

  105. In February 2015, In the Public Interest, a Washington D.C. anti-privatization advocacy organization issued a report, entitled "Virtual Public Education In California," critical of the K12-run CAVA Schools (hereinafter the "Public Interest Report"). The report also alleged that K12 has total control of the CAVA School Boards and the small school districts that oversee the school. The report alleged that K12 prefers small districts as authorizers of the schools the Company runs, because they

have limited resources to provide effective oversight, and pointing to the fact that in the 2013-14 school year, enrollments in the CAVA Schools accounted for 40% of all students attending any school in the authorizing districts. The report further noted CAVA School enrollments were 80% of the district enrollments in the authorizing districts when other charter schools were excluded. For example, CAVA San Diego enrolls over 3,000 students – 100 times the size of its authorizer, Spencer Valley Elementary School District located in rural Riverside County with only 30 students served in a schoolhouse building, and CAVA San Joaquin's enrollment of 1,600 students is 69 times larger than the core district enrollment of 23 students in its authorizing district, New Jerusalem.

106.    Thus, just like in Tennessee, it seems that K12 chooses small districts without the proper capacity to oversee the online school, and the districts are seemingly incentivized by oversight fees to keep the K12-run schools in their districts. The Public Interest Report explained that any attempt to properly monitor K12's management of a CAVA School would be fruitless – noting the ease in which a CAVA School could, and has, switched district authorizers. In 2013, CAVA Sutter moved from the Nuestro Elementary School District to Meridian Elementary School District; in 2012, CAVA San Joaquin moved from Stockton Unified School District to New Jerusalem School District. The Public Interest Report labeled these factors as "creat[ing] a disincentive for rigorous monitoring."

107.    The Mercury News Investigation reaffirmed many of the allegations in the Public Interest Report, finding that the districts did not take their duty to oversee the K12-run schools seriously. For example, in a 2015 interview The Mercury News conducted with Jefferson Elementary Superintendent Bernie Vidales as part of its investigation, Vidales conceded knowing very little about the online school for which he's responsible. The Mercury News Investigation also reported that Vidales wasn't sure how many kids were enrolled, where they lived, or even how well they had done on the last round of state tests. Vidales further explained that the district did little more than review the CAVA School's budget to ensure that it had enough cash to cover costs; and, despite evidence calling into question the performance and operations of the CAVA School the Jefferson Elementary school board oversaw, it voted unanimously to approve the school's charter for another five years.

108.    The Mercury News Investigation also cited the California Charter Schools Association's public calls for CAVA Kern to close because of low test scores and a three-year investigation from the Kern County superintendent revealing the school falsely reporting teacher-student ratio on state funding forms which led to a $1 million overpayment. Rather than closing the school, the school's authorizing district, the Maricopa Unified School District, allowed the K12-run school to instead change its name to CAVA at Maricopa.

109.    The Public Interest Report was also highly critical of the actual CAVA School Boards, reporting that these boards met infrequently and rubberstamped K12's recommendations. In the 2013-14 school year, there were 11 CAVA School Boards. Each of these boards met a total of four times each during the school year, with the meetings lasting on average less than 30 minutes; for example, CAVA Los Angeles met for less than 30 minutes each meeting during the 2013-14 school year, and spent just one hour and 37 minutes overseeing a virtual school of roughly 3,000 students. The Public Interest Report also examined the agendas for these meetings, and found that they were nearly identical across locations and that there was not a single instance of a CAVA School Board member rejecting and/or introducing an agenda item.

110.    The Mercury News Investigation also questioned the independence of the CAVA School Boards, finding that K12's "hand-picked" school administrators had close relationships to CAVA School Board members. The paper cited two examples on the same CAVA San Mateo Board: the president of the board, Don Burbulys, is married to the school's dean of student services; and Stephen Warren, the secretary of the board, is related to April Warren, an academic administrator. Indeed, a K12 employee and the Head of Schools for all CAVA Schools confirmed, in a witness examination as part of the California Teachers Association's petition to unionize CAVA School teachers (¶111, *infra*), the existence of many questionable relationships between CAVA School Board members and K12: (1)Peter Andrew, CAVA Los Angeles Board Member, is married to Cathy Andrew, a CAVA High School Director; (2) Don Burbulys, President of the Board of CAVA San Mateo, was married to Laura Terrazas, CAVA Dean of Student Services; (3) Chris DePrater, CAVA San Joaquin Board Member, is

married to Corrine DePrater a former CAVA employee; (4) Kelly Fellows, CAVA Maricopa Board Member, is married to Leah Fellows, the Community Day Director; (5) Andres Ricabal, former CAVA Sutter Board Member, is related to Amy Ricabal, a CAVA Middle School Curriculum Specialist; (6) Stephen Warren, CAVA San Mateo Board Member, is related to April Warren, CAVA Academic Administrator; (7) Cassandra Woodall, CAVA Fresno Board Member, is married to Harold Woodall a former K12 employee, and is also a close friend of Katrina Abston; (8) Nancy Mauri, CAVA San Diego Board Member, is also a teacher at CAVA; and (9) Carol Henson, CAVA Fresno Board Member and a teacher at K12's IQ Academy, is Abston's mother.

111.    A recent June 2016 decision from California's Public Employment Relations Board ("PERB") allowing CAVA School teachers to be treated as a single bargaining unit reaffirmed that the CAVA School Boards were indeed not independent entities and were run by a single administrative team. The PERB finding cited the following evidence, which disputes claims of the CAVA Schools' independence: (1) every CAVA School's charter application was signed by K12 employee Katrina Abston, the Head of Schools for all CAVA Schools; (2) every CAVA School used the same "general counsel" to prepare the charter documents and bylaws and the same auditor to examine the financial records; (3) there was one administrative team for all CAVA schools consisting of human resources, financial, and clerical staff; and (4) if Abston and her administrative team decided that a teacher's employment contract should be transferred to another CAVA School in response to changing enrollment conditions, this decision was without any other authorizations.

112.    The PERB decision explained that the bylaws give the CAVA School Boards responsibility for overseeing and evaluating the work of the Head of Schools, but found that "[i]t is questionable whether this function can be carried out by, for example, a Board whose directors include the Head of School's mother or a subordinate in the chain of command, without running afoul of irreconcilable conflicts of interest."

113.    While the bylaws give the CAVA School Boards responsibility for "[f]inancial development and management" and "[s]etting a framework for the budget process," the PERB decision

found that the evidence in the record established that the CAVA School Boards do not carry out these responsibilities, or do anything other than approve budget-related action items on the agenda, typically with no questions asked. It also noted that while the bylaws give the CAVA School Boards responsibility for approving significant program changes, there was some reorganization within both general and special education programs, as well as, high school supervision changes from subject-matter based to region based, which were accomplished without the approval or involvement of the Boards. The PERB decision concluded that:

> there is a profound chasm between the recitals in the operative documents and the actual practices of the CAVA Schools' Boards. Whether operating off of express or assumed delegations, implied pre-approvals, blanket authority, expediency or a desire for efficiency, the CAVA Schools operate with minimal direction, governance or leadership from their respective Boards. Accordingly, we conclude that the CAVA Schools' Boards of Directors are not sufficiently independent from Abston.

114.    The absence of oversight over K12's management of the CAVA Schools was also exemplified via K12's control over the CAVA School's purse strings. The Public Interest Report noted that K12 was paying itself out of bank accounts it manages and prohibits CAVA School Boards from finding other vendors unless K12 signs off.

## 2.    K12's CAVA Schools Suffered Academically

115.    The Public Interest Report also highlighted that CAVA Schools were not in compliance with California requirements to operate in the state. According to the October 2015 CRPE study, California requires online charter schools to have no more than 25 students per class. However, in June 2015, CAVA School teachers filed 69 different letter complaints with the schools' authorizing districts[3] – indicating that K12 was in violation of the limitations on class size.

116.    The Public Interest Report also highlighted years of poor academic results, indicating that CAVA had more dropouts than graduates, and in the last 4 years CAVA's overall graduation rate was 36%, compared to 78% for California. The Report further explained that 57% of schools with demographically similar student populations and 71% of all California schools performed better than CAVA Schools. Furthermore, from 2005 to 2013, CAVA's academic growth, as measured by the then-

---

[3]  Copies of these letters can be found at http://cavirtualeducators.org/?m=201506 (last visited November 26, 2016).

current state measure known as "Academic Performance Index," was negative in all years but 2009. In contrast to the rest of California public schools, however, the Mercury News Investigation reported that CAVA Schools had almost no English Language Learner students and enrolled a lower percentage of both students qualifying for free or reduced lunch and students from minority groups.

117.   Not only were the academic results for CAVA Schools students poor, but so too were the academic services that were marketed to these students by K12. In teacher interviews conducted for the Public Interest Report, most reported that the K12-provided computers, education software, and other materials used by both teachers and parents were of poor quality, impeding these teachers' abilities to educate students. Indeed, the poor quality of the supporting educational technology and software means that "school is closed until the problem is resolved."

118.   Special education teachers interviewed in the Public Interest Report stated that the CAVA Schools have failed to provide needed services to their students. One example given was from a teacher who said that some of her students have severe mental disabilities and need basic life skills education, such a personal hygiene, but were not receiving this needed education. The special education teachers also reported that their caseloads exceeded 35 students, much higher than the 28-student maximum California mandates in traditional public schools. The June 2015, teacher complaint letters also sought an investigation into the adequacy of K12-provided special education and cited services such as speech therapy, counseling, and daily in-person tutoring that were denied to these students.

119.   Despite repeated claims that K12 prepared students to attend California public universities, according to the Public Interest Report, the University of California system does not accept any of CAVA's laboratory science classes, and it requires at least two years of laboratory science and recommends three years. The Mercury News Investigation also reported that the University of California and California State University systems do not accept arts and laboratory science courses completed at virtual and homeschools. On their website, the University of California specifically notes that:

> UC faculty consider the experimentation process a critical component of any laboratory
> science course because it brings the scientific process to life. Therefore, online
> laboratory science ("d") courses will be approved by UC if they include a teacher-

supervised, hands-on lab component that accounts for at least 20 percent of class time. Computer-simulated labs and lab kits are currently not an acceptable alternative to the required wet labs.

An online publisher can receive provisional "a-g" approval for their online laboratory science courses that do not contain an appropriate required laboratory component. When adding a publisher's provisionally-approved online laboratory science course to an "a-g" course list, online and non-online institutions will be required to include in their course submission a description of the teacher-supervised, hands-on labs they have developed to supplement the online curriculum.

In their June 2015 letter complaints, CAVA School teachers also claimed the schools were padding graduation figures, and noted that less than one percent of all graduates qualified for University of California and California State University admission.

### D.    Agora Cyber Charter School

120.    The Agora Cyber Charter School, based in King of Prussia, Pennsylvania, was K12's largest revenue providing school both before and during the Class Period: in K12's fiscal year 2010, the Agora contract accounted for more than 10% of the Company's revenues; in the fiscal years 2011-2015, Agora accounted for approximately 13-14% of K12's revenues; and in its Form 10-K for the 2013 and 2014 fiscal years, K12 admitted that a change in its contract with Agora could ***adversely affect*** the Company's business, financial condition, and results of operation. Recognizing the importance of Agora, and Pennsylvania's generous per pupil allocation of state education funds for online charter students (*see* ¶45, *supra*), K12 spent over $1.4 million lobbying the Pennsylvania state legislature since 2007, according to expense reports available on the Pennsylvania Department of State's website.

#### 1.    Agora's Troubled Past

121.    Agora was founded in June 2005 by Dorothy Brown. In granting Agora its charter, the Pennsylvania Department of Education ("PDE") expressly cited Agora's affirmation that it would not employ an outside management organization to manage the online school. Despite these representations, shortly after the charter was approved, Brown caused Agora to enter into a contract with a company she formed, Cynwyd Group, to externally manage Agora in exchange for 7% of Agora's qualified gross revenues.

122.    In May 2006, Brown, on behalf of Cynwyd, signed a management contract with K12, in which K12 would receive 15% of Agora's qualified gross revenues in exchange for managing the

school. Despite having no role in management, Brown submitted invoices to K12 that caused Agora to pay approximately $2.6 million in management fees to Cynwyd between, in or about, December 2007 and February 2009.

123.   In the spring of 2009, after receiving complaints from parents of Agora students, the PDE conducted an audit of Agora. As a result of this audit, the PDE informed Agora that it would no longer pay any funds into the school's operating account, and further advised Agora that it had violated its charter and bylaws. On or about June 22, 2009, PDE issued a notice of revocation of Agora's charter due to the conflicts of interest concerning Brown and Cynwyd's receipt of payments from Agora, and for the lack of clear and credible evidence that Cynwyd rendered services to Agora.

124.   Brown subsequently sued the Agora Board of Trustees ("Agora Board") for millions Cynwyd was allegedly owed, resulting in a settlement in which K12 and the PDE paid Cynwyd $3 million in exchange for termination of Cynwyd's contracts with both Agora and K12. Also under the settlement, it was agreed that a replacement Agora Board would be appointed.

125.   At this time, neither K12 nor the PDE knew that the previous Agora Board never voted to approve a contract with Cynwyd. In July 2012, however, Brown was indicted for defrauding Agora and two other charter schools out of $6.3 million dollars, $5.6 million of which was related to Brown's fraudulent actions relating to Agora. The indictment alleged that the Agora Board never approved the contract with Cynwyd and that instead, Brown caused the creation of false documents, including false board meeting minutes and contracts to make it appear as if the board had held meetings to discuss and authorize the contract with Cynwyd. The indictment further alleged that Brown forged signatures on the contracts for Agora and the other schools, and the individuals whose names Brown caused to be listed as members of the school boards in question never actually served on the boards.

### 2.   Academic Results

#### a)   Agora's Historic Academic Results

126.   Academically, Agora's students historically did not fare much better. In April 2011, the Center for Research of Education Outcomes ("CREDO") at Stanford University published "Charter School Performance in Pennsylvania," and reported that Pennsylvania's cyber schools were performing

"significantly worse" in math and reading than public schools. Although not specifically named in CREDO's report, Agora was the second largest cyber charter school operating in the state at the time the report was issued.

127.    Later that same year, the scathing NYT Article was published (*see* ¶52, *supra*) with Agora as its centerpiece: "Nearly 60 percent of its students are behind grade level in math. Nearly 50 percent trail in reading. A third do not graduate on time. And hundreds of children, from kindergartners to seniors, withdraw within months after they enroll." The NYT Article pointed out Packard's claim that Agora's results were "significantly higher than a typical school on state administered tests for growth" in an October 2011 earnings call, but noted that:

> Weeks earlier, data had been released showing that 42 percent of Agora students tested on grade level or better in math, compared with 75 percent of students statewide. And 52 percent of Agora students had hit the mark in reading, compared with 72 percent statewide. The school was losing ground, not gaining it. Mr. Packard said in a recent interview that he was not aware of the data at the time he made the comments. A spokesman said Mr. Packard was relying on older data.

### b)    Agora's Academics Results During the Class Period

128.    Shortly after the beginning of the Class Period, the Agora Board was presented with the school's Scantron Test results as of October 13, 2013, based on students taking the exam at the beginning of the school year in grades 3-12. The results were attached to the Agora's Board's minutes for the meeting. In mathematics, out of a total of 92.5% of students taking the Scantron Test, overall 31% scored below average and 22% performed at low average, with 32% of returning students performing below average and 21% of returning students performing at low average. In reading, 88.9% of students had, at that point been tested, with 23% of students performing below average, and 23% of returning students performing at below average.

129.    In January 28 2014, Agora parents were put on notice that the school was designated a "focus school" by the federal government. Receiving such a designation meant that Agora scored in the bottom 10% of schools serving disadvantaged students, as a result of Agora's low test scores and a less than 50% graduation rate.

130.    Attached to the meeting minutes of the Agora Board's April 22, 2014 meeting was a report noting that only 42% of Agora K-5 students were on track in all core courses, 17% were not on target in any core course, and 18% were only on target in one core course. It also reported that only 73% of middle school students were passing English cumulative courses and 74% were passing math cumulative courses. In high school, it reported that only 63% were passing. It noted that every high school department had seen decreases in their passing rate from Q2 to Q3 except Business/Tech courses, with the largest decrease occurring in the English department (12%). The report also noted that in March 2014, K12 had seen a 59% increase in customer support calls related to issues with the Company's software, hardware, and other technical issues for a total of almost 3,700 calls in one month.

131.    As part of its October 2014 charter renewal application, a survey of parents, teachers and staff, and board members was conducted to generally understand the perception of these stakeholders regarding Agora's effectiveness, as well as "to evaluate the goods and services provided by its single-source provider K12 Inc." The consultants conducting the survey concluded that "the people who are inside the operation of the school . . . are not satisfied in several areas of the operation. Specifically, they rank online curriculum for general and special education students as well as computer devices and text/classroom materials supplied by the school, below expectations" and noted that "lower satisfaction levels point to opportunities for improvement on the part of K12 Inc.-supplied goods and services."

132.    The survey found that the Agora Board members' "opinions of the online curriculum for special education students, and textbooks and materials generally, were mediocre." Teachers and support staff were:

> much less complimentary about the online curriculum for general and special education students, school supplied computers and printers, as well as textbooks and other instructional materials. In fact, responses were weighted *Disagree/Strongly Disagree* on the questions about online curriculum for special education as well as the item asking about satisfaction with the supplied computer devices. Open-ended comments brought compliments but also a significant number of specific areas that deserve a focus on improvement.

(Emphasis in original). More than 50% of teachers and staff said they disagreed or strongly disagreed with the statement "the online curriculum meets the educational needs of students with disabilities" and

more than 40% disagreed or strongly disagreed with the statement "the online curriculum meets the educational needs of students."

133.    The survey also contained numerous complaints from teachers and support staff. One teacher noted that "expectations are set relatively low and students are able to complete entire semester's worth of work in one week." Another teacher complaint commented that there were "just too many students per teacher. We have wonderful workshops about engaging and getting to know students but it is very difficult (no make that impossible) when I have 175 students every 9 weeks. If Agora really cares about its students the student to teacher ratio must be lowered."

134.    A different teacher comment demonstrated that any efforts to help K12 improve their academics seemed to fall on deaf ears:

> We are performing a disservice to our high students by allowing them to do their school work whenever they feel like it. Completing 75% of your work the last two weeks of school and passing with a D is not educationally sound practice. We should not be allowing that. We also should have stricter policies regarding who can attend our school. We have kids attending our school to hide out. That needs to change. ***Also K12 does not change their courses to meet the needs of the students. I have been teaching the same course for a long time and there have been no updates to the course. I send mistakes to feedback and they aren't fixed. I've let them know that every test part 2 question since I've been teaching the course is on yahoo answers yet they keep giving out the same tests. Some of the questions above were difficult to answer.*** As a school we do try to meet the needs of our students but often times our hands are tied by curriculum or policy.

(Emphasis supplied). Other comments critical of K12 included, for example: "Teachers are overworked. Additional tasks are constantly added, without giving us extra time to fulfill the tasks. Administration is more driven by pleasing [K]12 management with increasing enrollment, than to fix the issues and meet the needs of our present student population[;]" and "K12 does things only to make themselves look good. We are doing ILPs--the only reason is so that K12 can put in their TV commercials that every student has an individualized learning plan. After the ILPs were created, K12 never came back to say do something with them."

### 3.    The Agora's Boards Decision to Severely Change Its Relationship with K12 and to Become Self-Managed

135.    Once a new board was seated following the Dorothy Brown settlement, the PDE allowed the Agora Board to submit a charter renewal application. K12 continued to manage Agora, and

following PDE's approval of Agora's renewal application, Agora and K12 renewed its turnkey management contract on November 12, 2009 (the "Agora/K12 Contract"). In response to the SEC's April 2, 2013 instruction to file the Agora agreement as an exhibit, on May 3, 2013, K12 filed that contract as exhibit 10.1 to its Form 10-Q for the quarter ended March 31, 2013.

136.    The Agora/K12 Contract ended on June 30, 2015, when Agora became a self-managed school. According to the Agora/K12 Contract, it would automatically renew unless either party provided "the other with written notice of non-renewal at least eighteen (18) months before the expiration of the then-current" term. For K12, official notice was required to be given to the Executive Vice-President of School Management and Services of K12, with a copy to the General Counsel of K12. Based on information and belief, the Agora Board gave proper notice of this non-renewal.

137.    According to confidential witnesses, each a former Agora Board member that served on the Board for some time during the Class Period, there were various concerns with the services K12 was providing.[4] BM1 said there were a number of reasons why the Agora Board decided to get rid of K12, that the board had given K12 eighteen months' notice, and that official notification of the break-up was made by both written and verbal communications. BM2 stated that he/she believed all proper notifications had been given. BM3 stated that the decision to break all ties with K12 was motivated by a number of problems that had been going on at the school. BM2 also explained that K12's failure to deliver on several clauses of the contract with K12 went into the Agora Board's decision to withdraw from the contract.

138.    Among the reasons BM1 listed for why the Board decided to get rid of K12 were: that the costs per student were high; staff was complaining that K12 was bullying them; K12 management was not reaching out to the community; the K12 curriculum was not compatible across the board; K12 had settled complaints involving special education students without notifying the Agora Board; a lot of

---

[4] Each former board member ("BMs") will be identified herein by number (BM1, BM2, etc.). BM1 was an Agora Board Member from October 2009 until October 2016; BM2 was an Agora Board Member from June 2014 until in or around May 2016; BM3 was an Agora Board Member from June 2014 until September 2015; and BM4 was an Agora Board Member from in or around December 2009 until December 2013.

school time was spent on Scantron Tests that did not help the students; students were not improving much; there was a lot of absenteeism; and the PDE had concerns about student record keeping.

139.    BM1 mentioned that K12's computers were "crappy." BM3 further commented that Agora was being overcharged by K12 for computers that were not functioning. BM2 mentioned that one reason the Agora Board decided to withdraw from the contract was that K12 promised to update technology every three or four years and that this had not been done.

140.    BM3 stated that K12 provided a lot of monitoring and testing, and that that when BM3 asked questions as a result of the monthly reports provided by K12, these questions went unanswered, and further explained that when BM3 asked how numbers had been calculated, the typical response was "we can't answer that right now" without any later follow up.

141.    BM1 expanded on the Scantron Test, explaining that every time you turned around, K12 was testing with Scantrons, but it was not helping the students. BM1 stated that parents were complaining about Scantron testing, and that the Scantron Tests were not really preparing the Agora students for any level of state testing. BM1 recalled that K12 had told the Agora Board that the Scantron Tests were too low, and the Agora's head of school had been trying to improve the scores, but the improvements never matched K12's forecasts. BM1 explained that these forecasts were provided to the Agora Board over the duration of the Agora/K12 contract lots of times, but "they had only gotten a little bit of improvement," and when the kids took the state and common core tests, it was clear those tests didn't match the Scantron Tests.

142.    BM1 explained that one of the primary reasons the Agora Board got rid of K12 was that students were not improving that much. BM4 stated that Agora Board members did have some concerns that student proficiency was not that good. In the minutes to an August 3, 2015 Agora Board meeting, in discussing lower enrollments for the coming school year, one member of the Agora Board commented: "we want to deliver the best possible education and that we knew we would shrink a bit. We have to move away from the K12 mentality focused only on enrollment numbers and focus on the education."

143.    BM1 stated that around June 2014, the Agora Board discovered that Sharon Williams, the head of school and a K12 employee, settled a number of cases involving special education students without notifying the Agora Board. BM1 stated that Agora had to pay a lot of many and after questioning K12 about the cases, the Agora Board learned that a lot of the cases were K12's fault. BM3 confirmed that there were a lot of problems with Agora's special education programs, and specifically cited the K12-managed settlements of special education cases without going to the Agora Board. BM3 further explained that a lot of the problems with special education concerned that lack of IEP (individual education plan) documents, which are required under a federal program for each special education student in order to evaluate academic levels and disabilities along with goals for the future. BM3 explained that IEPs were supposed to be created prior to a student starting the program, but that in a specific case, parents did not receive a report card for 3 years.

144.    After the Agora Board gave notice to K12, BM1 explained that the Board received information about expenses, and that the services K12 were offering was not worth that much. BM4 confirmed that Agora was very dependent on K12 to provide information. BM1 stated that after the Agora Board had terminated the contract, K12 was still trying to sell the Agora Board services, and the testing services were one of the components of these expenses.

145.    BM1 explained that K12 was using an old curriculum that had not been updated, but that the Company had told the Agora Board that the curriculum was compatible with Pennsylvania's Common Core. BM2 further commented that the K12 curriculum was outdated and there were issues with K12 management. BM1 explained that K12 would give presentations on the curriculum year-to-year based on updates, but that the presentations were not that great. In the February 25, 2014 Agora Board Meeting, the Agora Board hired a consultant, Jerry Brodsky, who then, according to BM1, started developing Agora's own curriculum. BM3 also confirmed that the Agora Board accepted Brodsky's proposal to design a curriculum for the school and that Brodsky completed the design, but as he was finishing the work, K12 "made him an offer of employment that he could not refuse" and K12 refused to tell Agora anything about Brodsky's new position.

146.    Eventually, as discussed in more detail below in §VI.D, *infra*, K12 was awarded a three-year contract to provide Agora's curriculum beginning in the 2015-16 school year. This was because, as BM1 explained, PDE did not approve the new curriculum Agora had developed, partially because they were not aware that the change was occurring. BM1 said that the new curriculum was better than what K12 had, but it had been developed quickly and had not been thoroughly tested.

147.    BM1 explained that K12 was more rigorous and panicky when the Agora Board was about to get rid of K12. BM1 stated that the Agora Board had hearsay that Agora was K12's "bread and butter" and the Agora Board members all agreed with it. BM1 said that when the Agora Board told K12, they were on eggshells, and in June 2014, there was a lot of back and forth. BM1 said from June 2014 to June 2015, K12 made a series of presentations, and didn't really accept the fact that the Agora Board was serious about getting rid of them. This is confirmed in emails provided to Lead Counsel in the course of their investigation. Just hours before the June 24, 2014 Agora Board meeting, in which the Board voted to request RFPs for various services and student learning devices as part of its desire to transition from Agora's current vendor to a self-administered school, Allison Cleveland, K12's Executive Vice President of School Management and Services, sent an email with a revised proposal based on a conversation between Nate (based on information and belief, Nate refers to Defendant Davis) with the president of the Agora Board, attached hereto as Exhibit A.[5]

148.    On August 11, 2014, the president of the Agora Board sent an email, attached hereto as Exhibit B, letting the Agora Board know that K12 had contacted her to inform the Agora Board that it was aware of $1.6 million that was apparently owed to K12 but that K12 was not trying to collect on. The board president next noted that: "Nate Davis CEO of k12 called me Friday evening and told me how fearful they are that we will not get our charter because it is not a straight renewal. He suggested we allow them to manage us for another year while we get renewed and then become independent." Lastly the president informed the other board members that she was planning to speak to the former Colorado Virtual Academy board members who also "broke from" K12 (*see* §V.A, *supra*). On August

---

[5] The email exhibits attached hereto have been redacted to protect any personal contact information as well as any attorney-client privilege and/or work product.

16, 2014, in an email attached hereto as Exhibit C, a former Colorado Virtual Academy board member noted that two Agora Board members had called him and they (the COVA Board members) were happy to help the Agora Board members in any way they can.

149.    At its September 22, 2014 meeting, Agora's Board approved K12 as its online curricular content provider through the 2017-18 school year pending the formal completion of contract negotiations. Agora planned to develop its own curriculum over the following four years, beginning with middle school development, then high school, then elementary school, but would continue to use K12's curriculum in the meantime.

150.    At the October 6, 2014 Board of Trustees Meeting, the Agora Board president read a statement:

> Tonight we have completed a loop that began early in 2014. We began a process to self-manage Agora Cyber Charter School and at the same time seek the highest quality products and services available for the more than 11,000 students we serve. With this action tonight the Board has put in place for next year the best available systems and curriculum at the most reasonable costs possible.

> This agreement with K12 includes solving some important transition issues as well. For instance, in the agreement there is a mechanism for many of our current administrators and staff to opt, their choice, to be employed by K12 in some other capacity and location OR to possibly remain with us at Agora right here at their desks.

> We have agreed to simultaneously continue using K12 curriculum and begin the process of building our own and offering it to parents and students as an option.

> In addition, we are very proud of our charter renewal efforts and look forward to elaborating for the Pennsylvania Department of Education the efforts we have gone to, to balance the needs of our students and school with the accountability we have to the taxpayers of Pennsylvania.

## VI.    THE TRUTH BEGINS TO EMERGE

### A.    The National Collegiate Athletic Association April 2014 Decision to Stop Accepting Coursework from Two Dozen K12 Schools

151.    In April 2014, the National Collegiate Athletic Association ("NCAA") announced that it would no longer be accepting coursework completed by student-athletes at 24 K12-operated schools, including 14 different California schools and Agora. The NCAA regulates eligibility to play in NCAA Division I or II sports in college, in part based on coursework to ensure that students are actually learning. The NCAA's increased regulation of online coursework was meant to ensure that students

were actually learning, rather than being used in a scheme to get coursework credit without gaining the education. In this same announcement, the NCAA also stated that all other K12 affiliated schools' coursework would be reviewed by the NCAA to see whether the courses met the NCAA's course requirements, and thus any student-athlete prospect was required to submit additional documents regarding completed coursework at any K12-affiliated school.

152.    K12, through a post on its official blog (blog.k12.com) responded to the NCAA on April 22, 2014. In their response, the Company explained that the NCAA revised its rules for nontraditional courses, and requires "students and instructors to have 'ongoing access to one another' and 'regular interaction' throughout the duration of the course. However [the] NCAA does not provide schools any measurable standard or rubric used to determine what they believe is a suitable level of student-teacher interaction." K12 went on to explain that in one of the NCAA-rescinded schools, there were over 5,000 students, the NCAA decision was "based on a review of old coursework from only two students . . . [and] did not account for updated technology systems and new instructional models with increased student-teacher interaction." On its April 29, 2014 earnings call, Murray further elaborated when asked about the NCAA:

> We are working very, very hard with the NCAA to work with them to shape the policies for them to be able to ensure that their mission of ensuring eligibility for the schools that they regulate can be implemented in an online model. It was unfortunate that they took the action they recently did.
>
>         * * *
>
> So it's not as much about a financial impact. It is more about us being able to serve the students that really do need our model[.]

153.    Investors and analysts took K12 for its word regarding the NCAA's vague standards and review process. For example, a Wells Fargo analyst largely summarized K12's explanation, and further stated that the NCAA's decision may be politically motivated as it has an "evident bias against virtual schooling" in an April 23, 2014 report.

**B.    K12's Largest Revenue Providing School Begins Looking for New Providers**

154.    On June 26, 2014, K12 released a "statement . . . on Agora Cyber Charter School" in a press release. For the first time, Defendants announced to investors and the public that the Agora Board

"elected to use an RFP process for the services and products required to operate the school." However, Defendants masked Agora Board's RFP process as simply a necessary process in Agora's required charter renewal application to the PDE:

> K12 Inc. has been working with the Board and looks forward to providing robust submissions for the provision of educational services, products, and curriculum. We are confident that this process will lead to an even stronger application to PDE for the renewal of the school's charter. We are also confident that the value K12 has brought, and can continue to bring, to the students of Agora will be clear in this process. We are proud that so many of the parents with students at Agora have expressed overall satisfaction with the school and especially with K12's curriculum.

> We value our long term relationship with Agora and look forward to building on the positive momentum we have created under the Board's leadership. The innovations K12 is making in curriculum, instruction and technology offer Agora students continued learning options to fit their individual needs.

### C.   K12's Discloses An Enrollment Cap at TNVA and Agora's "Interest" In Self-Management During Its August 14, 2014 Conference Call

155.   On August 14, 2014 earnings call with investors and analysts held to discuss K12's financial results for the fourth quarter and year ended June 30, 2014. In his opening remarks, Davis emphasized K12's continued and core focus on academic outcomes, in addition to explaining that the enrollment issues Defendants faced a year earlier had been addressed. However, in order to quell investor and analyst estimates that enrollments for the 2014-15 school year were back on track after the previous year's hiccup in enrollments, Davis explained that "there have been a few developments which are creating some headwinds and challenges to enrollment growth." One headwind was:

> [I]n Tennessee[] [t]he Education Commissioner reported that *annual assessment scores for the 2013-2014 school year at Tennessee Virtual Academy, which we manage, in total the scores were low. . . . The net result was that the Commissioner asked the Union County Public school, our partner, not to take new enrollments after the July 10* . . . . Just so you understand, the potential impact in the . . . last two years of the school, we had an average of approximately 3,000 students per year in enrollments in the Tennessee Virtual Academy. When this cap on new student growth was enacted, K12 had to turn away approximately 2,000 students within the enrollment process who were already interested in attending the program this fall, and potentially more as the season progressed.

(Emphasis supplied).

156.   Later on the call, Davis responded to a request asking for an "update on Agora[.]" Davis responded: "Agora did have one Board meeting where they made some decisions and indicated a clear interest to be a self-managed organization."

**D.** **Agora Confirms Its Intent to Become A Self-Managed School, Resulting in K12 Redefining Its Business Lines**

157.    On October 9, 2014, K12 released a press release "announc[ing] that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." In the press release, K12 explained that the Agora Board:

> would absorb the school's general administrative services and certain human resources functions as well as name vendors for select services which are currently provided by K12. Using the actual FY2014 enrollment volumes and reported financial results, the Company believes this new contract would have delivered approximately 25% of the revenue and 50% of the internal financial contribution when compared to K12's current contract with the Agora Board. Internal contribution is defined as revenue less direct costs for delivering the contracted services. Direct costs exclude all corporate, product, promotional, and other costs shared across all schools.

158.    In a separate press release filed with the SEC attached to a Form 8-K on October 9, 2014, K12 provided student enrollment figures for its 2015 fiscal year after the October enrollment count date. In this press release, rather than just reporting enrollments in K12's managed schools as it had in previous years, for the first time K12 reported student enrollments in Public School Programs, which included both Managed Programs and Non-managed Programs, where, as explained above in ¶40, the Company did not provide primary administrative oversight of the school, but did provide curriculum, technology, and/or other educational services. In the reported figures, K12's Managed Program enrollments decreased by almost 5% from the prior school year.

159.    Later that day, Defendants held an earnings call in which they further noted that enrollment data would be broken down by Managed and Non-managed Programs. In his opening remarks, Davis explained that the reduction in managed schools was due to the "new market dynamic" in which some schools decided to self-manage and due to the Tennessee enrollment cap recently put in place.

160.    Rhyu further broke out the effect of the Agora switching from a Managed to a Non-Managed Program beginning in FY2016 in the question and answer session of the call:

> So, in fiscal 2016, when the first year of the Agora contract comes into play, . . . directionally, you are going to see obviously, I think, a fairly significant decline in revenue.
>
> And if you look at our release from earlier today, we kind of indicate that we have got about 75% of the revenue is going to largely go away as we reported for that specific

contract. But we will retain a disproportionate amount of the profit margin. So structurally long-term, it will actually work to improve structural margins, but decrease revenues fairly significantly.

161.    Davis assured investors to not worry over the decrease in Managed Programs enrollments in his closing remarks:

> [W]hen you are in these dark days where people look and say your enrollment in the Managed Public Schools dropped, does that mean your business is in some trouble? I would say two things to remember.

> Number one, I mentioned those new states; I mentioned the states that are growing. Yes, we did go through some tough times with Tennessee and Colorado and lack of growth in the high penetrated states, but I see them as states that are growing.

> The thing I am most proud of, though, and I will only say this -- will show you the data. We are really proud that while on the outside you cannot see the factors on the inside, I am now seeing the factors that say the things we are doing on the right things to do.

> * * *

> The things that we have been working on for the last 18 to 24 months are now starting to bear fruit. And you can't see all of that fruit yet, but I can see the indicators. And I think you are going to be pleasantly surprised over the next 24 months as this business starts to turn those things around.

> We have now -- and we are going to publicly start talking more about the success that we are having in academics because we are pretty proud of that. There were dark days when people criticized us a lot for our educational results, but I am really proud of the way the Company has responded. We have done much better, more schools that are in less trouble.

**E.    K12 Announces Disappointing Costs Due to the Company's Continuing, Yet Unrecognized, Investment in Academics**

162.    On October 30, 2014, K12 released its financial results for the first fiscal quarter of FY2015, ended on September 30, 2014 in a press release attached to a Form 8-K filed with the SEC. Although K12 announced revenue and enrollments for the quarter in-line with their October 9, 2014 preview, it also announced disappointing operating costs.

163.    During K12's earnings call held this same day, K12 disclosed that it had a lower gross margin (the difference between revenue and instructional costs and services divided by revenue) percentage of 38% for the quarter, compared to 41.8% for the same quarter in the previous year. Rhyu explained that this decrease was due to K12 "continu[ing] to invest in teachers and academic programs" and that "some of the rate increases that contributed to our managed program revenue growth relate to

programs where K12 incurs significant costs." Rhyu assured investors though, that K12's Non-managed Programs had higher margins than the Managed Programs, and as the "non-managed piece of the business grows faster than the managed piece" the impact of the higher margins may "become more material."

164.    Also on the earnings call, the Defendants were asked if the "departments of ed, by states, or the Federal, their I guess buy-in on how your results are presented, and are they better recognizing the improvement you've shown?" In response, Davis admitted that:

> **[N]o, I don't think that there's been recognition of the work.** But, I will also admit that I don't think that the change has been long-term change, yet. In other words, if you're an administrator of a department of education and you look back at virtual charter schools and you question, you're just beginning to understand this whole issue of free and reduced lunch [mix], the amount of mobility in our program, just begin to understand the dynamics of an online school program. They've always compared us, for example, to the state averages, and not to the demographics and schools that are like our schools.

(Emphasis supplied).

165.    Davis was also asked by an analyst if "it makes sense to be a public company given the business that you're in?" In response, Davis stated:

> Well, we are a public company, and I don't think there are any near-term plans to do anything different than that, so our thinking is that that's probably not going to change, and that's not where we're spending our energy. Investors do look for returns on investment, they look for operating income growth, and so it's our job as management to deliver on both of those.

> Yes, there is a balance (technical difficulty). **I think that the pendulum swung in the last year-and-a-half to two years since I've been in this job, toward more focus on academics, and that was purposeful. I now have to make the pendulum swing back a little bit more toward the middle to balance growth**, but I can't ever lose sight of the fact that you know, the Company's reputation was at risk based on where we were before.

(Emphasis supplied).

**F.    The National Study of Online Charter Schools Publishes Its Findings**

166.    On October 27, 2015, the National Study of Online Charter Schools ("Online Charter School Study") published its findings in three volumes. Funded by the Walton Family Foundation, the Online Charter School Study was the "most ambitious and comprehensive study of online charter schools to date." Three independent research institutions, Mathematica Policy Research, a nonpartisan social policy research organization, the CRPE, and CREDO, offered a "rigorous analysis of the

operations of online charter schools, their policy environments, and their impacts on student achievements."

          **1.**     **Mathematica Policy Research's Analysis of the Current State of Online Charter Schools**

167.    In the first volume of the study, Mathematica Policy Research provided an analysis of the 200 online charter schools operating in the United States and the 200,000 K-12 students these schools serve based on data provided through Mathematica's survey of charter school principals and supplemented by school-level data from the U.S. Department of Education. The research findings noted that more than 25,000 students are enrolled in online charter schools both in Pennsylvania and California for the 2012-13 school year, and along with Ohio, accounted for half of online charter enrollments for the entire United States. In addition, Mathematica reported that 57% of online charter schools are affiliated with school management organizations, and about half of these are affiliated with K12 or the other largest online school management organization.

168.    Among the key findings from the Mathematica was that:

> in most online charter schools, synchronous instruction (with teacher and students working at the same time) occupies less time than it does in conventional schools. In fact the difference is dramatic: ***students in the typical online charter school have less synchronous instructional time in a week than students in a brick and mortar school have in a day.*** Online charter schools reported a median of four hours per week spent in synchronous instruction in 4th grade, three hours in 7th grade, and three hours in high school[.]

(emphasis in original). Similarly, the vast majority of online schools offer some sort of one-on-one instructional support for its students, "[b]ut *schools that offer one-on-one instructional support reported medians of only 45 to 60 minutes of one-on-one instructional time per week*." (emphasis in original).

169.    The lead author of the report concluded that:

> Challenges in maintaining student engagement are inherent in online instruction, and they are exacerbated by high student-teacher ratios and minimal student-teacher contact time, which the data reveal are typical of online charter schools nationwide. These findings suggest reason for concern about whether the sector is likely to be effective in promoting student achievement.

1

2. **CRPE's Analysis of Online Charter School State Policies and Regulations and For-Profit Providers' Influence on State Legislative Action**

2

170.   In the second volume of the Online Charter School Study, CRPE examined how state

3

policies "shape[d] the online charter school landscape." After examining the current state of laws and

4

policies related to online charter schools, which CRPE concluded were mostly reactionary to

5

controversies, the study recommended proactive policies to guide online charter schools in the states

6

centered around "data transparency and accountability, innovative funding models, and customized

7

enrollment policies."

8

171.   In examining the current state of online charter school policies, CRPE commented on the

9

lobbying power of "mega-provider" for-profit education management organizations, of which K12 is

10

the largest:

11

> [I]n states where performance or fiscal issues rise to the level of legislative action, online
12
> charter schools may prove to be very powerful advocates for protecting their interests.
> Because of their ties to for-profit organizations, online charter schools often have
13
> powerful lobbyists to influence legislation or fight additional regulation. What's more,
> charter authorizers in some states receive a percentage of a school's total revenues.
14
> Because online enrollment numbers can be very high per school, authorizers may come
> to rely on those revenues and may be reluctant to close chronically underperforming
15
> online schools.

16

\* \* \*

This can be an especially appealing revenue source for small, rural districts.

17

172.   CRPE also observed that two-thirds of online charter schools contract with for-profit

18

education providers, that enrollment is concentrated in a few large schools, and that because these

19

schools contract with mega-providers, citing as an example K12's provision of curriculum to Agora

20

with nearly 10,000 students and Ohio Virtual Academy with approximately 13,000 students, "a

21

program that is lacking in quality may affect many thousands of students with one school and even

22

more nationwide, especially if it permitted to operate year after year with no accountability."

23

3. **CREDO'S Analysis of Online Charter School Academic Performance as Compared to Traditional Public School Academic Performance**

24

25

173.   Lastly, in the third volume of the Online Charter School Study, CREDO presented the

26

"most comprehensive findings to date about impacts of online charter enrollment on the academic

27

progress of students." CREDO used academic data such as standards and tests that evaluate student

28

academic achievement from 158 online charter schools in the District of Columbia and 17 states, including California and Pennsylvania, to compare the "growth of students attending online charter schools to that of students in [traditional public schools] and students in brick-and-mortar charter schools." To isolate the effect of attending an online charter school on a student's academic growth, CREDO created a "virtual twin" for each online charter student by matching these students with demographically identical students in two control groups, *i.e.*, demographically identical students in both a traditional public school and a brick-and-mortar charter school. CREDO used the following factors to match an online charter school student to their "virtual twin:" grade level; gender; race/ethnicity; free or reduce-price lunch eligibility (an indicator of poverty); English language learner status, special education status; and prior test score on state achievement tests. The test scores post the time frame of a student's switch to the online charter school were compared to measure and compare academic growths.

174.     The report first analyzed the effects of mobility, commenting that online charter school operators often "cite the students' history of mobility as a cause for [academic] deficits." CREDO explained that if this was true, then they would expect to find that online charter school students experienced higher mobility before switching schools. However, the findings show otherwise: "students who switched to online schools have a pre-online school mobility rate of nine percent compared to eight percent of the comparison students. These findings place doubt on the argument that higher pre-online mobility creates widespread, systematic academic deficits for students who eventually switch to online charter schools."

175.     CREDO next analyzed online charter school persistence, beginning with the 2008-09 school year. The report found that 47% of students in the study are enrolled for one year, but qualified this in noting that 19% of the students in the study were only enrolled in an online charter school for the last school year in the study. On average, online charter school students are enrolled in these schools for two years, and there was a decreasing percentage of students remaining in online charter schools for a second year in each successive school year examined, which coincided with an increase in students

actually enrolling in online charter schools – *i.e.*, the newly enrolled students helped to mask the increasingly higher number of students who left online charter schools. Later in the report, CREDO noted its findings that:

> Both leavers and stayers had stronger growth in their second year than in their first year in an online charter school; however, the growth in the second year was significantly smaller for those students who spent their second year in an online school, stayers, compared to those students who returned to a [traditional public school] in their second year, leavers.

176. The biggest takeaway from the CREDO report is highlighted in the Online Charter School Study's press release:

> [T]he results in CREDO's report show that the majority of online charter students had far weaker academic growth in both math and reading compared to their traditional public school peers. To conceptualize this shortfall, it ***would equate to a student losing 72 days of learning in reading and 180 days of learning in math, based on a 180-day school year***. This pattern of weaker growth remained consistent across racial-ethnic subpopulations and students in poverty.

(Emphasis in original).

177. The CREDO report delved more into the results, concluding that attending an online charter school leads to lessened academic growth for the average student. It noted that students living in poverty show lower academic growth in both math and reading regardless of the type of school, yet online charter school students experienced a more negative overall effect. It also showed that all student profiles, regardless of race/ethnicity or the other demographic factors studied, have weaker growth in online charter schools than in traditional public schools due to the overwhelming negative impact on student growth from attending an online charter school. Only 2% of the online charter schools outperform their comparison schools, 32% perform no differently, and 67% have weaker growth than their comparison schools. In math, a full 88% of online charter schools had significantly weaker growth than their comparison traditional public school.

178. The CREDO report then repeated the comparison for online charter school students and their "virtual twin" in a brick-and-mortar charter school, to address whether the performance difference was due to the nature of being a charter, rather than being online. CREDO found "no major differences between the two sets of analyses. These results confirm that the findings presented above are a result of the ***online aspect*** of the schools as opposed to the charter aspect." (Emphasis supplied).

179.    CREDO ended its report by summarizing its findings and discussing future implications for attending online charter schools, stating:

- "Academic benefits from online charter schools are currently the exception rather than the rule."

- "Authorizers must step up to their responsibilities and demand online charter providers improve outcomes for students. Authorizers should hold a firm line with those schools which cannot meet their end of the charter bargain."

- "States should examine the current progress of existing online programs before allowing expansion. . . . This makes it critical for authorizers to ensure online charter schools demonstrate positive outcomes for students before being allowed to grow and that online charter schools grow at a pace which continues to lead to improved outcomes for their students."

## G.    K12 Announces Its First Quarter of Financial Results after the Loss of the Agora Managed Public School Contract

180.    On October 27, 2015, K12 issued a press release, attached as an exhibit to a Form 8-K filed with the SEC. In this press release, K12 announced its financial results for the fiscal quarter ended September 30, 2015. Among the financial highlights reported were: "Revenues of $221.2 million, compared to $236.7 million in the first quarter of FY 2015. The year over year decline is largely due to the Agora Cyber School shifting from a Managed to Non-managed program[;]" "Operating loss of $20.5 million, compared to an operating loss of $13.2 million in the first quarter of FY 2015[;]" "Net loss attributable to common stockholders of $12.8 million, compared to a net loss of $6.8 million in the first quarter of FY 2015[;]" and "Diluted net loss attributable to common stockholders per share of $0.34, compared to a diluted net loss of $0.18 in the first quarter of FY 2015."

181.    Later on this day, Defendants held an earnings conference call to discuss the financial results for the quarter ended September 30, 2015. On this call, Davis reiterated the revenue for the quarter, and noted that "[e]xcluding the impact of the Agora transition from a managed to a non-managed program, revenue grew 3.9% from the first quarter of last year." Rhyu further discussed K12's

financial results for the quarter as well as the underlying trends for K12's business, but did so "excluding the impact of Agora. We believe this way of looking at our results provide you with a clearer picture of the underlying trends." Rhyu also noted that K12's gross margins "declined slightly from 38% last year to 37.2% in the current period."

182.   The disappointing financial results were, as evidenced by Defendants' parsing out the Agora impact, significantly impacted by the switch of Agora from a Managed to a Non-managed school. Indeed, analysts noted that the net loss was worse than expected and the impact of the Agora transition continues to pressure margins, in contrast to Defendants' October 30, 2014 assurance that although Agora's switch would pressure revenues, margins would improve.

**H.     The California Office of Attorney General Launches an Investigation Into K12's Operations in California Subpoena**

183.   On October 27, 2015, K12 released its Form 10-Q for the quarterly period ended September 30, 2015. Buried at the end of the report, K12 announced that on September 24, 2015 it had received a civil investigative subpoena for documents and responses to interrogatories related to K12's operations in California from the Attorney General of the State of California, Bureau of Children's Justice. The Company explained that it had received the subpoena in connection "with an industry-wide investigation styled 'In the Matter of the Investigation of: For-Profit Virtual Schools,'" and that K12 was cooperating with the investigation.

**I.     Investors Send a Clear Message of Disappointment in K12's "Efforts" to Improve Academics and Retention**

184.   On October 28, 2015, K12 published a proxy statement filed with the SEC on Form DEF 14A announcing its annual meeting of stockholders on December 16, 2015, in which stockholders were asked to vote on a "non-binding advisory resolution approving the compensation of the named executive officers of the Company[,]" among other proposals. The proxy noted that 69% of stockholders voted for the same advisory vote in last year's stockholder meeting, but the Board's compensation committee refined executive compensation to balance and "best serve the long-term interests of our stockholders and public school customers[.]" One "notable" refinement included increased accountability for progress towards "improving academics and increased student retention."

185.    According to a December 17, 2015 EdSurge News article entitled *Investors and Teachers Unions Upbraid Online Charter School Operator K12*, the annual investor meeting held on December 16, 2015 had "disastrous results." Rather than a 69% approval of executive compensation, 53% of voting investors voted ***against*** the executive compensation proposal – sending a clear message to Defendants that investors were unhappy with "schools' lamentable academic performance" as observed in an article published by The Center for Media and Democracy's PRWatch on January 7, 2016.

**J.      The California Office of Attorney General's Investigation Leads to a Settlement In Which K12 Agrees to Significant Reforms and a Public Correction of the 2013-14 School Year Gains in the Scantron Test Results**

186.    On July 8, 2016, following its investigation into K12, the California Attorney General filed a complaint stating that K12 and 14 CAVA Schools managed by K12 used deceptive advertising to mislead families about students' academic progress, parents' satisfaction with the program and their graduates' eligibility for University of California and California State University admission. Along with the complaint, both parties submitted a joint final judgment which was entered as final by the presiding judge on that same day. In the final judgment K12 agreed to pay $6.0 million to the California Attorney General's Office "to defray the costs of this action and to fund the investigation and prosecution of enforcement cases to protect the rights of children" and to expunge $160 million in balanced budget credits accrued by the CAVA Schools and characterized by the California Attorney general as "debt relief to the non-profit schools [K12] manages[.]"

187.    K12 was also required to take 60 additional corrective actions under the final judgment. The Company agreed to ensure the accuracy of its advertisements, train teachers to prevent improper attendance claims, and reform the way it contracts with the CAVA Schools. K12 was also required to eliminate any type of incentive compensation for its enrollment staff, provide all students functional computers and give families a subsidy of at least $20 per month to cover the cost of high-speed internet service.

188.    K12 also agreed to, within one year of the judgement, seek approval for at least two courses that satisfy the University of California's laboratory science and visual and performing arts

course requirements to be eligible for admission to both the University of California and California State University schools systems. Additionally, K12 agreed that the CAVA Schools shall provide all supplies, materials, and/or venues necessary for a student to complete all the University of California course requirements, and to continue to provide the opportunity to satisfy those requirements through satisfactory SAT or AP exams.

189.    K12 agreed to remind the staff of the CAVA Schools of its obligation to provide meaningful access to English Language Learner/Limited English Proficient students. K12 further agreed to many actions to come into compliance with Americans with Disabilities Act regulations, including: (1) "empower the existing K12 Accessibility Coordinator to take in and independently investigate and resolve accessibility-related complaints within a specified time frame[;]" (2) conducting an independent evaluation by an agreed upon expert to ensure that K12's learning environment is accessible and adopt measures and policies in accordance with the evaluation; and (3) enhance training and controls of individualized learning plans, including ensuring that staff is properly trained in the purpose and educational value of the plans.

190.    Lastly, K12 agreed to many corrective measures concerning its past reporting of its Academic Reports and Scantron Test results:

a.    "K12 shall include a corrected version of the Scantron results from [school year 2013-14] in its 2016 Annual Academic Report."

b.    "K12 shall include a statement in the first quarterly earnings call following the entry of this Judgment correcting the statement regarding Scantron results in the Fiscal Year 2015 First Quarter Earnings Call held October 30, 2014."

c.    "K12 shall, in any future representations in advertising or any other statement to the public, prospective parents, or investors based on Scantron results, include all students within the Standard Error of Measurement ('SEM') in reflecting student academic achievement."

d.    "K12 shall remove the 2015 Annual Academic Report from its website, include the corrected 2013-2014 Scantron data in the 2016 Annual Academic Report, and include a statement at the front of the 2016 Report highlighting the revision (to be contained in an appendix)."

e.    "K12 shall correct the 'Academic Results' page on K12's website (http://www.k12.com/k12-education/academic-results.html)."

f.    "Regarding the Wells Fargo Securities Report issued Nov. 3, 2014: K12 shall inform Wells Fargo if the Scantron data in this report was inaccurate and provide the new data to Wells Fargo."

g.    "K12 shall determine whether the results of academic PMOs were inaccurately calculated and reported, and the K12 Compensation Committee shall take up the matter and shall make its Compensation Committee report available to the Attorney General before filing it with its FY2016 Proxy Statement."

191.    Along with the settlement and conclusion of the California Attorney General's investigation into K12's operations in California, the parties simultaneously settled a related *qui tam* action entitled *State of California, ex rel. Susie Kaplar v. California Virtual Academy @ Los Angeles, K12 Inc. D/B/A Delaware K12 Inc.*, Case No. BC483914 and filed in the Los Angeles County Superior Court of California on May 2, 2012. The qui tam plaintiff alleged that K12 and CAVA @ Los Angeles inflated the average daily attendance in order to received more state educational funds. As part of this settlement, K12 agreed to pay the California Attorney General's Office $2.5 million and $80,000 to the qui tam plaintiff for both bringing the claim and for attorney's fees. As part of the settlement, the seal of this action was lifted on July 8, 2016, except as to certain documents. Among the documents unsealed was a Confidentiality and Nondisclosure Agreement with K12 entered into or around August 2013 and signed by K12's General Counsel, Howard Polsky. This agreement noted that K12 was served with an investigative subpoena from the California Attorney General's Office on January 17, 2013.

1

### 1.   K12 Removes the 2014 Academic Report, 2015 Academic Report, and Academic Results Page from Its Website

2       192.    During the Class Period, K12 provided copies of its Academic Reports on its website.

3   However, as a result of the incorrect calculation in determining the academic gains using Scantron Test

4   results, K12 removed not only the 2015 Academic Report from its website as agreed upon in the

5   conclusion of the California Attorney General's investigation, but the 2014 Academic Report as well.

6   In addition, rather than just correcting the Academic Results page on K12's website, the Company

7   removed the entire page.[6]

8

### 2.   K12 Corrects Davis's Statement on the October 30, 2014 Earnings Call Regarding the 2013-14 Scantron Results

9

10      193.    During K12's August 9, 2016 earnings call with investors and analysts, Stuart Udell,

11  K12's current CEO, corrected Davis's earlier statement regarding Scantron Test results for the 2013-14

12  school year on the October 30, 2014 earnings call. Udell stated:

13          Before we release our 2016 academic report, I also wanted to take the opportunity today
            to correct an error regarding the academic gains we've reported using Scantron test
14          results for math and reading two years ago, and as reflected in the 2015 academic report.
            Specifically, for school year 2013-2014, we have recalculated those results by including
15          gain scores falling within the standard error of measurement. . . .

16          If gain scores falling within the standard error of measurement had been included in the
            analysis for school year 2013-2014 and the calculation methodology otherwise remained
17          the same, K12 students' mean gain would have exceeded the Scantron norm group's
            mean gain in grades 4 through 9 in reading, and in grades 3 through 10 in math.
18          ***However, K12's gains would not have exceeded the Scantron norm group in grade 3
            and in grade 10 for reading, and would not have more than doubled the norm group
19          gains in grades 6, 7 and 9 in reading, and 9 in math, as we had previously stated
            during our earnings call on October 30, 2014.***

20          K12's precise performance relative to Scantron norms in math and reading for school
            year 2013-2014 will be published in our 2016 annual Academic Report. That report will
21          be published within the next month. And as you'll see, in addition to presenting the
            above results, it will also present some further refinements to our methodology.

22

23

24

_____

25  [6] As determined in Lead Counsel's investigation. As of November 27, 2016, when Lead Counsel
    enters the link published in the final judgment filed as a result of the California Attorney General's
26  webpage for the "Academic Results" page (http://www.k12.com/k12-education/academic-
    results.html), the following message appears: "404 —page not found. We're sorry, the page you
27  requested was not found. Please check the spelling of your URL and if you are still having trouble try
    using the search on this page or one of the links below[.]"

28

1

2

3.      **K12 Admits that the Errors in Calculating the Academic Gains Using the
2013-14 School Year Scantron Test Results Resulted in an Overpayment in
the Individual Defendants' Cash Bonuses for the 2014 Fiscal Year**

194.    In K12's Proxy Statement filed with the SEC on October 28, 2016, the K12 Board's
compensation committee included a note regarding the error in the reported Scantron Test gains for the
2013-14 school year, explaining that the error resulted in an "overpayment of bonus compensation to
multiple current and former senior executives," including an overpayment to each Packard, Davis,
Rhyu, and Murray. In total, ***more than $212,500 was paid in bonuses due to the error***, but because the
compensation committee determined that the overpayment did not materially affect "the cash impact to
the Company" and "the impracticality of collecting the excess bonus paid to two former" executive
officers, "no further action was necessary."

4.      **2016 Academic Report Released**

195.    Lastly, on November 16, 2016, K12 released its 2016 Academic Report. In the 2016
report, Davis and CEO Udell noted in an opening letter that the state testing environment changed
dramatically in the 2014-15 school year due to new tests tied to the Common Core State Standards, and
thus:

> Faced with these challenges, K12 Inc. has worked diligently to analyze state testing data
> in ways that are useful and make sense. One way is to organize our analysis into groups
> according to test type. Another way is to report the data in context by comparing
> performance at the school and state levels. Finally, we also report year-over-year results
> from those schools that have retained the same testing program since the prior school
> year.

196.    The foreword to the report also noted that in the report K12 "introduce[d] some changes
in its presentation and analysis of the data" and explained that because of the new state tests tied to
Common Core standards, K12 could, in the majority of states, not provide a year-over-year view of
student performance. Although stated indirectly, these statements demonstrate Defendants' shift away
from the previous importance placed on the Scantron Tests as the superior method to measure a student
and schools' academic progress.

197.    Because the state tests are tied to the Common Core Standards, K12 further noted that
those "assessments were more rigorous than previous state tests, student performance results were, in
many cases, not encouraging, with lower percentages at or above proficiency compared to previous

years—not a valid comparison but an inevitable one." Indeed, K12 students overall tended to perform at percentages below consortium proficiency levels in both reading and mathematics, except for 3-8 grades in reading for those schools for one of the two Common Core Standard assessment tests.

198.    As required as part of the end of the California Attorney General's investigation into the Company, K12 announced that the "analysis of Scantron results in the 2015 Academic Report erroneously excluded students whose difference in scale scores between the fall and spring Scantron assessments fell within Scantron's standard error of measurement for that difference (that is, students whose scale scores differential was not statistically distinct from zero)." In a tiny footnote in the 2016 Academic Report, K12 expanded upon the change in analysis of the Scantron tests:

> In addition, the methodology used in previous reports identified outliers (which were excluded from the analysis) as students whose gain scores were outside three standard deviations of zero or their grade's mean gain. For the 2016 Academic Report, the methodology identifies (and excludes) outliers consistent with the methodology used by Scantron in its calculation of the national Scantron Norm Group, as documented in the 13th Edition of the Scantron Performance Series Technical Report which was published in December, 2015. ***Specifically, for both Mathematics and Reading and for each grade, only students who completed Scantron assessments in both fall 2014 and spring 2015 and whose fall 2014 scores were between the 25th and 75th percentiles are included in the analysis***. In the prior year, outliers were defined as students who were plus or minus one standard error of the mean of the distribution of gains or as students with zero gains as well as students beyond three standard deviations of the mean. ***Although this year's outlier approach excludes more gain scores than in prior years, it more closely aligns our methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain.*** Finally, this 2016 Academic Report calculates the overall percentage of the Scantron Norm Group mean gain as a weighted average of the grade-level percentages, where the weights are the number of students in each grade. (SEM not an error, but we improved upon this.)

199.    The impact of the change was significant. Whereas K12 had reported in its 2015 Academic Report that in grades 3-10 for the 2013-14 school year the Scantron reading percentage of norm group mean gain was 161%, it was revised down to 109%. Mathematics was similarly revised downward from 145% to 104%.

1

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

2

3    200.   During the Class Period, K12 filed periodic reports with the SEC, including Quarterly

4    Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial

5    statements. The following chart identifies the date, signatories, and period covered by each report:

| K12'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| FORM | PERIOD | DATE FILED | SIGNATORIES | REFERRED TO BELOW AS |
| 10-Q | 2014 Fiscal 1st Quarter | November 7, 2013 | Defendant Rhyu | 1Q2014 10-Q |
| 10-Q | 2014 Fiscal 2nd Quarter | February 4, 2014 | Defendant Rhyu | 2Q2014 10-Q |
| 10-Q | 2014 Fiscal 3rd Quarter | April 29, 2014 | Defendant Rhyu | 3Q2014 10-Q |
| 10-K | 2014 Fiscal Year | August 15, 2014 | Defendants Davis and Rhyu | FY2014 10-K |
| 10-Q | 2015 Fiscal 1st Quarter | October 30, 2014 | Defendant Rhyu | 1Q2015 10-Q |
| 10-Q | 2015 Fiscal 2nd Quarter | January 29, 2015 | Defendant Rhyu | 2Q2015 10-Q |
| 10-Q | 2015 Fiscal 3rd Quarter | April 28, 2015 | Defendant Rhyu | 3Q2015 10-Q |
| 10-K | 2015 Fiscal Year | August 4, 2015 | Defendants Davis and Rhyu | FY2014 10-K |
| 10-Q | 2016 Fiscal 1st Quarter | October 27, 2015 | Defendant Rhyu | 1Q2016 10-Q |

201.   Defendants also frequently spoke to investors and the public during the Class Period in

earnings conference calls, in press releases both filed with the SEC and published on K12's website, in

public statements in response to media and/or other reports concerning K12, and in K12's annual

Academic Reports. These actionable statements and omissions fall into three general categories: (1)

false and misleading statements and/or omissions concerning Agora; (2) false and misleading

statements and/or omissions concerning students' academic and Scantron Test results; and (3) false and

misleading statements and/or omissions concerning K12's academic services and offerings

A.   **Defendants' False and Misleading Statements and Omissions Concerning Agora**

1.   **Defendants' False and Misleading Statements and Omissions Concerning Agora Prior To K12 Announcing the Agora Board's Election To Use an RFP Process**

202.   The Company's 2Q2014 10-Q, 3Q2014 10-Q, and FY2014 10-K each omitted to state the risk that K12's contract with Agora would either not be renewed, or that the nature of this contract would materially change. At the time each of the Company's 2Q2014 10-Q, 3Q2014 10-Q, and FY2014 10-K were filed, Defendants knew, or were deliberately reckless in not knowing, that the Agora Board did not intend to renew the Agora/K12 Contract, as demonstrated by Agora providing the required eighteen months' notice per the Agora/K12 Contract (¶136) according to former Agora Board member accounts (¶137). The omission of this fact was material under Item 601(b)(10)(ii)(B) of Regulation S-K, which requires a company to file as an exhibit, or incorporate by reference, any material contract, including "[a]ny contract upon which the registrant's business is substantially dependent, as in the case of continuing contracts to . . . purchase the major part of registrant's requirements of goods, services or raw materials . . . upon which registrant's business depends to a material extent[.]" Defendants also acknowledged the materiality of this information:

a.   K12 filed the Agora/K12 Contract as an exhibit to its Form 10-Q for the fiscal quarter ended March 31, 2013, and filed with the SEC on May 3, 2013. K12 filed this exhibit in response to an April 2, 2013 letter from the SEC to K12's then-current CFO, in which the SEC requested that K12 file the Agora/K12 Contract as an exhibit to K12's financial statements or otherwise provide an analysis of why K12 was not substantially dependent on the contract.

b.   Defendants incorporated the Agora/K12 Contract as an exhibit to K12's Form 10-K for the fiscal year ended June 30, 2013, filed on August 29, 2013 and K12's FY2014 10-K.

c.   A letter to the SEC, dated June 18, 2014 and uploaded to the SEC's public website on September 2, 2014, from K12's counsel on behalf of the Company regarding K12's Form 10-K for the fiscal year ended June 30, 2013 and the 3Q2014 10-Q (the "June 18, 2014 SEC Letter"), stated "[a]s we disclosed in our FY 2013 Form 10-K, we still have two contracts in FY 2014 that meet the definition of "material agreements" under Item 601(b)(10)(ii)(B) of Regulation S-K, . . . and the

other with the Agora Cyber Charter School, which represent approximately . . . 14% of our overall revenue for the year to date[.]" The letter next stated that the Company would not disclose the existence of the possible risk that the Agora/K12 Contract would not be renewed:

> [W]e do not plan to disclose the existence of any contract renewal negotiations with a school—which will only invite a competitor or other school constituent to disrupt or interfere with those negotiations and potentially create a risk of non-renewal. To the extent we become aware of a probable risk of non-renewal of a material contract we would disclose such circumstances at the appropriate time.

203.    On the February 4, 2014 earnings call with investors and analysts, Davis responded to an analyst's request for an update on any state issues, including legislation or fund. The analyst also specifically asked if there was any update on Pennsylvania:

> NATE DAVIS: This is Nate speaking, hi Suzi. It's always difficult to predict what a legislature is going to do and what's going to happen. Of course the Pennsylvania legislation has some proposals in it that would affect us negatively. I don't know if that legislation will go through or won't go through. We monitor it closely. We make sure that we give our input and the schools give their input.

> So I can't handicap it and tell you that in fact it's going to happen or isn't going to happen. We monitor it closely, and our current thinking is that if it happens it would only happen late in the year. It would not affect us in much in the current year. That's the only one that I would -- that I highlight. I don't think there are any others that I see that have significant risk at this time. So we think we are in a pretty positive environment.

> As the economy's gotten better, a number of states have thought about the things that they need to do to continue to support education better. So we get the benefit of that. But I don't see a significant negative opportunity out --negative risk out there today.

204.    This statement omitted material facts necessary to make the statement not misleading because at this time, there was an issue in Pennsylvania: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶136, 137), a fact that was material to investors (*e.g.*, ¶120 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶147 (Agora Board members heard Agora was K12's "bread and butter"), ¶202 (Defendants admit the materiality of the Agora/K12 Contract)).

205.    Additionally, in the question and answer session of the April 29, 2014 earnings call, Defendants were asked to "spend a minute on Pennsylvania as we move into the potential renewal on that contract?" In response, Davis stated:

> In terms of our own school, as everybody knows, in the next year, year and a half, we will have -- actually we will file this year and next year in 2015, and then we will seek

an approval for our Agora school. That approval is something we continue to work on. We negotiate a new service contract, and then they will get a charter renewal process going in the state of Pennsylvania, as well.

We watch what others are doing as they go through the process and make sure that our service contracts will be compliant with everything that the state wants. I think we are a good partner for Agora, and I think they are happy with what we have done.

206.    This statement omitted material facts necessary to make the statement not misleading because: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶136, 137), a fact that was material to investors (*e.g.*, ¶120 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶147 (Agora Board members heard Agora was K12's "bread and butter"), ¶202 (Defendants admit the materiality of the Agora/K12 Contract)).

### 2. Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding the Agora Board's RFP Process and Selection of Providers

207.    On June 26, 2014, K12 released a "statement . . . on Agora Cyber Charter School" in a press release available on its website:

As required by the existing charter agreement, this Fall, the Agora Cyber Charter School in PA ("Agora") must submit an application for the renewal of its charter agreement with the Pennsylvania Department of Education (PDE), to continue operations for the 2015-2016 school year and beyond.

The Agora Board has elected to use an RFP process for the services and products required to operate the school. Proposals are due to the Agora Board on July 25, 2014.

K12 Inc. has been working with the Board and looks forward to providing robust submissions for the provision of educational services, products, and curriculum. We are confident that this process will lead to an even stronger application to PDE for the renewal of the school's charter. We are also confident that the value K12 has brought, and can continue to bring, to the students of Agora will be clear in this process. We are proud that so many of the parents with students at Agora have expressed overall satisfaction with the school and especially with K12's curriculum.

208.    This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶136, 137), a fact that was material to investors (*e.g.*, ¶120 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶147 (Agora Board members heard Agora was K12's "bread and butter"), ¶202 (Defendants admit the materiality of the Agora/K12 Contract)),

209.    The statement in ¶207 was also materially misleading when made by attempting to minimize the severity of Board's decision by asserting that the RFP Process was initiated in connection with Agora's charter renewal.

210.    During the question and answer session of the August 14, 2014 earnings call, an analyst asked for an update on Agora, to which Davis responded:

> They had one Board meeting. Agora did have one Board meeting where they made some decisions and indicated a clear interest to be a self-managed organization.
>
> Beyond that, we don't really know, because we're not going to hear until the next board meeting, which is August 25, I believe. After that Board meeting, I'm sure we'll hear more. There really isn't much to update you on other than the next Board meaning is August 25 and we will learn more then.

211.    This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because although Davis revealed to investors and analysts that the Agora Board had an interest in being a self-managed organization, he did not fully disclose that the Agora Board had already informed K12 that the Agora Board did not intend on renewing its contract with K12 (¶¶136, 137), a fact that was material to investors (*e.g.*, ¶120 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶147 (Agora Board members heard Agora was K12's "bread and butter"), ¶202 (Defendants admit the materiality of the Agora/K12 Contract)).

212.    Under the subheading. "Risks Related to Our Business and Our Industry" of K12's Risk Factors listed in the Company's FY2014 10-K, there was a discussion of the risk on non-renewal of a Managed Public School Contract, citing the Agora Board negotiations as an example: "in fiscal year 2014, the Agora Cyber Charter School . . . elected to use a request for proposal process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application." Later under this same subheading, the Form 10-K stated: "As noted above, the Agora School recently commenced a RFP process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application."

213.    The FY2014 10-K, again discussed the Agora Board's election of an RFP under "Management's Discussion and Analysis of Financial Condition and Results of Operations," stating:

"In fiscal year 2014, Agora elected to use a request for proposal process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application."

214.    These statements in ¶¶212 and 213 and were materially misleading when made, and/or omitted material facts necessary to make the statements not misleading because: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶136, 137, 202), a fact that was material to investors (*e.g.*, ¶120 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶147 (Agora Board members heard Agora was K12's "bread and butter"), ¶202 (Defendants admit the materiality of the Agora/K12 Contract)), but Defendants' attempted to minimize by discussing the use of an RFP Process in connection with its charter renewal.

215.    These statements in ¶¶212 and 213 and were materially misleading when made by attempting to minimize the severity of Board's decision by asserting that the RFP Process was initiated in connection with Agora's charter renewal.

216.    On October 9, 2014, K12 released a press release, available on its website, "announc[ing] that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." The press release further stated:

> Over the last several weeks, K12 has been working with the Agora School Board in a Request-for-Proposal (RFP) process for the services and products required to operate one of the state's largest online public schools. During the RFP evaluation process, K12 was selected to be the content provider for the school year beginning September 2015. The nationally recognized K12 curriculum uses a combination of online lessons and traditional materials to provide an innovative learning platform for students. The online lessons blend text, photos, illustration, animation, audio, and interactivity, giving students an engaging educational experience..

217.    This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because: (1) the Agora Board had informed K12 that the it did not intend on renewing its contract with K12 well before the "last several weeks" (¶¶136, 137, 202); and (2) although Agora entered into a three-year contract with K12 for curriculum, Agora had expressed disappointment with K12's curriculum and was developing its own curriculum to eventually

1   replace K12 and would be provided as an option to Agora students as soon as possible (¶¶145, 146,

2   149, 150).

3           **3.   Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding Its Selection of K12's Curriculum**

4           218.   In the question and answer session of the October 30, 2014 earnings call, in responding

5   to a question, Davis explained that there "is always a risk that a school can decide to go self-manage"

6   but that "[t]he good news is, what we found is that when they made those changes they have stayed

7   with the K12 curriculum which is the highest margin part of the business for us, and the part of the

8   business that we believe is the core of the services we provide."

9           219.   In Note 14, "Subsequent Event," to the Financial Statements, of the 1Q2015 stated: "On

10  October 9, 2014, the Company entered into a three year contract to provide academic curriculum to

11  Agora for a reduced scope of services that will include the academic curriculum beginning in the 2015-

12  16 school year."

13          220.   On the January 29, 2015 earnings call, after Rhyu responded to a request for financial

14  guidance on the Agora impact, Davis chimed in to add "more information for you" regarding Agora,

15  stating "They're still going to use the K12 curriculum and that is the highest-margin business we have."

16          221.   In each of the Company's 2Q2015 10-Q and 3Q2015 10-Q, the Company's discussion of

17  revenue recognition included: "On October 9, 2014, the Company entered into a three year contract

18  with Agora for a reduced scope of services that will include providing the academic curriculum to

19  Agora beginning in the 2015-16 school year." Additionally, both the Executive Summaries of

20  Management's Discussion and Analysis of Financial Condition and Results of Operations also

21  discussed Agora: "Agora Cyber Charter School recently renegotiated its service agreement at renewal

22  and entered into a three-year contract with us to provide Agora students with the K12 curriculum

23  starting in the 2015-2016 school year[.]"

24          222.   Agora's switch to curriculum was again discussed in K12's FY2015 10-K in various

25  sections:

a.    Under the heading "Risks Related to our Business and Our Industry," the FY2015 10-K stated: "in fiscal year 2015, the Agora Cyber Charter School ('Agora') renegotiated its service agreement and entered into a three-year contract with us to purchase our curriculum[.]"

b.    Under the subheading describing the "Public School Programs" as part of "Management's Discussion and Analysis of Financial Condition and Results of Operations," the FY2015 10-K stated: "In fiscal year 2015, Agora renegotiated its service agreement and entered into a three-year contract with us to purchase our curriculum and certain technology services[.]"

c.    In the Summary of Significant Accounting Policies to the "Notes to the Consolidated Financial Statements," the FY2015 10-K stated: "In fiscal year 2015, Agora renegotiated its service agreement and entered into a three-year contract with the Company to purchase the Company's curriculum and certain technology services[.]"

223.    In the 1Q2016 10-Q, the Company's discussion of revenue recognition included: "In fiscal year 2015, the Agora Cyber Charter School ('Agora') renegotiated its service agreement and entered into a three-year contract with the Company to purchase the Company's curriculum and certain technology services[.]"

224.    The statements in ¶¶218-223 were materially misleading when made, and/or omitted material facts necessary to make the statements not misleading because, although Agora entered into a three-year contract with K12 for curriculum, Agora had expressed disappointment with K12's curriculum and was developing its own curriculum to eventually replace K12 and would be provided as an option to Agora students as soon as possible (¶¶145, 146, 149, 150).

**B.    Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results**

225.    During the November 7, 2013 earnings conference call, while reflecting on his years with the Company, Packard explained to investors and analysts that in many of the schools K12 serves, a majority of students come to K12 at behind grade level and that:

> To ascertain that the students were performing adequately, we adopted an adaptive test from Scantron that was designed to measure student learning gains **and it showed that our students were learning at [national] norm levels.** However, given the large

number of new students who enter our schools each year, these schools would not obtain state averages despite these learning gains.

* * *

**While we felt and still believe the gains from the adaptive tests designed to measure gains are far better than state tests** that impute gains from non-scaled CRT tests that were not designed to measure gains, we understood that it was necessary to do well on both tests.

226.    The above statements in bold were materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because: (1) as admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating K12's mean student gains, Defendants omitted the results for students that fell within the standard error of measurement which inflated K12's overall student gains (¶¶190, 193, 198); (3) Defendants' removal of all academic reports and the Academic Results page from K12's website (¶192) demonstrates the materiality of these statements and omissions; (4) Defendants knew, or were deliberately reckless in not knowing, that important stakeholders in determining K12's presence in a school or state, did not agree that the Scantron Tests were better than state tests in determining a student's academic outcomes, and that the difference in results was a significant reason for the Tennessee Education Commissioner's decision to halt new enrollments at K12's Tennessee Virtual Academy (¶¶93-97) and the Agora Board's decision to not renew their managed contract with K12, and to instead switch to self-management (¶¶128, 138, 141, 144); and (5) Defendants' foreword to the 2016 Annual Academic Report demonstrates their shift away from Defendants' message that Scantron Tests provided the superior method to measure a student and schools' academic progress (¶¶195, 196).

227.    On the February 4, 2014 earnings call, in the opening remarks Murray noted that:

We also focused this fall on improving the participation in are Scantron testing, and I'm happy to report that we improved student participation from 85% last fall to 95% this fall. By working to ensure that the vast majority of students complete the Scantron exams in the fall, we are on track to have an **even more accurate picture of academic gains across all types of students for the 2013/2014 school year.**

228.    Murray's statement that K12 would have a more accurate picture of academic gains when the vast majority of students completed the Scantron Tests was materially misleading when made, and/or omitted to state material facts necessary to make the statement not misleading, because: (1) as admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating K12's mean student gains, Defendants omitted the results for students that fell within the standard error of measurement which inflated K12's overall student gains (¶¶190, 193, 198); and (3) Defendants knew, or were deliberately reckless in not knowing, that important stakeholders in determining K12's presence in a school or state, did not agree that the Scantron Tests were better than state tests in determining a student's academic outcomes, and that the difference in results was a significant reason for the Tennessee Education Commissioner's decision to halt new enrollments at K12's Tennessee Virtual Academy (¶¶93-97) and the Agora Board's decision to not renew their managed contract with K12, and to instead switch to self-management (¶¶128, 138, 141, 144).

### 1. Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results for the 2012-13 School Year

229.    On March 20, 2014, in a press release available on K12's website, K12 announced the release of its 2014 Academic Report. In this release, K12 listed the "key findings" of the 2014 Academic Report:

- On Scantron assessments, students in K12-managed public schools overall outperformed the mean norm group gain in both Reading and Mathematics.
- In the 2012-2013 school year, on Scantron assessments K12-managed public schools achieved 125 percent norm group gain in Reading across all grades and 102 percent norm group gain in Mathematics across all grades.

230.    The press release linked to the 2014 Academic Report, which included a letter from Davis. The Executive Overview of the 2014 Academic Report included "Scantron Highlights":

We believe the Scantron assessments provide a better indicator of student growth than what is being used in many states today.

• Over the past four years, K12 students have generally demonstrated gains very close to or above the Scantron mean norm group gains in both Reading and Mathematics.

* * *

• Students in K12-managed public schools overall outperformed the mean norm group gain in both Reading and Mathematics.

• K12-managed public schools achieved 125 percent norm group gain in Reading across all grades in the 2012–2013 school year.

• K12-managed public schools achieved 102 percent norm group gain in Mathematics across all grades in the 2012–2013 school year.

231.    The 2014 Academic Report next discussed the 'Scantron Performance Series® Assessment Results for 2012-2013" noting:

> In 2012–2013, even with an increase in the number of K12-managed public schools and students, the Scantron results showed improvement in growth for both Reading and Mathematics. For the 2012–2013 school year, students overall in K12-managed public schools achieved 125 percent of Scantron norm group gain in Reading and 102 percent norm group gain in Mathematics.

The report then included detailed analyses of the Scantron Test gains in the 2012-13 school year based on various demographics and specific school results.

232.    Under the subheading. "Academic Performance" of K12's description of its products and services, the Company's FY2014 10-K stated:

> As we reported in our 2014 Academic Report, pre- and post-test data from the Scantron Performance Series adaptive assessment system showed that, in aggregate, students in the managed public schools we serve achieved greater academic growth than the norm group in both mathematics and reading for the 2012-2013 school year.

233.    The above statements in ¶¶229-232 were materially false and misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because: (1) as admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating K12's mean student gains, Defendants omitted the results for students that fell within the standard error of measurement which inflated K12's overall student gains (¶¶190, 193, 198); and (3) Defendants' removal of the 2014 Academic Report and the Academic Results page from K12's website (¶192) demonstrates the materiality of these statements and omissions.

1

2.      **Defendants' False and Misleading Statements and Omissions Concerning Students' Academic and Scantron Test Results for the 2013-14 School Year**

2

234.      Davis discussed K12's Scantron Test results for the 2013-14 school year in his opening

3

remarks on the October 30, 2014 earnings call:

4

> Because state-administered tests vary widely in their standards, students in K12-managed virtual academies also take Scantron performance series tests in reading and mathematics, because we want a national comparison on gain. This testing is to measure the students' gains over their school year. For the 2013 to 2014 school year, students in K12 virtual academies exceeded the national norm mean gain, that's the mean gain measured by Scantron, in tests for both reading and mathematics, and they did it in all grades tested. For reading in 2013-2014, across grades 3 to 10, K12 students not only exceed the national norm group gain, but more than doubled it in grades 6, 7 and 9.

> For math in the same school year, across grades 3 to 10 again, K12 students exceed the national norm group gain, more than doubling it in grade 9. These results are evidence that the investments we continue to make in our programs to focus on academic achievement which we internally call Students First, are beginning to bear fruit.

The above statement was materially false and misleading when made, and/or omitted to state material

facts necessary to make the statements not misleading, and were made with scienter because: (1) as

admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm

level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron

gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were

thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating

K12's mean student gains, Defendants omitted the results for students that fell within the standard error

of measurement which inflated K12's overall student gains (¶¶190, 193, 198); (3) Defendants' removal

of all academic reports and the Academic Results page from K12's website (¶192) demonstrates the

materiality of these statements and omissions; (4) Defendants knew, or were deliberately reckless in not

knowing, that important stakeholders in determining K12's presence in a school or state, did not agree

that the Scantron Tests were better than state tests in determining a student's academic outcomes, and

that the difference in results was a significant reason for the Tennessee Education Commissioner's

decision to halt new enrollments at K12's Tennessee Virtual Academy (¶¶93-97) and the Agora

Board's decision to not renew their managed contract with K12, and to instead switch to self-

management (¶¶128, 138, 141, 144); and (5) Defendants' foreword to the 2016 Annual Academic

Report demonstrates their shift away from Defendants' message that Scantron Tests provided the

superior method to measure a student and schools' academic progress (¶¶195, 196). Defendants also specifically admitted that this statement was false and misleading as part of K12's settlement with the California Attorney General's office on July 8, 2016 and on K12's August 9, 2016 earnings call (¶¶190(b), 193), in which CEO Udell, in his correction on the August 9, 2016 earnings call, explained that K12's student "gains would not have exceeded the Scantron norm group in grade 3 and grade 10 for reading, and would not have more than doubled the norm group gains in grades 6, 7 and 9 in reading, and 9 in math"(¶193).

235.    On May 4, 2015, K12 announced via a press release that it had published the 2015 Academic Report. In this press release, Davis, in discussing the data released in the 2015 Academic report, stated: "This data is not just a broad scale report card of our students' progress, it is proof positive of the headway we've made as a company in recognizing the issues we face and building upon them to be transparent and provide the finest education to our students." The press release also highlighted key findings of the 2015 Academic Report, including: "On Scantron assessments, students in K12 managed public schools overall outperformed the mean norm group gain in both Reading and Mathematics."

236.    These above statements were materially false and misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because: (1) as admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating K12's mean student gains, Defendants omitted the results for students that fell within the standard error of measurement which inflated K12's overall student gains (¶¶190, 193, 198); and (3) Defendants' removal of all academic reports and the Academic Results page from K12's website (¶192) demonstrates the materiality of these statements and omissions.

237.   In addition, the statement that "On Scantron assessments, students in K12 managed public schools overall outperformed the mean norm group gain in both Reading and Mathematics" was also false as admitted by Defendants in K12's settlement with the California Attorney General's office on July 8, 2016 and on K12's August 9, 2016 earnings call (¶¶190(b), 193). In fact, students did not "overall outperform" the mean norm group in both reading and mathematics, as evidenced in CEO Udell's correction on the August 9, 2016 earnings call when he explained that K12's student "gains would not have exceeded the Scantron norm group in grade 3 and grade 10 for reading" (¶193).

238.   The May 4, 2015 press release linked to the 2015 Academic Report. This report was slightly updated for minor errors in September 2015. The 2015 Academic Report included a letter from Davis, and an Executive Overview that highlighted Scantron Results, including:

> In the 2013–2014 school year, in grades 3–10, students in K12-managed public schools exceeded the Scantron national norm group mean gain in both Reading and Mathematics. (See Figure 3.)
>
> • In Reading, in all grades tested (3–10), K12 students[] overall outperformed the norm group mean gain by 161%.
>
> • In Mathematics, in all grades tested (3–10), K12 students overall outperformed the norm group mean gain by 145%.

239.   The 2015 Academic Report next presented an "Aggregated Analysis of Student Test Data" and noted that "In the 2013–2014 school year, in grades 3–10, students in K12-managed public schools exceeded the Scantron national norm group mean gain in both Reading and Mathematics.

240.   The 2015 Academic Report then presented Scantron Test results, highlighting:

> As reported in Figure 16 and Table 11, in Reading, in all grades tested (3–10), K12 students exceeded the norm group gain from fall to spring. Overall, K12 students outperformed the norm group mean gain in Reading by 161%.

And:

> As reported in Figure 17 and Table 12, in Mathematics, in all grades tested (3–10), K12 students exceeded the norm group gain from fall to spring. Overall, K12 students outperformed the norm group mean gain in Mathematics by 145%.

The report then included detailed analyses of the Scantron Test gains in the 2012-13 school year based on various demographics and specific school results.

241.   The statements in ¶¶238, 239, and 240 discussing Scantron results, and the 2015 Academic Report's analyses of these results were materially false and misleading when made, and/or

omitted to state material facts necessary to make the statements and analyses not misleading because: (1) as admitted in its 2016 Annual Academic Report, when measuring K12's student gains to national norm level gains, Defendants were not aligning their "methodology for analyzing our students' Scantron gains with Scantron's own methodology for calculating the Scantron Norm Group mean gain" and were thus improperly comparing gains that were measured on different scales (¶198); (2) in calculating K12's mean student gains, Defendants omitted the results for students that fell within the standard error of measurement which inflated K12's overall student gains (¶¶190, 193, 198); and (3) Defendants' removal of all academic reports and the Academic Results page from K12's website (¶192) demonstrates the materiality of these statements and omissions

242.   Additionally, he statements in ¶¶238, 239, and 240 highlighting that in grades 3-10, K12-managed students exceeded the Scantron national norm group mean gain in in reading were also false as admitted by Defendants in K12's settlement with the California Attorney General's office on July 8, 2016 and on K12's August 9, 2016 earnings call (¶¶190(b), 193). In fact, CEO Udell's clarified on the August 9, 2016 earnings call, K12's student "gains would not have exceeded the Scantron norm group in grade 3 and grade 10 for reading" (¶193).

### C.   Defendants False and Misleading Statements and Omissions Concerning K12 Students' Academic Performance and K12's Service and Offerings

243.   On March 20, 2014, in a press release available on K12's website, K12 announced the release of its 2014 Academic Report. In this release, K12 listed the "key findings" of the 2014 Academic Report:

- Persistence makes a difference. Data confirm that students perform better on state proficiency tests the longer they stay with the K12 program. Students enrolled three or more years in K12-managed public schools achieve higher percentages at or above proficiency compared to students enrolled less than one year: 17 percent higher in Reading, 22 percent higher in English Language Arts, and 11 percent higher in Mathematics.

- In K12-managed public schools, as in most public schools, lower income students – those eligible for free or reduced-price lunch – do not perform as well as students not eligible for federal meal subsidies.

- Compared to most public schools, K12-managed public schools serve a significantly higher percentage of students who qualify for free or reduced-price lunch: 63 percent in K12-managed schools compared with a national average of 49 percent.

244.   These key findings were materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because: (1) students on average persist with online charter schools for two years (¶175); and (2) online charter school students living in poverty (*i.e.*, those receiving free or reduced lunches) experienced a more negative overall effect on academic growth than students in traditional public schools living in poverty (¶177).

245.   On the April 29, 2014 earnings call with investors and analysts, in his opening comments, Davis highlighted the key findings shared at K12's Academic Day held the previous month:

> First, a higher percentage of K12 students are eligible for free or reduced lunches than most schools. In fact, 63% of our students are eligible for free and reduced lunches compared to 49% nationally. As is true across the nation, students who are eligible for meal subsidies tend to academically underperform those who are not eligible. This translates into academic performance of students at K12-managed schools that are generally below the performance of students in traditional schools.
>
> * * *
>
> And third, perhaps the most important on the effectiveness of our program, persistence makes a difference. Data confirms that students perform better on state assessment tests the longer they stay with the K12 program. Students enrolled three or more years in K12 managed public schools achieved higher proficiency compared to students enrolled less than one year, and in fact, 17% higher in reading, they were 19% higher in English language arts, and 22% higher in mathematics if they stayed three years.

246.   The statements were materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because: (1) online charter school students living in poverty (*i.e.*, those receiving free or reduced lunches) experienced a more negative overall effect on academic growth than students in traditional public schools living in poverty (¶177); (2) students on average persist with online charter schools for only two years (¶175); and (3) both students who left an online school and returned to a traditional school and students who stayed in an online school had stronger growth in their second year than in their first year in an online charter school; however, the growth in the second year was significantly smaller for those students who stayed in an online school, compared to those students who returned to a traditional public school (¶175).

247.   During the question and answer session of the April 29, 2014 earnings call, Davis responded to a question on whether special education would be a continued focus for the Company. Davis responded:

Absolutely. We have talked many times about as a public school we take on all kids who apply, make it through the process and the parents decide this really is a good program for them. And to the extent they are special education students, if they get through that process, we want to serve them. We think they are an important market, and so we will continue.

I don't think the number is going to decline in percent. I think you may see it actually go up a little bit or stay flat. But yes, it will remain a key focus for us.

248.    This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because a common concern of K12's management of schools was its poor service of special education students, as illustrated by: (1) Agora's intent to not renew their managed school contract with K12, in part due to issues with the way K12 handled special education students (¶¶132, 138, 143): (2) the complaints of teachers in California (¶118); and (3) the California Attorney General's settlement with K12, in which K12 was specifically required to take actions to come into compliance with the Americans with Disabilities Act (¶189).

249.    Also on the April 29, 2014 earnings call, Murray responded to a request to "spend a minute on the NCAA situation[:]"

We are working very, very hard with the NCAA to work with them to shape the policies for them to be able to ensure that their mission of ensuring eligibility for the schools that they regulate can be implemented in an online model. It was unfortunate that they took the action they recently did.

In terms of the impact on us, to be honest with you, it's not great in terms of absolute numbers of students, but from a marketing perspective, we would prefer not to be signaled out as a company who can support those kinds of students, even though it is a small number of students for us.

So it's not as much about a financial impact. It is more about us being able to serve the students that really do need our model, including those students who want to go on to Division 1 or Division 2 athletic programs.

250.    This statement, in which Murray pivoted from addressing the actual underlying concerns of the NCAA (that students and instructors were not receiving ongoing access and regular interaction, and thus may not be actually learning (¶¶151-153)), was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because, as revealed by the Online Charter School Study in a review of 200,000 online charter school students, a significant portion of which attend K12-managed schools, "students in the typical online charter school have less synchronous instructional time in a week than students in a brick and mortar school have in a day" and

that "schools that offer-one-on-one instructional support reported medians of only 45 to 60 minutes of one-on-one instructional time per week" (¶¶167, 168).

251.   During the question and answer session of the August 14, 2014 earnings call, Davis responded to a question about K12's in-house services and if that was a developing trend. Although not a direct answer to the question, Davis commented that: "The strength of our program is in our curriculum. We think that's one of the great assets we have."

252.   The statement above was materially false and misleading because one of the Agora teachers' and board members' main disappointments of K12, and reasons why the Agora Board did not renew the Agora/K12 Contract was its curriculum (¶¶131, 132, 134, 138, 145).

253.   In describing K12's services as part of the discussion on K12's business, the 2014 Form 10-K stated:

> *Advanced and Special Education Services.* We believe that our learning systems are able to **effectively address the educational needs of** both advanced and **special education students** because they employ flexible teaching methods and students can use them at their own pace. **For students requiring special attention**, we employ a national director who is an expert on the delivery of special education services in a virtual or blended public school environment and who oversees the special education programs at the schools we serve. **We direct and facilitate the development and implementation of "individualized education plans" for students with special needs,** and each school's special education program is designed to be compliant with the federal Individuals with Disabilities Education Act and all state special education requirements.

254.   This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because a common concern of K12's management of schools was its poor service of special education students, as illustrated by: (1) Agora's intent to not renew their managed school contract with K12, in part due to issues with the way K12 handled special education students (¶¶132, 138, 143 (including specifically a lack of individual education plans at Agora)): (2) the complaints of teachers in California (¶118); and (3) the California Attorney General's settlement with K12, in which K12 was specifically required to take actions to come into compliance with the Americans with Disabilities Act (¶189).

255.   On September 18, 2014, K12 published a press release entitled "University of California Grants 'A-G' Approval of 95 Fuel Education Courses." K12 reported that it:

[T]oday announced that the University of California "a-g" review board approved 95 of its online and blended courses, more approved courses than those of any other online and blended provider.

Through its "a-g" requirements, the University of California verifies that enrolling students have an appropriate experience of 15 college-preparatory courses in history/social science, English, math, a lab science, a language other than English, the visual and performing arts, and a college-preparatory elective. California students who take Fuel Education courses are assured that they are certified by the University of California as meeting the subject requirement for enrollment. . . . For more information about the University of California's "a-g" requirements, visit ucop.edu"

256.    This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because K12 did not offer any approved courses to satisfy the University of California's laboratory science and visual and performing arts course requirements to be eligible for admission to both the University of California and California State University schools systems(¶¶119, 188).

257.    In his opening remarks on the October 30, 2014 earnings call Davis noted :

When you have a high percentage of students who traditionally underperform in their schools before joining K12, our average static test scores are bound to be lower than traditional schools. But even with these high percentage of students who are often considered at risk, in many instances our academic performance is now better than school districts with light characteristics[.]

258.    This statement was materially false and/or misleading when made, and/or omitted to state material facts necessary to make the statements not misleading, because the October 27, 2015 CREDO report, as part of the Online Charter School Study, found that all student profiles, regardless of demographics, had weaker growth in online charter schools than in traditional public schools (¶177).

259.    Also during the opening remarks on the October 30, 2014 earnings call, Murray stated:

[W]e gained approval for 95 courses from the University of California which audits course requirements to ensure that students have attained a body of general knowledge that will provide the breadth and perspective to enable success for more advanced study in the California university system. K12 now has 30% more courses approved in California than any other provider.

260.    This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because K12 did not offer any approved courses to satisfy the University of California's laboratory science and visual and performing arts course requirements to be eligible for admission to both the University of California and California State University schools systems(¶¶119, 188).

261. During the question and answer session of the October 30, 2014 earnings call, Davis responded to the following question:

> JASON ANDERSON, ANALYST, STIFEL NICOLAUS: …could you talk about maybe over the last couple years, kind of the sentiment from the departments of ed, by states, or the Federal, their I guess buy-in on how your results are presented, and are they better recognizing the improvement you've shown?
>
> * * *
>
> NATE DAVIS: .. I'd start by saying, I'm still disappointed that there's not enough recognition for the good work that we're doing, so no, I don't think that there's been recognition of the work. But, I will also admit that I don't think that the change has been long-term change, yet. In other words, if you're an administrator of a department of education and you look back at virtual charter schools and you question, you're just **beginning to understand this whole issue of free and reduced lunch [mix], the amount of mobility in our program, just begin to understand the dynamics of an online school program. They've always compared us, for example, to the state averages, and not to the demographics and schools that are like our schools**.

262. The statement in bold was materially false and/or misleading when made, and/or omitted to state material facts necessary to make the statements not misleading, because the October 27, 2015 CREDO report, as part of the Online Charter School Study, found that: (1) all student profiles, regardless of demographics, had weaker growth in online charter schools than in traditional public schools (¶177), (2) its findings "place[d] doubt on the argument that higher pre-online mobility creates widespread, systematic academic deficits for students who eventually switch to online charter schools" (¶174); and (3) although students living in poverty (measured by free or reduced lunch) tended to have lower academic growth regardless of the school, online charter school students had a more negative effect overall (¶177).

263. On May 4, 2015, K12 announced via a press release it 2015 Academic Report. The press release highlighted key findings of the 2015 Academic Report, including:

- Persistence continues to be a key factor to success. Data confirms that student performance on state proficiency tests increases the longer they stay with the K12 program. In grades 3-8, students enrolled three or more years in K12 managed public schools achieve higher percentages at or above proficiency: 14 percentage points higher in Reading and 19 percentage points higher in Mathematics.

- The trend noted in grades 3-8—that students consistently perform better in Reading than in Mathematics—continues in high school.

264.    These above key points were materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because students on average persist with online charter schools, K12 being one of these main schools, for only two years (¶¶47, 167, 171, 175).

265.    On the August 4, 2015 earnings call, Davis highlighted in his opening remarks that "the University of California expanded the number of courses approved for the state by 40%. . . . This is especially valuable because many other states and school districts view California's endorsement as sort of an informal seal of approval."

266.    This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because K12 did not offer any approved courses to satisfy the University of California's laboratory science and visual and performing arts course requirements to be eligible for admission to both the University of California and California State University schools systems (¶¶119, 188).

267.    In describing K12's services as part of the discussion on K12's business, the 2015 Form 10-K stated:

> *Advanced and Special Education Services.* We believe that our learning systems are able to **effectively address the educational needs of** both advanced and **special education students** because they employ flexible teaching methods and students can use them at their own pace. **For students requiring special attention,** we employ a national director who is an expert on the delivery of special education services in a virtual or blended public school environment and who oversees the special education programs at the schools we serve. **We assist and facilitate the development and implementation of "individualized education plans" for students with special needs**, and each school's special education program is designed to be compliant with the federal Individuals with Disabilities Education Act and all state special education requirements.

268.    This statement was materially misleading when made, and/or omitted to state material facts necessary to make the statements not misleading because a common concern of K12's management of schools was its poor service of special education students, as illustrated by: (1) Agora's intent to not renew their managed school contract with K12, in part due to issues with the way K12 handled special education students and subsequent complaints (¶¶132, 138, 143 (including specifically a lack of individual education plans at Agora)); (2) the complaints of teachers in California (¶118), and

(3) the California Attorney General's settlement with K12, in which K12 was specifically required to take actions to come into compliance with the Americans with Disabilities Act (¶189).

## VIII.   LOSS CAUSATION

269.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

270.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other Class members.

271.    During the Class Period, Plaintiffs and other Class members purchased or acquired K12 securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly on heavy trading volume when information disclosed to the market for the first time was partially revealed and/or the concealed risks materialized on or about: June 26, 2014; August 14, 2014; October 9, 2014; October 30, 2014; and October 27, 2015.

272.    During the Class Period, investors were focused on student academic improvements as a result of Defendants continued message that K12's "core mission [was] helping students achieve the best possible outcomes" (¶57), as well K12's customers' (i.e., the school boards and state and local authorities overseeing K12's management of these schools) "satisfaction" concerning K12's renewed focus on academics and management of these public charter schools.

273.    On June 26, 2014, after the market closed, K12 announced that the Agora Board elected to use an RFP process for the management of the Agora Cyber Charter School for operations of the school in the 2015-2016 school year and beyond.

274.    On this news, the price of K12's stock fell more than 5%, or $1.30 per share, to close at $24.32 per share on June 27, 2014, on unusually heavy trading volume.

275.    The June 26, 2014 announcement partially revealed that the Agora Board was considering different arrangements for the services and products required to run Agora for the 2015-16 and later school years, and thus that there was a chance of K12 losing a significant amount of revenue

in the future, a risk that had been concealed by Defendants' decision not to disclose that the Agora Board had provided K12 notice of non-renewal of the Agora/K12 Contract (*see* ¶¶136, 137, 202, *supra*). However, the June 26, 2014 announcement failed to disclose, among other things, that the Agora Board did not intend on renewing its contract with K12, in part due to the Agora Board's disappointment with K12's management of Agora, its failure to provide services to Agora students, its failure to bring about improved academic outcomes, and that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results. In fact, the June 26, 2014 announcement further misled the market concerning these risks by stating that the RFP process was necessary for Agora's renewal and by implying that K12 maintained a positive relationship with the Agora Board while continuing to hide the fact that the Agora Board had provided a notice of non-renewal.

276.    The significance of the June 26, 2014 announcement is illustrated in analysts' commentary. For instance, in a BMO Flash report published on June 26, 2014, BMO noted that "While the board was required to submit an application to renew its charter this cycle, it was not necessarily required to use an RFP process to select a manager—***something we believe has not been done before***." BMO explained that Agora was K12's largest managed school, generating 14% of its FY2013 revenues but had less than 14% enrollments for the Company—essentially indicating that losing Agora would have a greater negative impact on revenues than it would a positive impact on costs. In its June 27, 2014 report, Wells Fargo similarly reported that "complete loss of the contract would likely reduce FY2016E Adjusted EBITDA by 25-30%." However, both analysts were reassured by Defendants' assurances that the Agora Board likely chose to be proactive in its charter renewal process and loss of the complete contract was, as Wells Fargo commented, "highly unlikely given strong existing relationships" between K12 and the Agora Board.

277.    On August 14, 2014, Defendants held an earnings call with investors and analysts after announcing K12's financial results for the fourth quarter and year ended June 30, 2014 in a press release, also an attached exhibit to a Form 8-K filed with the SEC. On the earnings call, after discussing

K12's positive financial results as announced in its press release, Davis reiterated K12's "core focus on academic outcomes" and previewed the status of the Managed Public Schools enrollments for the 2014-15 school year. Although Davis highlighted positives in streamlining and improving the enrollment process, he also noted that there were "some headwinds and challenges" to the upcoming school year and enrollment numbers, particularly:

> [I]n Tennessee[] [t]he Education Commissioner reported that annual assessment scores for the 2013-2014 school year at Tennessee Virtual Academy, which we manage, in total the scores were low. . . . The net result was that the Commissioner asked the Union County Public school, our partner, not to take new enrollments after the July 10 . . . . Just so you understand, the potential impact in the . . . last two years of the school, we had an average of approximately 3,000 students per year in enrollments in the Tennessee Virtual Academy. When this cap on new student growth was enacted, K12 had to turn away approximately 2,000 students within the enrollment process who were already interested in attending the program this fall, and potentially more as the season progressed.

In his comments, however, Davis emphasized that the academic challenges at the Tennessee Virtual Academy "rested primarily with first-year students."

278.   During the question and answer session of the earnings call, Davis responded to an update request concerning the Agora Board's RFP process, explaining that in the Agora Board's most recent meeting the board "made some decisions and indicated a clear interest to be a self-managed organization. Beyond that, we don't really know, because we're not going to hear until the next board meeting."

279.   On this news, the price of K12's stock fell 13.3%, or $2.98 per share, to close at $19.42 per share on August 14, 2014, on extremely heavy trading volume.

280.   Investors and analysts, although impressed by K12's financial results for the quarter and year ended June 30, 2014 that beat consensus estimates, were shocked by Defendants' preview of low enrollment growth as a result of the loss of new enrollments at the Tennessee Virtual Academy due to poor academic results and the Agora Board's interest in self-management. For example, in a "Flash" report prior to the earnings call, BMO analysts stated that "the stock should react positively to this report[;]" however, that tune changed in BMO's report published after the earnings call: "[e]nrollment trends came in below expectations, due in part to . . . enrollment caps due to low student

achievement[.]" Barrington Research in its report also pointed to Defendants' earnings calls 2014-15 enrollment "headwinds" as the cause of the nearly $3 stock sell-off. In its August 15, 2014 report, Wells Fargo highlighted the risk of losing the Agora contract and other schools following Tennessee's course of action as examples as to why it downgraded K12.

281. The August 14, 2014 announcement regarding the Tennessee Education Commissioner's decision to halt enrollments at the Tennessee Virtual Academy due to continued poor academic results partially revealed that K12's students were not achieving improved academic outcomes and that enrollments were suffering as a result, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements. However, the August 14, 2014 announcement regarding the halt in enrollments in Tennessee did not reveal the full extent of K12's failure to bring about improved academic outcomes and did not fully reveal that schools did not place as great of an importance on Scantron Test results (*see* ¶¶93, 94 (Tennessee Education Commissioner's frustration with K12 lobbyist's reliance on Scantron Test results and claim that state test results weren't valid)), in contrast to Defendants' frequent touting of these results.

282. The August 14, 2014 announcement regarding the Agora Board's interest in being self-managed partially revealed that the Agora Board was considering different arrangements for the services and products required to run Agora for the 2015-16 and later school years, and thus that there was a significant chance of K12 losing a significant amount of revenue in the future, a risk that had been concealed and understated by Defendants' prior misleading statements, including the June 26, 2014 announcement. However, the August 14, 2014 announcement failed to disclose, among other things, that the Agora Board did not intend on renewing its contract with K12, in part due to the Agora Board's disappointment with K12's management of Agora, its failure to provide services to Agora students, its failure to bring about improved academic outcomes, and that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results. Nor did the August 14, 2014 announcement reveal what K12's relationship with Agora would be in the future, as the Agora Board still had outstanding decisions from its RFP process.

283.   On October 9, 2014, in a press release attached to a Form 8-K filed with the SEC, K12 disclosed its financial guidance for the first quarter and 2015 fiscal year. In the press release, K12 also "provided expanded disclosure on student enrollment for FY2015," detailing the student enrollments as of the October count date. For the first time, rather than reporting Managed Public Schools enrollments for the year, K12 reported student enrollments in Public School Programs, which included both Managed Programs and Non-managed Programs, where, as explained above in ¶¶39-40, the Company did not provide primary administrative oversight of the school, but did provide curriculum, technology, and/or other educational services. In these figures, K12's Managed Program enrollments decreased by almost 5% from the prior school year, but with the addition of Non-managed Programs, total enrollments only decreased by 20 student for FY2015 from FY2014.

284.   In a separate press release on October 9, 2014, published on K12's website and via GlobeNewswire, the Company "announced that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." In the press release, K12, for the first time, detailed that the Agora Board:

> would absorb the school's general administrative services and certain human resources functions as well as name vendors for select services which are currently provided by K12. Using the actual FY2014 enrollment volumes and reported financial results, the Company believes this new contract would have delivered approximately 25% of the revenue and 50% of the internal financial contribution when compared to K12's current contract with the Agora Board. Internal contribution is defined as revenue less direct costs for delivering the contracted services. Direct costs exclude all corporate, product, promotional, and other costs shared across all schools.

285.   Later that day, Defendants held an earnings call in which they reiterated the financial results and explained that revenue and enrollment data would be broken down by Managed and Non-managed Programs. In his opening remarks, Davis linked the reduction in managed schools to the "new market dynamic" in which some schools decided to self-manage and the Tennessee enrollment cap recently put in place. In the question and answer session of the call, Rhyu further parsed out the effect of the Agora contract switching from a Managed to a Non-Managed Program beginning in FY2016:

> So, in fiscal 2016, when the first year of the Agora contract comes into play, . . . directionally, you are going to see obviously, I think, a fairly significant decline in revenue.

And if you look at our release from earlier today, we kind of indicate that we have got about 75% of the revenue is going to largely go away as we reported for that specific contract. But we will retain a disproportionate amount of the profit margin. So structurally long-term, it will actually work to improve structural margins, but decrease revenues fairly significantly.

286.    However, in his closing remarks, Davis assured investors to not worry over the decrease in Managed Programs enrollments:

[W]hen you are in these dark days where people look and say your enrollment in the Managed Public Schools dropped, does that mean your business is in some trouble? I would say two things to remember.

Number one, I mentioned those new states; I mentioned the states that are growing. Yes, we did go through some tough times with Tennessee and Colorado and lack of growth in the high penetrated states, but I see them as states that are growing.

The thing I am most proud of, though, and I will only say this -- will show you the data. We are really proud that while on the outside you cannot see the factors on the inside, I am now seeing the factors that say the things we are doing on the right things to do.

* * *

The things that we have been working on for the last 18 to 24 months are now starting to bear fruit. And you can't see all of that fruit yet, but I can see the indicators. And I think you are going to be pleasantly surprised over the next 24 months as this business starts to turn those things around.

We have now -- and we are going to publicly start talking more about the success that we are having in academics because we are pretty proud of that. There were dark days when people criticized us a lot for our educational results, but I am really proud of the way the Company has responded. We have done much better, more schools that are in less trouble.

287.    On this news, the price of K12's stock fell 7%, or $1.12 per share, to close at $14.87 per share, on unusually heavy trading volume. The stock continued to tumble the following day, dropping another 7.06%, or $1.05 per share, to close at $13.82 per share.

288.    The October 9, 2014 announcements partially revealed that Agora's switch reflected a trend of schools moving from K12's Managed to Non-managed Programs as their relationship with K12 evolved, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements. Indeed, this trend was the primary takeaway of analysts: an October 13, 2014 BMO report noted that the "market-wide shift away from fully managed public school programs as schools and districts . . . become competitors to the company by providing their own programs . . . ; the

company disclosed new enrollment metrics as it transitions to the changing environment." Wells Fargo, in their October 10, 2014 analyst report summarized that as schools mature, they seek "greater control" as evidenced by the Agora and Colorado contract changes that "fired K12 as a school manager"; that charter boards and authorizers want greater transparency from K12; and that these trends "are likely to transform the economics of [K12's] business over time[.]"

289.    However, the October 9, 2014 announcements did not reveal the full extent of the loss to the Company's bottom line brought about by Agora's switch. Nor did the announcements reveal the reasons why the Agora Board decided to take over control of the schools' management, which in large part were K12's failure to provide services to Agora students, its failure to bring about improved academic outcomes, and that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results.

290.    On October 30, 2014, K12 announced its financial results for the first fiscal quarter of FY 2015, ended on September 30, 2014, in a press release attached to a Form 8-K filed with the SEC. Although K12 announced revenue and enrollments for the quarter in-line with their October 9, 2014 preview, it also announced disappointing operating costs. Later that day, K12 held an earnings call with investors and analysts in which it repeated its financial results for the quarter, including a lower gross margin (the difference between revenue and instructional costs and services divided by revenue) percentage of 38% compared to 41.8% for the same quarter in the previous year. Rhyu explained that this decrease was due to K12 "continu[ing] to invest in teachers and academic programs" and that "some of the rate increases that contributed to our managed program revenue growth relate to programs where K12 incurs significant costs." Rhyu, however, assured investors, stating that K12's Non-managed Programs had higher margins than the Managed Programs, and as the "non-managed piece of the business grows faster than the managed piece" the impact of the higher margins may "become more material."

291.    During the question and answer portion of the earnings call, the Defendants were asked if the "departments of ed, by states, or the Federal, their . . . buy-in on how your results are presented, and are they better recognizing the improvement you've shown?" In response, Davis admitted that:

> **[N]o, I don't think that there's been recognition of the work.** But, I will also admit that I don't think that the change has been long-term change, yet. In other words, if you're an administrator of a department of education and you look back at virtual charter schools and you question, you're just beginning to understand this whole issue of free and reduced lunch [mix], the amount of mobility in our program, just begin to understand the dynamics of an online school program. They've always compared us, for example, to the state averages, and not to the demographics and schools that are like our schools.

292.    Later in the call, Davis was asked by an analyst if "it makes sense to be a public company given the business that you're in?" In response, Davis stated:

> Well, we are a public company, and I don't think there are any near-term plans to do anything different than that, so our thinking is that if that's probably not going to change, and that's not where we're spending our energy. Investors do look for returns on investment, they look for operating income growth, and so it's our job as management to deliver on both of those.
>
> Yes, there is a balance (technical difficulty). **I think that the pendulum swung in the last year-and-a-half to two years since I've been in this job, toward more focus on academics, and that was purposeful. I now have to make the pendulum swing back a little bit more toward the middle to balance growth**, but I can't ever lose sight of the fact that you know, the Company's reputation was at risk based on where we were before.

293.    On this news, the price of K12's stock fell more than 14%, or $2.17 per share, to close at $12.98 per share, on unusually heavy trading volume. The stock continued to tumble the following day, dropping another 4.47%, or $0.58 per share, to close at $12.40 per share, on unusually heavy trading volume.

294.    The disappointing gross margins and disclosures during the question and answer portion of the October 30, 2014 earnings call partially revealed that although K12 was supposedly continuing to invest more to improve academic results, the relevant authorities were not impressed with K12's efforts to improve academic performance and that the cost to continue and magnify these improvements would further impact K12's margins, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements.

295.   However, the October 30, 2014 disclosures did not reveal that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results. Additionally, although Davis admitted that relevant authorities were not impressed with K12's efforts to improve academic results, he also stated that the authorities did not fully understand the issues K12 was facing to bring about these results such as educating students who received free or reduced lunches and students who were more mobile than an average student, and that the relevant authorities were unfairly comparing them to overall state academic outcomes, rather than comparing K12's academic outcomes to schools with similar demographics.

296.   On October 27, 2015, the Online Charter School Study, undertaken by Mathematica Policy Research, CRPE, and CREDO, published a "rigorous analysis of the operations of online charter schools, their policy environments, and their impacts on student achievements." Each organization published one volume for the Online Charter School Study.

297.   The first volume, released by Mathematica Policy Research, surveyed the current array of 200 online charter schools and the 200,000 students they serve. This first volume of the Online Charter School Study reported that of these 200 schools, 57% are affiliated with for-profit school management organizations, and of those, half are either associated with K12 or one other school management organization. In its analysis of the schools, Mathematica Policy Research found that "students in the typical online charter school have less synchronous instructional time in a week than students in a brick and mortar school have in a day." (Emphasis removed). Mathematica Policy Research explained that synchronous instruction means instruction with a teacher and students working at the same time. The first volume of the study further noted that the vast majority of online schools offer some sort of one-on-one instructional support for its students, "[b]ut *schools that offer one-on-one instructional support reported medians of only 45 to 60 minutes of one-on-one instructional time per week.*" (Emphasis in original). The lead author of Mathematica Policy Research's report concluded that although for online schools, the challenges in maintaining student engagement are inherent but these challenges were "exacerbated by high student-teacher ratios and minimal student-teacher contact time,"

which suggestions *"reason for concern about whether the sector is likely to be effective in promoting student achievement."* (Emphasis supplied).

298.    Mathematica Policy Research's findings partially revealed that the NCAA's April 2014 decision to not accept coursework from 24 K12-operated schools because these schools did not provide regular and ongoing access and interaction between students and teachers carried weight and indicated an ongoing problem, in contrast to Defendants' earlier claims that the NCAA's actions were "unfortunate" and based on a review of old coursework.

299.    The Online Charter School Study's second volume was CRPE's examination of state policies and how those policies "shape[d] the online charter school landscape." The report commented on K12's lobbying power, and further noted that districts that authorize online charter schools in some states receive a percentage of the school's total revenues, which "can be an especially appealing revenue source for small, rural districts" and may result in reliance "on those revenues and [the authorizing districts] may be reluctant to close chronically underperforming online schools."

300.    In its examination, CRPE also observed that two-thirds of online charter schools contract with for-profit education providers, that enrollment is concentrated in a few large schools, and that because these schools contract with mega-providers (citing as an example K12's provision of curriculum to Agora with nearly 10,000 students), "a program that is lacking in quality may affect many thousands of students with one school and even more nationwide, especially if it permitted to operate year after year with no accountability."

301.    The CRPE examination partially revealed that the influence of revenues on small, rural authorizing districts that online charter schools bring to these districts may be part of the reason why K12 remained an online school's provider in the face of lagging academic performance.

302.    The third volume of the study, undertaken by CREDO, consisted of the "most comprehensive findings to date about impacts of online charter enrollment on the academic progress of students." By creating "virtual twins" for each online charter student by matching these students with

demographically identical students in traditional public schools and brick-and-mortar charter schools, CREDO was able to isolate the effects of attending an online charter school.

303.    In comparing the virtual twins, CREDO's "findings place doubt on the argument that higher pre-online mobility creates widespread, systematic academic deficits for students who eventually switch to online charter schools." CREDO's analysis also found that, on average, online charter school students are enrolled in these schools for two years, that there was a decreasing percentage of students remaining in online charter schools for a second year in each successive school year examined, and thus, although there was an increase in actual enrollment in online charter schools over the years, newly enrolled students helped to mask the increasingly higher number of students who left online charter schools. The CREDO study also found that both students who left an online school and returned to a traditional school and students who stayed in the online school, had stronger growth in their second year than in their first year in an online charter school; however, the growth in the second year was significantly smaller for those students who stayed in an online school for their second year, compared to those students who returned to a traditional public school.

304.    By far the biggest takeaway of CREDO's analysis was that:

> [T]he results in CREDO's report show that the majority of online charter students had far weaker academic growth in both math and reading compared to their traditional public school peers. To conceptualize this shortfall, it ***would equate to a student losing 72 days of learning in reading and 180 days of learning in math, based on a 180-day school year***. This pattern of weaker growth remained consistent across racial-ethnic subpopulations and students in poverty.

(Emphasis in original). Indeed, the report showed that all student profiles regardless of demographics had weaker growth in online charter schools than in traditional public schools. The CREDO report summarized its findings and noted that "[a]cademic benefits from online charter schools are currently the exception rather than the rule."

305.    The CREDO results revealed that even when academic results of online charter schools students where compared to demographically identical students, the online charter school students tend to do worse, in contradiction to the statements Defendants frequently made that K-12 students'

academic results were not improving as hoped by regulators because the results were not being compared to demographically similar students.

306.   Also on October 27, 2015, K12 issued a press release, attached as an exhibit to a Form 8-K filed with the SEC, in which K12 announced its financial results for the fiscal quarter ended September 30, 2015. Among the financial highlights reported were: "Revenues of $221.2 million, compared to $236.7 million in the first quarter of FY 2015. The year over year decline is largely due to the Agora Cyber School shifting from a Managed to Non-managed program[;]" "Net loss attributable to common stockholders of $12.8 million, compared to a net loss of $6.8 million in the first quarter of FY 2015[;]" and "Diluted net loss attributable to common stockholders per share of $0.34, compared to a diluted net loss of $0.18 in the first quarter of FY 2015."

307.   Later on this day, Defendants held an earnings conference call to discuss the financial results for the quarter ended September 30, 2015. On this call, Davis reiterated the revenue for the quarter, and noted that "[e]xcluding the impact of the Agora transition from a managed to a non-managed program, revenue grew 3.9% from the first quarter of last year." Rhyu further discussed K12's financial results for the quarter as well as the underlying trends for K12's business, but did so "excluding the impact of Agora. We believe this way of looking at our results provide you with a clearer picture of the underlying trends." Rhyu also noted that K12's gross margins "declined slightly from 38% last year to 37.2% in the current period."

308.   The disclosures in K12's press release and earnings conference call on October 27, 2015, the first quarter after Agora's switch, revealed the impact of Agora's change in relationship with K12 from being a fully managed school to contracting with K12 for its curriculum on K12's financial results, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements. BMO, in its October 27, 2015 report, commented that the "impact of the Agora transition continues to pressure . . . margins." Barrington Research noted that net losses per share were below estimate in its October 28, 2015 report.

309.    On this news, the price of K12's stock fell 15.85%, or $1.93 per share, to close at $10.25 per share, on unusually heavy trading volume.

310.    After the close of market on October 27, 2015, K12 released its quarterly results for the fiscal quarter ended September 30, 2015 in a Form 10-Q filed with the SEC. Therein, the Company disclosed that it received a subpoena from the Attorney General of the State of California, Bureau of Children's Justice in connection with an investigation styled "In the Matter of the Investigation of: For-Profit Virtual Schools."

311.    Though the market did not immediately react to the disclosure of the subpoena buried in the Company's Form 10-Q, K12's stock price slid a cumulative $0.54 per share, or 5.2%, over three days from a close of $10.25 per share on October 27, 2015, to a close of $9.71 per share on October 30, 2015.

312.    Together, the events and disclosures on October 27, 2015 indicated to the market that K12 was faced with significant risks to its economic performance based on its deficient educational practices and outcomes and potential adverse actions by regulators in connection with those deficient educational practices and outcomes, risks that had been concealed by Defendants' false and misleading statements described above. These concerns were later validated and confirmed by the settlement between K12 and the California Attorney General on July 8, 2016, which required K12 to correct both K12's Scantron Test results and Defendants' false and misleading statements regarding those results, revealing the misleading nature of Defendants' continued touting of Scantron Test gains to measure academic outcomes for K12 students. The settlement also required K12 to comply with numerous specific provisions to provide services to K12-educated students in California in order to remediate the deficiencies identified by the California Attorney General, confirming that Defendants' previous statements concerning K12's academic services and offerings were false and misleading.

313.    The foregoing allegations describe Plaintiffs' general theory of damages, demonstrate that Plaintiffs' damages were caused by Defendants' misrepresentations and omissions as alleged

1  herein, and negate any inference that Plaintiffs' losses were the result of general market conditions or
2  other factors unrelated to Defendants' misrepresentations and omissions alleged herein..

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

314.   The market for K12's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, K12's securities traded at artificially inflated prices during the Class Period. On June 23, 2014, the Company's stock closed at a Class Period high of $25.98 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of K12's securities and market information relating to K12, and have been damaged thereby.

315.   During the Class Period, the artificial inflation of K12's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about K12's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of K12 and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

316.   At all relevant times, the market for K12's securities was an efficient market for the following reasons, among others:

a.   K12 stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.   As a regulated issuer, K12 filed periodic public reports with the SEC and/or the NYSE;

c.     K12 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.     K12 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e.     The average daily trading volume for K12 securities during the Class Period was approximately 326,625 shares, with more than 38.9 million shares of stock outstanding as of October 21, 2015, and a market capitalization reaching almost $1.03 billion during the Class Period.

317.   As a result of the foregoing, the market for K12's securities promptly digested current information regarding K12 from all publicly available sources and reflected such information in K12's stock price. Under these circumstances, all purchasers of K12's securities during the Class Period suffered similar injury through their purchase of K12's securities at artificially inflated prices and a presumption of reliance applies.

318.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

319.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

320.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

321.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of K12 who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

322.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased K12's securities between October 10, 2013 and October 27, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

323.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, K12's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the

proposed Class. Millions of K12 shares were traded publicly during the Class Period on the NYSE. As of October 21, 2015, K12 had 38,939,704 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by K12 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

324. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

325. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

326. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of K12;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether the price of K12 securities were artificially inflated because of Defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

327. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendant K12 and the Individual Defendants

328.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

329.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase K12's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

330.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for K12's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

331.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about K12's financial well-being and prospects, as specified herein.

332.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of K12's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about K12 and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

333.     Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

334.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing K12's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants'

overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

335.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of K12's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired K12's securities during the Class Period at artificially high prices and were damaged thereby.

336.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that K12 was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their K12 securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

337.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

338.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

339.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

340.    The Individual Defendants acted as controlling persons of K12 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

341.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

342.    As set forth above, K12 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

XIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)   declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)   awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)   awarding equitable, injunctive, and other relief as the Court may deem just and proper.

XIV.   **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: December 2, 2016

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Leanne H. Solish
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiffs and the Putative Class*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On December 2, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 2, 2016, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 4:16-cv-04069-PJH In re K12 Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephen Paul Barry**
  stephen.barry@lw.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Kevin H. Metz**
  Kevin.Metz@lw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Avraham Noam Wagner**
  avi@thewagnerfirm.com

- **Peter Allen Wald**
  peter.wald@lw.com,#sflitigationservices@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)