UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BABULAL TARAPARA, et al.,

      Plaintiffs,

      v.

K12 INC., et al.,

      Defendants.

Case No.  16-cv-4069-PJH

**ORDER GRANTING MOTION TO
DISMISS IN PART AND DENYING IT IN
PART**

      Defendants' motion to dismiss the above-entitled action pursuant to Federal Rule of Civil Procedure for failure to state a claim came on for hearing before this court on April 19, 2017.  Plaintiffs appeared by their counsel Kevin Ruf and Leanne Solish, and defendants appeared by their counsel Allen Makins, Marshall Wallace, Peter Wald, and Stephen Barry.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

## BACKGROUND

      This is a proposed class action, alleging securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, and control-person liability under § 20(a).  Defendants are K12 Inc. ("K12"), Ronald J. Packard ("Packard"), Nathaniel ("Nate") A. Davis ("Davis"), James J. Rhyu ("Rhyu"), and Timothy L. Murray ("Murray").  Plaintiffs allege that they purchased shares of K12 stock during the proposed Class Period (October 10, 2013 to October 27, 2015).  Consolidated Amended Class Action Complaint ("CAC") ¶¶ 1, 23-24.

      Defendant K12 provides technology-based educational products and solutions to public school districts, public schools, virtual (i.e., on-line) charter schools, and families (for home schooling).  CAC ¶¶ 25, 37.  Defendant Packard was the Chief Executive

United States District Court
Northern District of California

Officer ("CEO") of K12 from 2000, when he founded the company, until December 31, 2013, when he resigned. CAC ¶ 26. He also served as the Executive Chairman of K12 from 2000 to 2007, and was a director from 2000 to June 13, 2014. CAC ¶ 26.

Defendant Davis was Chairman and CEO of K12 from January 1, 2014, until he relinquished that position on February 8, 2016. CAC ¶ 28. He has also been a K12 director since July 2009, was named as Chairman in June 2012, and Executive Chairman in January 2013. CAC ¶ 28. After relinquishing his role as CEO, he returned to his Executive Chairman role in February 2016. CAC ¶ 28.

Defendant Rhyu is a Certified Public Accountant, and has been Chief Financial Officer ("CFO") and Executive Vice President of K12 since June 2013. CAC ¶ 30.

Defendant Murray joined K12 in April 2012 as its President and Chief Operating Officer ("COO"). CAC ¶ 32. He resigned from his position at K12 in September 2015, after which he continued to provide "transition services" for a period of up to six months pursuant to a consulting agreement. CAC ¶ 32.

As reflected in its Fiscal Year ("FY") 2014 Form 10-K, K12 operates through three "business segments" – (1) "Managed Public Schools," described as "turn-key management services sold to public schools on a contractual basis;" (2) "Institutional Sales," described as "educational products and services sold à la carte to school districts, public schools, and other educational institutional systems that K12 did not manage, such as its Fuel Education or 'FuelEd' services;" and (3) "International and Private Pay Schools," described as "private schools for which K12 charged tuition and made direct consumer sales." CAC ¶ 38.

According to plaintiffs, the Managed Public Schools comprised the vast majority of K12's revenues during the proposed Class Period – approximately 85%. CAC ¶ 42. In a K12 Managed Public School, a local school board contracts with K12 to provide all aspects of school management, including creating and implementing the academic plan; monitoring academic achievement; recruiting and training teachers; marketing the program and enrolling students; recommending compensation for school personnel;

implementing student support services; providing financial and regulatory support; and procuring curriculum, computers, and other required services and equipment.  CAC ¶ 43.

Funding for Managed Public Schools is provided by state governments, generally on a per-pupil basis.  CAC ¶ 44.  In the 2013-2014 school year, K12 operated Managed Public Schools in 33 states and the District of Columbia; in the 2014-2015 school year, K12 operated  "Managed Public Schools" in 32 states and the District of Columbia.  CAC ¶ 43.

Plaintiffs allege that K12 encountered problems with operating its online schools – in particular, the Agora Cyber Charter School ("Agora"), the Tennessee Virtual Academy, the California Virtual Academies, and the Colorado Virtual Academy (which ended its relationship with K12 shortly before the start of the proposed Class Period).

Agora, based in Pennsylvania, has a charter granted by the Pennsylvania Department of Education ("PDE").  See CAC ¶¶ 121, 126.  Plaintiffs allege that Agora was K12's largest revenue-providing school both before and during the proposed Class Period.  CAC ¶ 120.  In K12's FY 2010, the Agora contract allegedly accounted for more than 10% of K12's revenues; in FY 2011 through FY 2015, Agora allegedly accounted for approximately 13-14% of K12's revenues; and in its Form 10-K for FY 2013 and FY 2014, K12 indicated that a change in its contract with Agora could adversely affect the Company's business, financial condition, and results of operation.  CAC ¶ 120.

In May 2006, Agora's founder signed a management contract with K12, pursuant to which K12 would receive 15% of Agora's qualified gross revenues in exchange for managing the school.  CAC ¶ 122.  In the spring of 2009, after receiving complaints from parents of Agora students, the PDE conducted an audit of Agora, and subsequently informed Agora that it would no longer pay any funds into the school's operating account, and further advised Agora that it had violated its charter and bylaws.  CAC ¶ 123.  In June 2009, the PDE issued a notice of revocation of Agora's charter.  CAC ¶ 123.

At some point litigation ensued between Agora's founder and the Agora Board (not entirely clear from the allegations in the CAC), and following that litigation, "it was agreed

1    that a replacement Agora Board would be appointed." CAC ¶ 124; <u>see also</u> CAC ¶¶ 123,

2    125. The new Board submitted a charter renewal application. CAC ¶ 135. K12 entered

3    into a new management agreement with Agora on November 12, 2009, following the

4    PDE's approval of the renewal application. <u>See</u> CAC ¶ 135.

5        This agreement, which took effect on July 1, 2010, provided for automatic renewal

6    on June 30, 2015 unless either party notified the other no later than 18 months prior to

7    that date (or no later than January 1, 2014). <u>See</u> CAC ¶ 136; Exh. A to Declaration of

8    Steven Barry in Support of Motion to Dismiss ("Barry Decl."), ¶ 5.1 ("This Agreement . . .

9    will terminate on June 30, 2015 ("Initial Term") unless sooner terminated under Section

10    12 of this Agreement."); <u>id.</u> ¶ 5.2 ("Following the Initial Term, this Agreement will

11    automatically extend for successive additional periods of three (3) year(s) . . . , unless (a)

12    either party provides the other with written notice of non-renewal at least eighteen (18)

13    months before the expiration of the then-current Initial Term or Renewal Term (as

14    applicable); or (b) the Agreement is sooner terminated under Section 12.").

15        Three years before the notice deadline, the Agora Board sent K12 a "notice of

16    non-renewal" dated June 28, 2012, advising that it was "invoking the notice clause

17    [¶ 5.2]" and giving "Notice of Non-Renewal." CAC ¶¶ 136-137; Exh. B to Barry Decl.

18    K12 did not publicly report at that time that it had received the notice of non-renewal from

19    Agora.[1] The parties allegedly continued to negotiate the terms of a future relationship,

20    with the possibility that K12 would provide unbundled educational content and support

21    services while Agora itself assumed management duties. <u>See</u> CAC ¶¶ 144-150.

22        K12 used Scantron Performance Series® Tests ("Scantron tests") to measure

23    student learning and the performance of schools it managed, claiming that it was a

24    _____

25    [1]   In their motion to dismiss, defendants allege that on November 8, 2012, the Agora Board sent K12 a second letter to "clarify" that its prior "letter was not intended to suggest

26    that Agora . . . intend[ed] to disassociate itself from K12," but "simply to fulfill the notice requirement contained in the [existing] Education[] Services Agreement." Exh. C to Barry

27    Decl. However, defendants assert, the Agora Board also indicated its interest in "begin[ning] negotiations with K12 regarding the provision of educational services after

28    the expiration of the current [contract]." <u>Id.</u> These allegations do not appear in the CAC, and the court does not take them into account in considering the facts as pled.

common measuring tool for a student's academic growth in a school year across states. CAC ¶ 59. Math and reading tests were administered at the start and end of each school year "to provide a common measure of academic achievement across all K12-managed public schools, since testing varies from state to state." CAC ¶¶ 59, 66. K12 also compared its aggregate results to the mean "gains" of Scantron's national norm group – approximately 600,000 students. CAC ¶¶ 59-66. The results of the Scantron tests were reported to investors and the public in K12's "Academic Reports." CAC ¶¶ 60-61, 65-67.

In February 2013, K12 issued its first annual Academic Report, reporting results from the 2011-2012 school year. CAC ¶ 60. In a press release published on February 7, 2013, K12 announced the results of the 2013 Academic Report, calling the results for the 2011-2012 school year "solid," and highlighting K12's investment in improving academic outcomes, asserting that "[t]o date, K12 has invested more than $330 million in innovative curriculum, technology, learning systems, and teacher training and support[.]" CAC ¶ 61.

On March 20, 2014, K12 released its 2014 Academic Report, highlighting academic results for the 2012-13 school year. In the accompanying press release, Davis stated "that by publishing this Academic Report K12 is continuing its commitment to accountability and transparency." CAC ¶ 63. K12's Chief Academic Officer was quoted as stating that "the results of the Scantron tests and many of the state-adopted growth measure assessments show a more positive picture on student learning." CAC ¶ 65.

The 2014 Academic Report claimed that Scantron provided a more accurate measure of student progress and academic growth than state tests administered to all students. CAC ¶ 65. It also included an analysis of student performance on the Scantron tests in reading and mathematics, administered to students in grades 3-8 in the fall and spring of the 2012-13 school year, and indicated that in the 2012-13 school year, K12 Managed Public Schools achieved a 125% norm group gain in reading and a 102% norm group gain in mathematics across all grades. CAC ¶ 66.

K12 noted that the percentage of participation in Scantron tests for both fall and spring administration was 86% for reading and 87% for mathematics. CAC ¶ 67.

1  However, plaintiffs allege, the remaining 13-14% of students were more academically at-

2  risk; and in addition, because results included only students who were present in both the

3  fall and the following spring, it excluded the most mobile students, who, according to K12,

4  generally performed worse academically.  CAC ¶ 67.

5  Plaintiffs claim that during a February 4, 2014 earnings call, Davis gave misleading

6  answers to questions about Agora.  CAC ¶¶ 203, 205.  Davis was asked for a general

7  update on state issues, including legislation, and for an update on "Pennsylvania."  CAC

8  ¶ 203.  Plaintiffs assert that there was an "issue" in Pennsylvania at that time, as the

9  Agora Board had informed K12 in mid-2012 that it did not intend on renewing its contract

10  with K12.  CAC ¶ 203.  However, instead of mentioning Agora, Davis discussed

11  "Pennsylvania" legislation in general terms – i.e., stating that "[i]t's always difficult to

12  predict what a legislature is going to do and what's going to happen.  Of course the

13  Pennsylvania legislation has some proposals in it that would affect us negatively. . . .  So

14  I can't handicap it and tell you that in fact it's going to happen or isn't going to happen."

15  See CAC ¶ 203.

16  In April 2014, the National Collegiate Athletic Association ("NCAA"), which

17  regulates eligibility to play in NCAA Division I or II sports in college, in part based on

18  coursework to ensure that students are actually learning, announced that it would no

19  longer be accepting coursework previously completed by prospective student-athletes at

20  24 K12-operated schools, including 14 schools in California, and also including Agora.

21  CAC ¶ 151.  Plaintiffs assert that K12's response was to blame the NCAA for changing its

22  rules to require student-teacher interaction, while failing to provide any standard by which

23  student-teacher interaction could be measured.  CAC ¶ 152.

24  In an earnings conference call on April 29, 2014, held to discuss K12's quarterly

25  financial results, defendants were asked to "spend a minute on Pennsylvania as we move

26  into the potential renewal on that contract."  CAC ¶ 205.  Davis responded,

27
28
　　　[W]e will file this year and next year in 2015, and then we will
　　　seek an approval for our Agora school.  That approval is
　　　something we continue to work on.  We negotiate a new

> service contract and then they will get a charter renewal
> process going in the state of Pennsylvania. . . .
>
> We watch what others are doing as they go through the
> process and make sure that our service contracts will be
> compliant with everything that the state wants. I think we are a
> good partner for Agora, and I think they are happy with what
> we have done.

CAC ¶ 207.  Davis did not mention that the Agora Board had informed K12 almost two

years earlier that it intended not to renew the management contract.  CAC ¶ 208.

On June 24, 2014, the Agora Board issued a request for proposals ("RFP") for

online education services and materials, and invited vendors (including K12) to submit

bids.  CAC ¶ 147.  Two days later, after the market closed on June 26, 2014, K12 issued

a press release reporting the Agora RFP, noting that K12 was looking forward to

"providing robust submissions for the provision of educational services, products, and

curriculum."  CAC ¶ 154.  K12 implied that the RFP process was necessary for the

school's charter renewal.  CAC ¶ 154 ("We are confident that this process will lead to an

even stronger application to the PDE for the renewal of the school's charter.").

This June 26, 2014, announcement "partially revealed that the Agora Board was

considering different arrangements for the services and products required to run Agora

for the 2015-2016 and later school years, and thus that there was a chance of K12 losing

a significant amount of revenue in the future."  CAC ¶ 275.  It appears that as of this date,

K12 still had not fully disclosed to investors that Agora had sent the notice of non-renewal

in June 2012.  On June 27, 2014, K12's stock price fell approximately 5% to close at

$24.32.  CAC ¶ 274.

On August 14, 2014, in a conference call with investors and Wall Street analysts,

held to discuss K12's quarterly and fiscal year financial results for the year ended June

30, 2014, Davis responded to a request for an "update on Agora."  CAC ¶¶ 155-156.  He

stated that "Agora did have one Board meeting where they made some decisions and

indicated a clear interest to be a self-managed organization."  CAC ¶ 156.  There is no

indication, however, that he disclosed that Agora had advised K12 of its intention to

terminate the management contract, or that it would no longer contract for management

services from K12 or any other vendor.

During the same conference call, Davis addressed an issue with the operation of the Tennessee Virtual Academy ("TNVA"), which had been established as a K12 partner school in 2011. CAC ¶¶ 90, 98, 155. Following the 2013-14 school year, purportedly based on the school's academic performance, Tennessee's education commissioner capped the number of students permitted to enroll at TNVA. CAC ¶¶ 96-97. During the conference call, Davis acknowledged that TNVA's 2013-14 state test scores "were low," but noted that students "who persisted in the school for two or more years performed at a reasonable level." CAC ¶¶ 97-98, 155; Exh. D to Barry Decl. K12's stock price dropped 13% the same day, to close at $19.42. CAC ¶ 279.

At its September 22, 2014, meeting, the Agora Board approved K12 as its online curriculum content provider through the 2017-2018 school year. CAC ¶ 149. At the October 6, 2014 meeting of the Agora Board, the Board President announced that Agora had completed the process to self-manage Agora Cyber Charter School, which it had begun "early in 2014[,]" and that it had agreed to "simultaneously continue using K12 curriculum and begin the process of building our own and offering it to parents and students as an option." CAC ¶ 150.

Three days later, on October 9, 2014, K12 reported in a press release that the Agora Board had decided to "absorb the school's general administrative services and certain human resources functions as well as name vendors for select services which are currently provided by K12" but added that it had also reached a new three-year contract with K12 to provide "academic curriculum" for Agora starting in the 2015-2016 school year. CAC ¶ 157. K12 stated that, using FY 2014 enrollment volumes and reported financial results, it believed this new contract "would have delivered approximately 25% of the revenue and 50% of the internal financial contribution" – defining "internal contribution" as "revenue less direct costs for delivering the contracted services" – "when compared to K12's current contact with the Agora Board." CAC ¶ 157.

Later that same day (October 9, 2014), in an earnings call, K12 provided student

1    enrollment figures for FY 2015 after the October enrollment count date.  CAC ¶ 157.

2    Plaintiffs assert that rather than simply reporting student enrollments in managed schools

3    as it had in previous years, K12 for the first time reported enrollments in Public School

4    Programs, which included both managed and non-managed programs.  CAC ¶ 158.

5    Davis explained that the reduction in managed schools was due to a "new market

6    dynamic" in which some schools decided to self-manage and also due to the recent

7    Tennessee enrollment cap.  CAC ¶ 159.  Rhyu also acknowledged, however, that as a

8    result of Agora switching from a managed to a non-managed program beginning in

9    FY2016, "you are going to see, obviously, I think, a fairly significant decline in revenue."

10   CAC ¶ 160.  K12's stock price declined 7% that day, to close at $14.87.  CAC  ¶ 287.

11         On October 30, 2014, K12 released its financial results for the quarter ending

12   September 30, 2014.  CAC ¶ 162.  During an earnings call held that same day, K12

13   disclosed that it had a lower gross margin percentage compared to the percentage for the

14   same quarter in the previous year.  Rhyu explained that this decrease was due to K12

15   "continu[ing] to invest in teachers and academic programs" and that "some of the rate

16   increases that contributed to our managed program revenue growth relate to programs

17   where K12 incurs significant costs."  CAC ¶ 163.  Nevertheless, Rhyu assured investors

18   that K12's Nonmanaged Programs had higher margins than the Managed Programs, and

19   as the "non-managed piece of the business grows faster than the managed piece" the

20   impact of the higher margins may "become more material."  CAC ¶ 163.

21         K12 published its Academic Report for the 2013-14 school year on May 4, 2015.

22   CAC ¶ 68.  An accompanying press release noted that K12-managed schools overall had

23   outperformed the Scantron norm group's mean gain in both reading and math.  CAC

24   ¶¶ 69-70.  K12 acknowledged a "disconnect" between "positive Scantron results and the

25   scores on state tests[,]" adding,

26            We hypothesize that the disconnect reflects how, in high
             school, the content expectations of the Scantron tests diverge
27            from those of state tests.  Scantron assesses a broad range of
             skills.  In high school, however, whether states administer
28            end-of-course exams or high school graduation tests, testing

9

is more narrowly focused on the specific skills and knowledge
articulated in each state's standards on topics in algebra,
geometry, probability and statistics, etc.

CAC ¶ 71.

On October 27, 2015, the last day of the proposed Class Period, the National

Study of Online Charter Schools ("Online Charter School Study") published a

comprehensive study of online charter schools operating in the United States, which

included separate analyses by three independent research institutions – Mathematica

Policy Research, the Center on Reinventing Public Education at the University of

Washington ("CRPE"), and Stanford's Center for Research on Education Outcomes

("CREDO").  CAC ¶ 166.

The CRPE study, see CAC ¶¶ 170-172, specifically mentioned K12.  CRPE

referred to K12's provision of curriculum to Agora with nearly 10,000 students, noting that

"a program that is lacking in quality may affect many thousands of students with one

school and even more nationwide, especially if it is permitted to operate year after year

with no accountability."  CAC ¶ 172.

CREDO published a press release, stating that the results in its report showed that

"the majority of online charter students had far weaker academic growth in both math and

reading compared to their traditional public school peers[,]" which shortfall it equated to

"a student losing 72 days of learning in reading and 180 days of learning in math, based

on a 180-day school year."  CAC ¶ 176.

Also on October 27, 2015, K12 issued a press release, entitled "K12 Inc. Reports

First Quarter Fiscal 2016 With Revenue of $221.2 Million," in which it reported

disappointing financial results for its 1Q16.  CAC ¶ 180.  Among the highlights were

"[r]evenues of $221.2 million, compared to $236.7 million in the first quarter of FY 2015."

K12 explained this decline as being "largely due to the Agora Cyber School shifting from

a Managed to a Non-Managed program."  CAC ¶ 180.  K12 also reported an "[o]perating

loss of $20.5 million, compared to an operating loss of $13.2 million in the first quarter of

FY 2015[;]" and a "[n]et loss attributable to common stockholders of $12.8 million,

compared to a net loss of $6.8 million in the first quarter of FY 2015[.]"  CAC ¶ 180.
K12's stock price fell $1.93 per share, or 15.8%, to close at $10.25 per share on October 27, 2015.

Later that day, defendants held an earnings conference call to discuss the quarterly financial results.  Davis asserted that "[e]xcluding the impact of the Agora transition from a managed to a non-managed program, revenue grew 3.9% from the first quarter of last year."  CAC ¶ 181.  Rhyu also discussed K12's financial results, as well as the underlying trends for K12's business, but did so "excluding the impact of Agora," explaining that "[w]e believe this way of looking at our results provide you with a clearer picture of the underlying trends."  CAC ¶ 181.

After the market closed on October 27, 2015, K12 filed its Form 10-Q with the SEC for the quarter ending September 30, 2015.  In that filing, K12 disclosed that it had received a subpoena from the Attorney General of the State of California ("California AG"), Bureau of Children's Justice, in connection with an investigation styled "In the Matter of the Investigation of: For-Profit Virtual Schools."  CAC ¶ 183.[2]  Although the market did not immediately react to the disclosure of the subpoena – plaintiffs claim it was "buried" in K12's Form 10-Q, CAC ¶ 183 – plaintiffs assert that the Company's stock price slid a cumulative $0.54 per share, or 5.2%, over three days from a close of $10.25 per share on October 27, 2015 (the last day of the proposed Class Period), to a close of $9.71 per share on October 30, 2015.

On July 8, 2016, the California AG filed a complaint asserting that K12 and 14 CAVA schools it operated had used deceptive advertising to mislead families about students' academic progress, parents' satisfaction with the program and their graduates' eligibility for University of California and the California State University admission.  CAC ¶ 186. The parties also submitted a joint final judgment which was entered by the court

---

[2]  Plaintiffs allege that K12 currently operates ten different California Virtual Academies or "CAVAs" in the state, and that it received the AG's investigative subpoena in September 2015.  CAC ¶ 14.

1   that day.  CAC ¶ 186.  K12 agreed to pay $6 million to the AG to defray costs of the

2   action and the investigation, and to expunge $160 million in balanced budget credits

3   accrued by CAVA schools and characterized by the AG as "debt relief to the non-profit

4   schools [K12] managed."  CAC ¶ 186.

5        K12 also agreed to take action to ensure the accuracy of its advertisements, to

6   train teachers to prevent improper attendance claims, and to reform the way it contracted

7   with CAVA schools. CAC ¶ 187.  It further agreed to eliminate incentive compensation for

8   its enrollment staff, to provide all students with functional computers, and to give families

9   a subsidy of $20 a month to cover the cost of high-speed Internet access; and to seek

10  approval for at least two courses that satisfied UC's lab science and visual and

11  performing arts course requirements. CAC ¶ 188.

12       Lastly, the judgment required K12 to include a corrected version of the Scantron

13  results from school year 2013-2014 in its 2016 Annual Academic Report; to include a

14  statement in the first quarterly earnings call following entry of the judgment correcting the

15  prior statement regarding Scantron results made in the 1Q15 earnings call on October

16  30, 2014; and to remove the 2015 Annual Academic Report from its website, include the

17  corrected 2013-2014 Scantron data in the 2016 Annual Academic Report, include a

18  statement on the front of the 2016 Report highlighting the revision, and correct the

19  "Academic Results" page on its website.  CAC ¶ 190(a), (b), (d), (e).

20       In an August 9, 2016, investor call, K12's then-CEO, Stuart Udell, stated that in

21  aggregating student results, K12 had erroneously omitted students whose gains from the

22  fall to spring examinations were statistically insignificant.  CAC ¶¶ 193, 198-199.  He

23  further explained that when this error in the statistical methodology used to tally results

24  for the 2013-2014 school year was corrected, K12 students' mean gains still exceeded

25  the norm group's averages in both subjects, and outstripped the mean group's gains in

26  every grade for math, and in all but two grades for reading.  CAC ¶¶ 193, 198.  K12's

27  stock price did not meaningfully react to the report of the Scantron error, and plaintiffs do

28  not allege that K12 made any corrective disclosures concerning this issue during the

proposed Class Period.

K12 released its 2016 Academic Report on November 16, 2016, in which it included the required statements and corrections. CAC ¶ 195-198. With regard to the results for reading and math, plaintiffs assert that the impact of the changes was significant. "Whereas K12 had reported in its 2015 Academic Report that in grades 3-10 for the 2013-2014 school year the Scantron reading percentage of norm group mean gain was 161%, the figure was revised down to 109%. Mathematics was similarly revised downward from 145% to 104%." CAC ¶ 199.

In the CAC, plaintiffs allege that throughout the proposed Class Period, defendants made materially false and/or misleading statements and failed to disclose material adverse facts about K12's business, operations, and prospects, including that K12 was publishing misleading advertisements about students' academic progress, parent satisfaction, their eligibility for UC and CSU admission, class sizes, the individualized and flexible nature of K12's instruction, hidden costs, and the quality of the materials provided to students.

These allegations are divided among three "general categories" of actionable statements (or omissions) made during the proposed Class Period. These include false and misleading statements and/or omissions regarding Agora, false and misleading statements and/or omissions regarding students' academic and Scantron test results, and false and misleading statements and/or omissions concerning the quality and effectiveness of K12's academic services and offerings. See CAC ¶ 201.

Plaintiffs assert that the "truth" emerged at various points during the proposed Class Period, through (1) the June 26, 2014 announcement of Agora's RFP process, CAC ¶ 273; (2) the August 14, 2014 disclosure of the TNVA enrollment cap and Agora's interest in self-management, CAC ¶¶ 277-278; (3) K12's October 9, 2014 report confirming that Agora would assume responsibility for its own management, CAC ¶ 284; (4) Davis's suggestion on October 30, 2014 that regulators were "just beginning . . . to understand the dynamics of an online school program," CAC ¶ 291; and (5) the

1    publication of the Online Charter School Study and K12's disclosure of the California

2    AG's industry-wide inquiry on October 27, 2015, CAC ¶¶ 296, 306; see also CAC ¶ 18.

3        Plaintiffs filed the present action on July 20, 2016, and filed the CAC on December

4    2, 2016. Defendants seek an order dismissing the claims asserted against them, for

5    failure to state a claim.

6                       **DISCUSSION**

7    A.     Legal Standards

8        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

9    sufficiency of the claims asserted in a complaint. Navarro v. Block, 250 F.3d 729, 732

10    (9th Cir. 2001). A pleading must contain a "short and plain statement of the claim

11    showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint

12    does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds'

13    of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic

14    recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly,

15    550 U.S. 544, 555 (2007).

16        A complaint "must contain sufficient factual matter . . . to state a claim to relief that

17    is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially

18    plausible when it "allows the court to draw the reasonable inference that the defendant is

19    liable for the misconduct alleged." Id. "[F]actual allegations must be enough to raise a

20    right to relief above the speculative level." Twombly, 550 U.S. at 555.

21        In considering whether the complaint states a claim, the court accepts as true all of

22    the factual allegations contained in the complaint. Iqbal, 556 U.S. at 1949; see also

23    Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). However, legal

24    conclusions are "not entitled to the assumption of truth." Twombly, 550 U.S. at 555. Nor

25    is the court required to "accept as true allegations that contradict matters properly subject

26    to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted

27    deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.3d

28    1049, 1055 (9th Cir. 2008) (quotations and citations omitted).

1    To state a claim for securities fraud under § 10(b) of the Securities Exchange Act

2  of 1934, and Securities Exchange Commission Rule 10b-5 promulgated thereunder, a

3  plaintiff must allege particularized facts showing (1) a material misrepresentation or

4  omission of fact; (2) made with scienter; (3) a connection with the purchase or sale of a

5  security; (4) reliance or "transaction causation;" (5) economic loss; and (6) loss causation

6  (causal connection between the material misrepresentation and the loss).  Dura Pharms.,

7  Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also Matrixx Initiatives, Inc. v.

8  Siracusano, 563 U.S. 27, 37-38 (2011).

9    In addition, a complaint alleging claims under § 10(b) and Rule 10b-5 must satisfy

10  the pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private

11  Securities Litigation Reform Act ("PSLRA").  In re VeriFone Holdings, Inc. Sec. Litig., 704

12  F.3d 694, 701 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a

13  heightened pleading requirement – that a party "state with particularity the circumstances

14  constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  And since 1995, all private securities

15  fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA,

16  which require that both falsity and scienter be pled with particularity.  Zucco Partners,

17  LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

18  B.    Defendants' Motion

19    Defendants argue that the CAC fails to state a claim because it amounts to

20  improper "puzzle pleading;" because it fails to allege an actionable misstatement or

21  omission; because the allegations do not support a strong inference of scienter; because

22  it fails to allege facts showing loss causation; and because it does not state a claim

23  against the individual defendants under § 20(a).

24    1.    Improper "puzzle pleading"

25    As an initial matter, defendants assert that the CAC amounts to "puzzle pleading,"

26  which violates the requirement that the complaint contain "a short and plain statement of

27  the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

28    In the securities fraud context, the term "puzzle pleading" refers to a pleading that

15

1    requires the defendant(s) and the court to "match up" the allegedly false and misleading

2    statements that form the basis of the plaintiff's claims with the reasons those statements

3    are misleading.  See, e.g., In re Cisco Sys. Inc. Sec. Litig., 2013 WL 1402788 at *5 (N.D.

4    Cal. Mar. 29, 2013); see also In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F.Supp.

5    2d 1059, 1073 (N.D. Cal. 2001) (finding that structure of complaint rendered it

6    "exceedingly difficult to discern precisely which statements are alleged to be misleading").

7         Here, defendants assert, the CAC block-quotes extensive passages from public

8    statements, and then repeats for each passage a series of supposedly contrary "facts,"

9    without specifying the portion of each statement alleged to be false, alleging why it is

10   false, or alleging what contrary information the defendants had.  Defendants do

11   acknowledge that in certain sections of the CAC, plaintiffs have bolded portions of block

12   quotes and appear to be limiting their objections to the specific statements in bold.

13   However, they assert, these are "limited instances."

14        In the court's experience, a securities fraud complaint that employs a true puzzle-

15   style pleading format will recite lengthy statements attributed to the defendants, followed

16   by a generalized list of reasons that the statements may have been false or misleading or

17   a generalized list of omissions that were required to make the statements not misleading.

18   Here, by contrast, plaintiffs have explained why they believe each such statement (or

19   compilation of statements) is false and misleading, but because the CAC is so long,

20   confusing, and meandering, it is difficult to locate the main points within it.

21        Nevertheless, the length and breadth of the CAC does not create the type of

22   "puzzle-like" complaint that warrants dismissal on that basis alone.  See In re

23   Cornerstone Propane Partners, L.P., 355 F.Supp.2d 1069, 1081 (N.D. Cal. 2005) (finding

24   that puzzle-pleadings "abuse the principles of Rule 8 not because they are not short" but

25   "because they are not plain").  That is, the problem with the CAC is not so much that it is

26   a "puzzle-style" complaint, but rather that it is unwieldy and about 50 pages too long.  In

27   In re GlenFed, Inc., Sec. Litig., 42 F.3d 1541 (9th Cir. 1994) (a pre-PSLRA case) the

28   Ninth Circuit found that the plaintiffs' 113-page complaint – which the court described as

"rambl[ing] through long stretches of material quoted from defendants' public statements . . . unpunctuated by any specific 'reasons for falsity[,]'" as clearly suffering from "poor draftsmanship," and as being "cumbersome almost to the point of abusiveness" – nevertheless adequately pleaded facts sufficient to satisfy the requirements of Rule 9(b). Id. at 1553-54.

    2.    Misstatements or omissions under § 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

Defendants argue that the CAC fails to allege any actionable misstatement or omission. To prevail on a § 10(b) claim of false or misleading statements, a plaintiff must show that the defendant made a statement that was "misleading as to a material fact." Basic, Inc. v. Levinson, 485 U.S. 224, 238 (1988). In general, the materiality requirement is satisfied when the plaintiff alleges facts showing "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id. at 231-32 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

To sufficiently allege a material misstatement for a § 10(b) claim, the plaintiff must specify each statement alleged to have been misleading and the reason(s) why that statement is misleading; if those allegations are made on information and belief, the plaintiff must also allege all facts on which that belief is formed. Daou, 411 F.3d at 1014; see also 15 U.S.C. § 78u-4(b)(1).

"To be actionable under the securities laws, an omission must be misleading."

17

Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. "An omission is not misleading unless it 'affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.'" Brody, 280 F.3d at 1006 (citation omitted). A duty to disclose exists only "to . . . make statements in light of the circumstances under which they were made not misleading." 17 C.F.R. § 240.10b–5(b).

Defendants contend that the CAC fails to allege any actionable misleading statement or omission, asserting that many of the challenged statements are forward-looking and protected by the PSLRA's statutory "safe harbor;" that many of the challenged statements are "puffing" statements which are not actionable as a matter of law; and that plaintiffs allege no facts showing that any statement of present or historical fact was false or misleading when made.

a. Forward-looking statements

Defendants assert that "many" of the allegedly misleading statements are not actionable under the PSLRA because they are "forward-looking statements" that fall within its "safe-harbor" provision. A false or misleading statement may be shielded from liability under the "safe harbor" provision of the PSLRA, even where the plaintiff has adequately alleged the elements of a § 10(b) violation. See In re Quality Sys., Inc. Sec. Litig., ___ F.3d ___, 2017 WL 3203558 at *7 (9th Cir. July 28, 2017).

A forward-looking statement is, e.g., "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" a statement of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" or a "statement of future economic performance[.]" 15 U.S.C. § 78u-5(i)(1).

Under this provision, defendants are not liable "with respect to any forward-looking statement, whether written or oral, if and to the extent that" the statement is identified as

forward-looking and accompanied by meaningful cautionary statements, or if the plaintiff fails to plead facts supporting a strong inference that the defendant made the statement with "'actual knowledge' that it was 'false or misleading' at the time made." See 15 U.S.C. § 78u-5(c)(1); see also In re Cutera Sec. Litig., 610 F.3d 1103, 1111-13 (9th Cir. 2010). The "cautionary language" and "actual knowledge" safe harbor prongs are disjunctive. In re Quality Sys., __ F.3d __, 2017 WL 3203558 at *13. That is, even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have "actual knowledge" that the statement was false or misleading. Id.

Defendants begin this portion of their motion by listing four statements they claim are protected forward-looking statements.[3]

• "It's always difficult to predict what a legislature is going to do and what's going to happen. . . . Pennsylvania . . . has some proposals in it that would affect us negatively. I don't know if that legislation will go through or won't go through." CAC ¶ 203 (citing statement in February 4, 2014 earnings call).

• "[A]s everybody knows, . . . . we will file this year and next year in 2015, and then we will seek an approval for our Agora school. . . .We negotiate a new service contract, and then they will get a charter renewal process going in . . . Pennsylvania. . . . " CAC ¶ 205 (citing statement in April 29, 2014, earnings call).

• "K12 Inc. . . . looks forward to providing robust submissions for the provision of educational services, products, and curriculum [at Agora]." CAC ¶ 207 (citing June 26, 2014 K12 press release).

• "I don't think the number [of special education students] is going to decline in percent. I think you may see it actually go up a little bit or stay flat." CAC ¶ 247 (citing statement in April 29, 2014 earnings call).

---

[3] Defendants also cite generally to the Appendix attached to their motion, apparently intending that the court search through those additional 38 pages to locate any statements that might be labeled "forward-looking."

Defendants claim that in these statements, plaintiffs "challenge several projections regarding K12's relationship with Agora, its operational prospects in Pennsylvania, and its future business plans and priorities" – in particular, alleging that the statements regarding K12's future prospects with Agora were misleading because the Agora Board had informed K12 that it did not intend on renewing its management contract with K12. See CAC ¶ 208. Defendants assert however, that each of these statements is protected by meaningful cautionary language, as K12 warned explicitly of the risk that its management agreement with Agora would expire in June 2015, and might not be renewed.

Defendants point to the allegation that K12 filed the Agora/K12 contract as an exhibit to its Form 10-Q for the quarter ending March 31, 2013, and to its 2013 and 2014 10-Ks. CAC ¶ 202. They also note the statements under "Risk Factors" in K12's 2013 and 2014 10-Ks that there was a risk of "failure to . . . renew existing contracts with our schools." They argue that the contract "disclosed" that it would expire in June 2015 and that either party could decide not to renew it, and that such "disclosure," combined with the statements in the "Risk Factors" sections of the 10-Ks, constituted meaningful cautionary language such that they cannot be liable for the forward-looking statements relating to future prospects of K12 and Agora.

Defendants assert that "[t]he same holds true" for other statements that defendants have identified as forward-looking, including "statements concerning K12 partner schools' potential decision – like Agora – to become self-managed but continue using the K12 curriculum (citing CAC ¶¶ 218, 220), which plaintiffs allege were misleading because while Agora had "entered into a three-year contract with K12 for curriculum," Agora "had expressed disappointment with K12's curriculum and was developing its own . . . to eventually replace K12" (citing CAC ¶ 224). Defendants contend that K12 specifically cautioned in public filings that the "independent boards of the schools or school districts we serve [could] subsequently shift their priorities or change objectives, and as a result reduce the scope [of] or terminate their relationship with us" (citing K12's 2013 10-K)).

20

Finally, defendants contend that statements about the expected "impact" of the NCAA's credit recognition decision (citing CAC ¶ 249) cannot support a claim for the same reason. They again point to K12's 2013 10-K, which cautioned that K12's "curriculum and approach to instruction may not achieve widespread acceptance, which would limit [K12's] growth," and asserted that some "academics and educators . . . may favor less formalistic methods."

In opposition, plaintiffs assert that defendants are not saved by the PSLRA's "safe harbor" under either prong of the test. They argue that the statements alleged to be forward-looking were made in response to analysts' questions about present situations involving Agora and the NCAA, and that K12's "cautionary language" failed to disclose that the "risk" of contract non-renewal had "already transpired."

"[E]xamined as a whole," see Cutera, 610 F.3d at 1111-12, the four statements initially listed in defendants' motion and the additional statements referenced in the body of the argument appear to have been made in response to questions about future events, although they are also somewhat vague and imprecise. Nevertheless, while K12 did disclose to investors that renewal of the Agora contract was not a certainty, it is not clear that the challenged statements were "accompanied by" meaningful cautionary statements, as the cautionary statements cited by defendants appear in K12's Form 10-Ks filed August 29, 2013 and August 15, 2014, and the challenged statements were made on February 4, April 29, June 26, 2014, and October 30, 2014, and January 29, 2015.

Moreover, it appears clear from the allegations that while Agora advised K12 in mid-2012 that it would not be renewing the management agreement when it terminated on June 30, 2015, K12 did not unambiguously inform investors of that fact until October 9, 2014. It is true that K12 informed investors on June 26, 2014, that it had been "working with the Board" with regard to possible "provision of educational services, products, and curriculum," in response to Agora's RFP, but there is no indication in any of the cited SEC filings or public statements that K12 had revealed to investors that its

largest revenue-producing school had sent a "notice of non-renewal" in mid-2012.

It is that omission that forms the basis of plaintiffs' claims with regard to Agora, and the court finds, for purposes of the present motion, that defendants have not established that any statement concerning K12's future relationship with Agora was a forward-looking statement, identified as such, which was "accompanied by" meaningful cautionary language.

        b.    "Puffing" statements

Defendants argue that many of the challenged statements are inactionable "puffing" statements. Statements of mere corporate puffery – "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" – are not actionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1060 (9th Cir. 2014) (quoting In re Cutera, 610 F.3d at 1111).

Defendants assert that the CAC challenges "several" non-actionable puffing statements,[4] specifically referring to

    • a statement during the April 29, 2014, earnings call, describing K12 as a "good partner for Agora," and a statement in a June 26, 2014 press release discussing "the value K12 has brought . . . to the students of Agora," CAC ¶¶ 205, 207;

    • a statement in the April 29, 2014, earnings call, indicating that K12 was "working very, very hard" to resolve the NCAA issues, CAC ¶ 249;

    • statements in K12's 2014 and 2015 Form 10-Ks noting the ability of its "learning systems" to "effectively address the educational needs of . . . special education students," CAC ¶¶ 253, 267;

    • a statement in a May 4, 2015, press release, referencing K12's aim to "provide the finest education to our students," CAC ¶ 235; and

---

[4] As with the argument regarding forward-looking statements, defendants again cite generally to their 38-page Appendix.

1    • statements during the August 14, 2014, earnings call, describing K12's

2    curriculum as "[t]he strength of our program" and "one of the great assets we have," CAC

3    ¶ 251.

4        The court finds that at least as to the statements cited by defendants in their

5    moving papers, those statements do qualify as corporate "puffery," or at a minimum, are

6    so vague as to be inactionable. Optimistic, subjective assessments such as statements

7    that K12 brought "good value" to Agora, or that K12 was "working very very hard" to

8    resolve its differences with the NCAA, or that K12's learning systems "effectively

9    address[ed] the educational needs of . . . special education students" are not affirmative

10   representations of fact that can be proven to be false (or even statements that create a

11   clearly false impression), which would be material to an investor's decision to invest in the

12   company. See Retail Wholesale & Dep't Store Union Local 338 Retirement Fund v.

13   Hewlett-Packard Co., 845 F.3d 1268, 1275-76 (9th Cir. 2017).

14        c.    Statements of present or historical fact

15        Defendants assert that plaintiffs allege no facts showing that the statements of

16   present or historical fact were false or misleading when made. Here, defendants

17   separately address the three categories of challenged statements – the "Agora

18   statements," the "Scantron statements," and the "quality and effectiveness statements."

19        i.    Agora statements

20        According to defendants, the CAC challenges 18 statements regarding the Agora

21   contract process and K12's Pennsylvania operations generally (the "Agora Statements").

22   See CAC ¶¶ 202-224. These statements include:

23        • a statement by Davis during a February 4, 2014 investor call: "[T]he

24   Pennsylvania legislation has some proposals in it that would affect us negatively. I don't

25   know if that legislation will go through or won't go through. We monitor it closely." CAC

26   ¶ 203.

27        • statements in a June 26, 2014 press release: "[T]his Fall, [Agora] must submit

28   an application for the renewal of its charter agreement with the Pennsylvania Department

of Education (PDE), to continue operations for the 2015-2016 school year and beyond. The Agora Board has elected to use an RFP process for the services and products required to operate the school.  Proposals are due to the Agora Board on July 25, 2014. K12 Inc. has been working with the Board and looks forward to providing robust submissions for the provision of educational services, products, and curriculum."  CAC ¶ 207.

  • a statement in K12's 2014 10-K:  In FY 2014, Agora elected to use a request for proposal process for the services and products required to operate the school for the 2015-2016 school year in connection with its charter renewal application."  CAC ¶ 213.

  • a statement in K12's 1Q15 Form 10-Q (repeated in substance in an October 9, 2014 press release):  "On October 9, 2014, the Company entered into a three-year contract to provide academic curriculum to Agora for a reduced scope of services that will include the academic curriculum beginning in the 2015-16 school year."  CAC ¶¶ 216, 219.

Plaintiffs contend these and other "Agora Statements" were materially false or misleading because they omitted to state either that K12's contract with Agora would not be renewed or that the nature of the contract would materially change; and that Agora had "expressed disappointment with K12's curriculum and was developing its own" which could "be provided as an option to Agora students as soon as possible" and "eventually replace" K12's.  CAC ¶¶ 145, 202, 204, 206, 208, 214, 217.

Defendants argue that plaintiffs allege no facts showing that the statements regarding Agora's RFP in advance of the school's charter renewal were false or misleading, as Agora did in fact opt to use an RFP process in preparing its October 2014 charter renewal application, and that is exactly what K12 told investors.  Defendants assert that plaintiffs must do more than simply allege that a statement was false and misleading – they must plead specific facts showing why and how that is so.

Nor, defendants assert, was it false and misleading for K12 in October 2014 to announce its three-year curriculum contract with Agora.  Defendants claim that plaintiffs

admit such statements were factually true, yet assert the statements were "misleading" given Agora's alleged plan to "eventually" develop its own curriculum. Defendants contend that accurate statements of historical fact are not materially misleading, and that allegations that are not necessarily inconsistent with the allegedly false statement do not establish falsity.

Regardless, defendants argue, even if Agora did aspire to create an in-house curriculum, the challenged statements did "not convey an implicit prediction" that K12's Agora relationship would "continue into the future." Defendants contend that because they did not give an impression differing materially from the true state of affairs, the challenged statements cannot support a claim.

In opposition, plaintiffs assert that Agora's June 28, 2012, non-renewal notice – which K12 apparently received on July 16, 2012 – was highly material to investors, given the importance of K12's relationship with (and financial dependence on) Agora. Plaintiffs contend that defendants provided no indication that K12 had received this notice from Agora until June 26, 2014, when it announced Agora's RFP, thus obliquely suggesting that Agora would not be renewing the management contract. This was almost two years after the Agora Board sent the notice, and plaintiffs assert that in the interim, investors were led to believe that the Agora/K12 management contract would automatically renew upon the contract's June 30, 2015, expiration. Plaintiffs contend that defendants' failure to disclose the non-renewal notice constitutes a material omission.

In addition, plaintiffs assert, between June 26 and October 9, 2014, defendants continued to fail to disclose the receipt of the notice of non-renewal, and instead couched the negotiation process as part of a perfunctory RFP process necessary for Agora's charter renewal, and that they feigned ignorance as to the true nature of the negotiations with K12. Plaintiffs argue that defendants' statements were materially misleading both because defendants omitted to disclose the non-renewal notice and because they misleadingly created an impression that the negotiations with Agora resulted from its charter renewal.

1    Finally, plaintiffs assert, after K12 announced on October 9, 2014, that it would be
2    awarded a three-year curriculum contract with Agora, and up until the close of the
3    proposed Class Period (October 27, 2015), defendants periodically mentioned this
4    "awarded contract."  See CAC ¶¶ 218-223.  However, plaintiffs argue, what these
5    statements omitted to say was that Agora was actively creating its own in-house
6    curriculum that would, once approved, be immediately offered to Agora students, largely
7    reducing the scope of students, and thus the revenue K12 would receive over those three
8    years, which was already reduced because K12 was no longer managing Agora.

9        The court finds that plaintiffs have adequately alleged that defendants made false
10    or misleading statements with regard to the Agora contract.  It is undisputed that Agora
11    sent K12 its notice of intent not to renew the management contract in June 2012, and that
12    for the next 2+ years, Agora was apparently negotiating a "non-management" contract for
13    provision of curriculum services.  However, the facts as pled support the reasonable
14    inference that defendants knew as of June 2012 that there would be no management
15    contract after June 2015.  Nevertheless, K12 did not disclose this fact to investors during
16    the entire period of the "negotiation," until they announced that Agora would be
17    implementing the RFP process, which appeared to preclude a management contract.

18        In view of the allegation that a substantial portion of K12's revenue was derived
19    from the management contracts, the court finds that plaintiffs have adequately alleged
20    materially false/misleading statements with regard to Agora and the failure to disclose the
21    notification of the projected termination of the contract.  A statement is materially
22    misleading when it "affirmatively created an impression of a state of affairs that differed in
23    a material way from the one that actually exists."  See Reese v. Malone, 747 F.3d 557,
24    570 (9th Cir. 2014).  The disclosure required by the securities laws is measured not by
25    literal truth, but by the ability of the material to accurately inform rather than mislead.  See
26    In re Convergent Tech. Sec. Litig., 948 F.2d 507, 512 (9th Cir. 1991); Brody, 280 F.3d at
27    1006.

28        In addition, more often than not, materiality is a question of fact.  See S.E.C. v.

Todd, 642 F.3d 1207, 1220 (9th Cir. 2011); see also Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) ("whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact"); Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987) (adequacy of disclosure is normally a jury question).  Resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is "so obvious that reasonable minds [could] not differ."  Durning, 815 F.2d at 1268; accord TSC Indus., 426 U.S. at 450.

ii.    Scantron statements

The CAC challenges 11 statements regarding K12's Scantron results and the utility of Scantron testing generally (the "Scantron Statements").  See CAC ¶¶ 225-242. These statements include:

• a statement by Packard during a November 7, 2013 investor call:  "To ascertain that the students were performing adequately, we adopted an adaptive test from Scantron that was designed to measure student learning gains and it showed that our students were learning at [national] norm levels."  CAC ¶ 225.

• a statement by Packard during the same investor call:  "[W]e felt and still believe the gains from the adaptive tests designed to measure gains are far better than state tests that impute gains from non-scaled CRT tests that were not designed to measure gains. . . ."  CAC ¶ 225.

• a statement in a March 20, 2014 press release:  "In the 2012-2013 school year, on Scantron assessments K12-managed public schools achieved 125 percent norm group gain in Reading across all grades and 102 percent norm group gain in Mathematics across all grades."  CAC ¶ 229.

• a statement by Davis during the October 30, 2014, earnings call:  "Because state-administered tests vary widely in their standards, students in K12-managed virtual academies also take Scantron performance series tests in reading and mathematics, because we want a national comparison on gain."  CAC ¶ 234.

• statements in K12's 2015 Academic Report and in the May 4, 2015 press release

27

1    linked to that Report: "In the 2013-2014 school year, in grades 3-10, students in K12-

2    managed public schools exceeded the Scantron national norm group mean gain both in

3    Reading and Mathematics."  CAC ¶¶  238, 239.

4         Plaintiffs assert that these and other "Scantron Statements" were materially false

5    or misleading because in 2016, K12 determined that its 2013-2014 Scantron analysis had

6    erroneously omitted certain scores, and also adopted Scantron's methodology for

7    excluding "outlier" scores (which K12 had previously omitted from its calculation); and

8    because K12 noted in the 2016 Academic Report that because of new state tests tied to

9    Common Core standards, K12 could, in the majority of states, not provide a year-over-

10   year view of student performance, even though it continued in 2016 to report results on

11   norm-referenced Scantron tests as a uniform benchmark for student and school

12   performance nationwide.  See CAC ¶¶ 226, 228, 233, 234, 236, 237, 241, 242.

13        Defendants argue that plaintiffs have not pled facts showing that defendants'

14   earlier statements regarding the Scantron results were materially false or misleading.  For

15   example, with regard to statements related to K12's 2012-2013 Scantron results,

16   defendants assert that the "isolated error" in K12's analytical methodology for 2013-2014

17   had "zero bearing on – and cannot demonstrate the falsity of – statements related to the

18   prior year's testing results," and defendants claim that plaintiffs allege no facts

19   establishing that it did.

20        Wwith regard to the November 2013 statement by Packard that Scantron testing

21   then "showed that [K12] students were learning at national norm levels," CAC ¶ 225,

22   defendants argue that K12's Scantron analysis relating to the 2013-14 school year had

23   only just begun at the time of Packard's comments.  They contend that K12 did not

24   calculate its 2013-14 results until May 2015 – which was 18 months after the challenged

25   statement – and they argue that those results supported Packard's remarks.

26        In addition, defendants assert, in 2016, even after recalculating its 2013-14 gains,

27   K12 determined that its students still outperformed the Scantron norm group's mean gain

28   in both math and reading (even if by a smaller margin), as reported.  For the same

1 reason, defendants argue, even if K12's recalculation required revision of the original

2 figures, plaintiffs have not alleged facts materially contradicting statements about K12

3 students' overall performance relative to the national average. They contend that a

4 reasonable investor's decision could not conceivably have been affected by the precise

5 numerical change in K12's reported scores.

6       In opposition, plaintiffs complain that defendants are attempting to "minimize the

7 significance" of the misleading nature of the Scantron-related statements by focusing on

8 the statement that the California AG specifically required K12 to publicly retract. But,

9 plaintiffs assert, the CAC alleges that K12 was also mandated to "correct the 'Academic

10 Results' page on K12's website," CAC ¶ 190(e), and that in response, K12 removed both

11 the Academic Report containing the Scantron results for the 2012-13 school year and the

12 entire "Academic Results" page from its website, as well as removing the Academic

13 Report for the 2013-14 school year. See CAC ¶ 192.

14       In addition, plaintiffs assert, when K12 published the 2016 Academic Report, the

15 Scantron results for the 2013-14 school year were revised downwards. CAC ¶ 198.

16 They claim that the lower results culminated from K12 properly aligning its methodology

17 with Scantron's calculation method of the national norm group; K12 also admitted that the

18 "methodology used in previous reports" was similar to the CA AG-admonished method for

19 the 2013-14 school year. CAC ¶ 198.

20       Finally, plaintiffs argue that the significance of K12's calculation errors is a fact-

21 intensive question not appropriate for a motion to dismiss, and contend that defendants'

22 choice to disclose this otherwise, nonpublic information undermines their contention of

23 immateriality.

24       The court finds that the CAC fails to state a claim as to the Scantron statements.

25 Plaintiffs appear to emphasize two issues – the 2013-14 calculation error, which resulted

26 from mistakenly omitting individual student scores falling within Scantron's "standard

27 error of measurement" when aggregating overall results for that year; and K12's

28 unrelated decision in 2016 to revise its methodology for identifying "outlier" test results.

29

On the first issue, plaintiffs have alleged no facts showing that K12's isolated computation error in a single school year rendered any challenged statement materially false or misleading. To the contrary, the representation that K12 students "outperformed" national averages remained undisputedly true. See CAC ¶¶ 69, 199. Here, plaintiffs contend that while K12 students still surpassed the Scantron norm group's gains in every grade level for math, they fell short of the national mean in two grades for reading.

However, a reasonable investor is not likely to have viewed such incremental changes in K12's (still positive) testing results for one school year as having significantly altered the "total mix" of information made available for the purpose of decisionmaking by stockholders concerning their investments. See Retail Wholesale, 845 F.3d at 1274 (quotations and citations omitted). Indeed, plaintiffs concede in their opposition that K12's stock price showed no "statistically significant movement" when the error in calculating the Scantron results was disclosed.

On the second issue, plaintiffs have not alleged with particularity that K12's pre-2016 methodology for identifying outlier test scores was improper, let alone that it rendered statements about students' academic performance materially false or misleading. "[M]ere disagreements over statistical methodology . . . are insufficient to allege a materially false statement." In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 877-78 (9th Cir. 2012). Furthermore, applying the new outlier standard retroactively to K12's 2013-14 results, after also accounting separately for the correction in the standard error of measurement, confirms that K12 students outperformed the national averages in both math and reading for that year, as initially reported (though not by nearly as much).

The main question here is whether defendants can be liable for providing inaccurately calculated Scantron results for K12, for a single school year. Given that defendants subsequently posted corrected results, it is undisputed that the original results were inaccurate. Defendants claim it was a mistake in calculation. Plaintiffs plead no facts showing that it was other than a simple mistake. The court finds that plaintiffs cannot state a claim of securities fraud with regard to the Scantron results. At

most, it appears to have been simple negligence.

iii.    Quality and effectiveness statements

Third, the CAC challenges an assortment of 13 statements broadly related to the nature and quality of "K12's academic services and offerings" (the "quality and effectiveness statements"). See CAC ¶¶ 243-268. These statements include:

• a statement in the March 20, 2014 press release, announcing the release of K12's 2014 Academic Report and the "key findings" of the Report: "Persistence makes a difference. Data confirm that students perform better on state proficiency tests the longer they stay with the K12 program." CAC ¶ 243.

• a statement by Davis during the August 14, 2014 earnings call, that "[t]he strength of our program is in our curriculum. We think that's one of the great assets we have." CAC ¶ 251.

• statements in K12's 2014 and 2015 Form 10-Ks: "We believe that our learning systems are able to effectively address the educational needs of both advanced and special education students because they employ flexible teaching methods and students can use them at their own pace." CAC ¶¶ 253, 267.

• a statement in the September 18, 2014, K12 press release entitled "University of California Grants A-G Approval of 95 Fuel Education Courses:" K12 "today announced that the University of California "a-g" review board approved 95 of [K12's] online and blended courses, more approved courses than those of any other online and blended provider[,]" and that this includes required courses in all 15 areas, including lab science and visual/performing arts. CAC ¶ 255.

• a statement by Davis during an October 30, 2014, earnings call: "When you have a high percentage of students who traditionally underperform in their schools before joining K12, our average static test scores are bound to be lower than traditional schools. But even with these high percentage of students who are often considered at risk, in many instances our academic performance is now better than school districts with light characteristics." CAC ¶ 257.

31

• a statement by Murray during the same earnings call: "[W]e gained approval for 95 courses from the University of California which audits course requirements to ensure that students have attained a body of general knowledge that will provide the breadth and perspective to enable success for more advanced study in the California university system." CAC ¶ 259.

Plaintiffs claim that these and other such statements were materially false or misleading in light of the following: the findings of the Online Charter School Study and the CREDO report in October 2015; "complaints" by and "concerns" among unnamed school personnel regarding aspects of the K12 program, including the curriculum; K12's 2016 agreement with the California AG to adopt specified conduct measures, including in the area of special education; and the fact that K12 did not offer any approved courses to satisfy UC's lab science and visual and performing arts course requirements to be eligible for admission to UC or CSU schools systems. See CAC ¶¶ 243-245, 252, 254, 257-258, 260-261, 263, 268.

Defendants argue that none of the quality and effectiveness statements constitutes an actionable false and misleading statement. For example, they assert that plaintiffs plead no facts showing the falsity of the statement in the March 20, 2014, press release announcing the issuance of the 2014 Academic Report, that a "key finding" of the Report that students improved academically "the longer they stay[ed] with the K12 program." Defendants note that the "reasons" plaintiff claim this statement was false were that students on average persist with an online charter school for two years, and that online charter school students living in poverty experienced a more negative overall effect on academic growth than traditional public school students living in poverty. See CAC ¶ 244.

Defendants assert, however, that these "reasons" were derived from the findings of the CREDO study (part of the Online School Study), an "industry-wide" study which was published in October 27, 2015, more than a year and a half after the issuance of the 2014 Academic Report. Moreover, they argue, the CREDO report largely supports

32

1    defendants' statements, as, for example, it found that "stayers" at online schools "had

2    stronger growth in their second year than in their first year."

3        As another example, defendants point to the statements concerning K12's ability

4    to effectively serve students with special needs.  See CAC ¶¶ 247, 253, 267.  Plaintiffs

5    allege that these statements were false and misleading because one of the reasons

6    Agora opted not to renew its management contract with K12 was "due to issues with the

7    way K12 handled special education students," and because of complaints of teachers in

8    California and the provision in K12's settlement with the California AG that required that

9    K12 take actions to come into compliance with the Americans With Disabilities Act.  CAC

10   ¶¶ 248, 254, 268.

11       Defendants assert, however, that plaintiffs have simply pointed to alleged outside

12   criticisms and isolated complaints – including from unspecified "teachers" – that, at most,

13   reflect subjective concerns.  They argue that such allegations do not constitute contrary

14   "facts," and fail to render any challenged statement false or misleading.  See In re Netflix,

15   Inc., Sec. Litig., 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (existence of

16   complaints does not establish the falsity of statements about company services); Curry v.

17   Yelp Inc., 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) (customer complaints

18   alleging state of affairs contrary to defendant's representations cannot "independently

19   suffice to establish the falsity of those representations").

20       Likewise, defendants argue, K12's voluntary agreement with the California AG to

21   implement various special education measures does not establish the falsity of any prior

22   statement.  They assert that contrary to plaintiffs' suggestion, the AG nowhere stated that

23   K12 or any California partner school was not in compliance with their special education

24   obligations.

25       Defendants contend that rather than requiring "actions to come into compliance

26   with the Americans with Disabilities Act," as plaintiffs allege, the California settlement

27   noted K12's "existing initiative to ensure an accessible learning environment," and

28   required implementation of further measures only following "the adoption of final web

33

accessibility rules implementing Section 508 of the Rehabilitation Act of 1974 and the Americans with Disabilities Act" by the U.S. Department of Justice, – a regulatory effort defendants claim is still ongoing. Defendants assert that a company's voluntary "improvements" or operational changes do not establish that prior positive statements were false when made.

Finally, defendants point to the statements regarding UC's approval of K12 courses pursuant to its "A-G" certification program. See CAC ¶ 255. Plaintiffs allege that all such statements were "materially misleading" because K12 "did not offer any approved courses to satisfy" the "laboratory science and visual and performing arts" components of the A-G program. CAC ¶ 256. Defendants contend that to the contrary, K12 – in a challenged press release, for example – identified the exact subject areas of its approved courses (without mentioning laboratory science or visual and performing arts), and provided links to a "complete list" of those courses (citing Sept. 18, 2014 K12 press release).

Thus, defendants argue, even if they did not provide all the information they possessed about UC's policy towards laboratory science and visual and performing arts courses in the online setting, the information K12 did provide – and the reasonable inferences one could draw from that information – were entirely consistent with the more detailed explanation of the A-G program that plaintiffs argue the challenged statements should have included." See Brody, 280 F.3d at 1007. Defendants conclude (citing their Appendix) that because plaintiffs have not pled particularized facts demonstrating that any challenged statement was materially false or misleading when made, they cannot state a claim.

In opposition, plaintiffs assert that the statements in this category all purported to illustrate K12's successful efforts in improving student academic outcomes, but that once defendants chose to tout K12's academic successes and services, they were bound to do so in a manner that wouldn't mislead investors. See Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 707-08 (9th Cir. 2016) (quoting Berson v. Applied Signal Tech., Inc., 527

F.3d 982, 987 (9th Cir. 2008)).

Plaintiffs contend that defendants frequently reported figures regarding the benefits of "persistence" at K12 schools and the academic performance of low-income and "at risk" K12 students, but that while K12 executives may have had access to accurate information, investors did not.

Plaintiffs argue that K12's seemingly positive results, such as its claim that "[d]ata confirm that students perform better on state proficiency tests the longer they stay with the K12 program" and "[s]tudents enrolled three or more years in K12-managed public schools achieve higher percentages at or above proficiency compared to students enrolled less than one year," sounds optimistic; but that the picture changes when the claim is qualified with information from the October 2015 Online Charter School Study, such as that "[o]n average, online charter school students are enrolled in these schools for two years, and there was a decreasing percentage of students remaining in online charter schools for a second year." See e.g., CAC ¶¶ 175, 243-244. Plaintiffs assert that defendants' "trumpeted statistics" may have been "factually true," but argue that their "manner of presentation" served to mislead investors.

Similarly, plaintiffs assert, Davis and K12 discussed K12's focus on the special education market, highlighting the services provided to special education students. See CAC ¶¶ 247, 253, 267. Plaintiffs contend that defendants admit that they had contemporaneous facts available that contradicted their statements, but in their motion simply dismiss these facts as isolated customer complaints. Plaintiffs argue, however, that these "complaints" document K12's failure to provide the services to students of special needs that K12 claimed to provide.

For example, plaintiffs compare the allegations in CAC ¶ 118 (February 2015 report by organization "In the Public Interest" quoted unidentified special education teachers in California who stated that K12-operated CAVA schools failed to provide needed services to their students) and CAC ¶ 143 (unidentified member of Agora Board stated that K12 failed to provide "individualized education plans") with those in CAC

35

¶ 253 (statement in Agora's 2014 Form 10-K that "[w]e believe that our learning systems are able to effectively address the educational needs of both advanced and special education students") and CAC ¶ 267 (same statement in K12's 2015 Form 10-K).

Plaintiffs cite Robb v. Fitbit Inc., 216 F. Supp. 3d 1017, 1028-29 (N.D. Cal. 2016), where the court found the allegations sufficient because the "plaintiffs have alleged not that users have difficulty using the product but that the product itself does not do the thing that it claims to do." They argue that just as in the Robb case, where the product at issue was a fitness tracker, the alleged complaints in this case are sufficient to show that K12 misrepresented the nature and quality of its academic services and offerings.

Finally, with regard to the allegations of misleading statements announcing approval of 95 K12 courses by the UC pursuant to its pre-enrollment "A-G" certification program, plaintiffs assert that these announcements created the impression that K12 provided courses in all required subject matters (the "A-G" subject matters), when in fact, K12 did not offer approved courses in two of the seven total subject matters.

Plaintiffs argue that defendants could have easily announced the approval of their 95 courses without reference to "A-G," which has specific meaning, but that because they made the statements in a press release, they were obliged to make fully accurate disclosures. Plaintiffs argue that investors are not required to scour links provided in a press release and compare the subject matter of all 95 approved courses with the seven "A-G" subject matters. They contend that under federal securities law, an investor is not required to undertake extensive research, but is presumed to know that which a reasonable investor would know.

It may be that plaintiffs can state a claim as to the quality and effectiveness statements, but the court finds that they have largely failed to do so here. First, some of the statements regarding academic success of K12 students or about the "quality and effectiveness" of K12's offerings are vague and imprecise. For example, the statement that "[t]he strength of our program is in our curriculum. We think that's one of the great assets we have[;] and the statement that "even with these high percentages of students

36

1   who are often considered at risk, in many instances our academic performance is now

2   better than school districts with light characteristics" are not sufficiently specific and

3   concrete to constitute an actionable misstatement of fact.

4       Moreover, plaintiffs' citation to isolated "complaints" by anonymous teachers and

5   parents does not show that defendants "had contemporaneous facts available that

6   contradicted their" generalized statements concerning special education, because the

7   mere existence of customer complaints – without more – does not render statements

8   about a company's service false.  See In re Netflix, Inc. Sec. Litig., 2005 WL 1562858, at

9   *7 (N.D. Cal. June 28, 2005).  In any event, the "complaints" alleged in the CAC – e.g., of

10  "a lot of problems with Agora's special education programs," CAC ¶ 143 – lack specificity

11  and fail to show that any challenged statement was false when made.

12      A second problem is that in some instances, plaintiffs have not pled facts clearly

13  showing that the alleged misstatements were false.  For example, plaintiffs rely on the

14  October 2015 study of online charter schools to suggest that K12's prior statements

15  about the "quality and effectiveness" of its educational offerings were misleading.

16  However, the CAC pleads no facts showing that any such industry-wide findings, which

17  were not specific to K12, in fact contradicted any of the statements plaintiffs claim were

18  misleading, and no facts showing how defendants' "manner of presentation" was

19  misleading, as plaintiffs claim.

20      Finally, the statement regarding K12's "A-G" course approvals (the courses

21  supposedly certified by UC pursuant to its A-G program) appears to have been false, in

22  that K12 UC's approval "includes required courses in all 15 areas, including lab science

23  and visual arts," CAC ¶ 255, which arguably created the impression that it provided

24  courses in all subject matters required under the "A-G" program.  Nevertheless, the court

25  finds that allegation unclear, largely for the same reasons the entire CAC is unclear.

26      Plaintiffs further refer in CAC ¶ 255 to CAC ¶ 119, where plaintiffs allege (based

27  on statements in the "In the Public Interest" report) that the UC system does not accept

28  any of CAVA's laboratory science classes.  However, the alleged false statements at

issue in this case are those relating to Agora (and Scantron and "quality and effectiveness") – not CAVA, at least as far as the court can tell. Plaintiffs also refer in ¶ 255 to ¶ 188 – another paragraph that relates to CAVA. The complaint is so disorganized that the court has found it nearly impossible to structure a chronology, to organize the claims into any semblance of logical order, or to make sense of allegations that require flipping back and forth repeatedly in an attempt to comprehend what claims plaintiffs are asserting.

The court finds that the quality and effectiveness allegations fail to state a claim, but will allow plaintiffs to amend the complaint to attempt to state a claim  They must specify which statements they are claiming were false at the time they were made, and why they were false when made, and must organize the allegations into a more comprehensible structure so that both defendants and the court can determine exactly what plaintiffs are alleging.

3.     Scienter

Defendants argue that the allegations in the CAC do not support a strong inference of scienter. The PSLRA imposes strict requirements for pleading scienter in actions brought pursuant to § 10(b) and Rule 10b-5, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In determining whether a complaint adequately pleads scienter, a court must consider "whether the totality of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting No. 84 Emp'r- Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)).

The court must consider all reasonable inferences, whether or not favorable to the plaintiff – that is, it must take into account plausible opposing inferences. Telllabs, 551 U.S. at 322-24.   While "the court's job is not to scrutinize each allegation in isolation but

38

to assess all the allegations holistically[,]" id. at 326, the inference of scienter must ultimately be more than merely "reasonable" or "permissible" – it must be "cogent and compelling, thus strong in light of other explanations[,]" id. at 324.

Defendants assert that plaintiffs allege no facts showing a motive to defraud, and no facts showing actual knowledge of any material omission, or supporting a strong inference of conscious disregard or deliberate recklessness. In addition, they contend that plaintiffs have plead no facts showing scienter as to each defendant and as to each alleged misstatement.

a.    Agora statements

With regard to the Agora statements, defendants assert that plaintiffs' scienter allegations hinge on the faulty premise that defendants knew with certainty – and represented otherwise – that the Agora Board's 2012 non-renewal notice foreclosed the possibility of an ongoing relationship between the parties. They claim that the CAC itself negates that theory.

Relying on the November 8, 2012, letter, see above at 4 n.1, defendants argue that the Agora Board disclaimed any intention of inhibiting negotiations with K12, and that it actively pursued discussions throughout 2014, which in fact led to a new contract that year (for provision of educational content and support services). Defendants assert that because the notice of non-renewal did not preclude a continuing relationship between K12 and Agora, defendants' alleged knowledge of the notice does not support an inference that they knowingly misled investors through their comments.

In addition, defendants point to the allegations regarding the statements by four confidential witnesses (whom they refer to as "CWs"), former Agora Board members whom plaintiffs label "BM1," "BM2," "BM3," and "BM4." See CAC ¶¶ 137-147 & n.4. Defendants claim that these witnesses purport to explain the "various concerns" that "motivated" Agora to end its turnkey management relationship with K12 (citing CAC ¶¶ 137-142). Defendants assert, however, that these vague "concerns" – even if known to defendants – do not contradict statements about a possible continuing business

1   relationship, and provide no evidence of a knowing misstatement by the individual

2   defendants.

3        Defendants also contend that where a plaintiff cites to evidence from confidential

4   witnesses, the complaint must include particularized allegations showing that each

5   defendant had reason to know about the improprieties identified by the CWs.  See In re

6   U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1075 (N.D. Cal. 2002) (requiring

7   particularized allegations showing each defendant "had reason to know about the

8   improprieties identified by the [CWs]")).  Defendants claim that plaintiffs' allegations thus

9   offer no basis from which to infer scienter as to the claims involving the Agora

10  statements.

11       In opposition, plaintiffs argue that the CAC adequately alleges that defendants

12  acted with scienter.  They note that defendants do not claim that they did not know about

13  the June 2012 notice of non-renewal from K12's largest single source of revenue.   They

14  assert that such knowledge satisfies the "required state of mind."  They also contend that

15  the CAC extensively details the Agora Board's disenchantment with K12 during the Class

16  Period (citing CAC ¶¶ 128-148; 150).  They claim that these accounts indicate the Agora

17  Board's clear intent to disassociate from K12.

18       The court finds that plaintiffs have adequately alleged scienter as to the Agora

19  statements (or at least as to the failure to disclose that the management contract was

20  being terminated).  Courts in the Ninth Circuit have imputed scienter where the matters at

21  issue relate to the "core operations" of the company.  See South Ferry LP, No. 2 v.

22  Killinger, 542 F.3d 776, 784-86 (9th Cir. 2008); In re Rocket Fuel, Inc. Sec. Litig., 2015

23  WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) ("core operations" theory supports

24  inference of scienter).

25       Here, given the individual defendants' roles at K12, as alleged in the CAC, the

26  court finds it entirely plausible that defendants knew about the Agora non-renewal notice,

27  the Agora Board's intent to disassociate from K12, and the academic outcomes and

28  services K12 provided.  See Reece, 747 F3d at 575 (scienter alleged when "the nature of

the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter").

### b. Scantron statements

With regard to the Scantron statements, the court has already found (as explained above) that plaintiffs cannot state a claim. Thus, because the court must consider the complaint in its entirety in order to determine whether the plaintiffs have adequately alleged scienter, see Zucco, 552 F.3d at 991 (citing Tellabs, 551 U.S. at 322-23), the court need not address scienter.

In addition, however, the court wishes to emphasize that taking "nonculpable explanations" into account, Tellabs, 551 U.S. at 323-24, the most plausible inference is that K12 made an isolated mistake in its statistical analysis for a single school year and timely corrected that mistake upon discovery. Such "allegations of negligence are insufficient to establish a strong inference of deliberate recklessness." See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002). Moreover, plaintiffs have not alleged any facts showing that any of the defendants knowingly misled investors, or were reckless in issuing the false data for that one school year.

### c. Quality and effectiveness statements

With regard to the quality and effectiveness statements, defendants assert that the CAC catalogs criticisms involving K12, and then alleges that statements bearing what defendants describe as "marginal (if any) relation" to those criticisms must have been knowingly false when made. Defendants argue, however, that nowhere in the lengthy complaint do plaintiffs allege any concrete information contradicting any challenged statement – let alone particularized facts demonstrating that defendants were aware of (or deliberately disregarded) that contradictory information at the time of their statements.

In particular, defendants point to plaintiffs' references to the "concerns" of the Agora Board which Agora's self-management transition in late-2014, as well as the references to the Online Charter School Study and the California AG settlement in 2016 (citing CAC ¶¶ 250, 262, 268). They argue, however, that plaintiffs allege no factual

1   basis to support their implicit assertion that defendants received or possessed

2   information that was at odds with the statements they are alleged to have made publicly.

3   Defendants contend that to the extent any negative inferences can be drawn, the

4   "innocent inferences cognizable from the facts pled" are dispositive in defendants' favor.

5   See Zucco, 552 F.3d at 991.

6       Defendants point to defendants' "affirmative steps . . . to discredit specific public

7   criticisms" and purported efforts to "create[] an overly friendly environment for

8   themselves" as "weigh[ing] in favor of finding scienter."  However, defendants assert, "[i]f

9   scienter could be pleaded merely by alleging that officers and directors possess[ed]

10  motive and opportunity to enhance a company's business, virtually every company in the

11  United States that experiences a downturn in stock price could be forced to defend

12  securities fraud actions."  See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th

13  Cir. 2002)).

14      As indicated above, it is a little unclear from the CAC exactly which statements fall

15  into the category of quality and effectiveness statements, and why they are alleged to be

16  false, so the court is unable to determine whether scienter is adequately pled.

17      4.      Loss causation

18      In their fourth main argument, which appears in a series of footnotes, defendants

19  assert that the CAC does not adequately allege loss causation.  To allege loss causation,

20  a plaintiff need only allege facts showing "a causal connection between the deceptive

21  acts that form the basis of the claim of securities fraud and the injury suffered by the

22  plaintiff."  In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005); see also Dura

23  Pharms., 544 U.S. at 342.  Loss causation is a "context-dependent" inquiry.  Lloyd v.

24  CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016).  Liability attaches for the loss the

25  purchaser sustains "after the truth became known" regarding defendant's material

26  misrepresentation.  Dura Pharms., 544 U.S. at 344.

27      The burden of pleading loss causation is typically satisfied by allegations that the

28  defendant revealed the truth through "corrective disclosures" which "caused the

42

company's stock price to drop and investors to lose money." See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2406 (2014). The alleged misrepresentation need not be the "the sole reason for the investment's decline in value," but plaintiff's allegations must provide "some indication that the drop in [defendant's] stock price was causally related to [the defendant's] financial misstatement[s]." Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062 (9th Cir. 2008) (alterations in original) (citation omitted).

Further, loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." In re Gilead, 536 F.3d at 1057. "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." Id. "This is not a probability requirement . . . it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of loss causation." Id. (citation and quotation omitted).

Defendants' arguments regarding loss causation appear in three footnotes. First, in footnote 21, defendants contend that the CAC fails to allege a causal connection between the Scantron statements and plaintiffs' claimed losses, as the Scantron results were not corrected until August 2016, ten months after the close of the Class Period. As the court finds that plaintiffs have not stated a claim with regard to the Scantron statements (and cannot), the court does not address this argument here.

Second, in footnote 22, defendants assert that the October 27, 2015, Online Charter School Study did not "correct" any prior misstatements, and thus did not constitute a viable "corrective disclosure" capable of supporting the loss causation element of plaintiffs' claim. The footnote containing this argument appears in the section of defendants' brief in which they argue that plaintiffs failed to plead facts showing that any of the quality and effectiveness statements was materially false and misleading when made.

Third, in footnote 24, defendants argue that K12's disclosure of the California AG's subpoena, and subsequent settlement, cannot support loss causation because "the

1   announcement of an investigation, without more, is insufficient to establish loss

2   causation." See Loos v. Immersion Corp., 762 F3d 880, 890 (9th Cir. 2014). Rather,

3   they assert, a plaintiff must plead facts showing that "investors understood" the

4   announcement to be a "partial disclosure" of a prior "inaccuracy." Lloyd, 811 F.3d at

5   1210. Here, defendants contend, plaintiffs allege no facts indicating that the market

6   understood K12's announcement to indicate fraud; moreover, K12's stock price did not

7   react negatively in the trading day after the disclosure (citing CAC ¶ 311).

8       In opposition, plaintiffs contend that the CAC alleges a series of events

9   constituting partial corrective measures and/or partial materializations of concealed risks

10  on or about June 26, 2014, August 14, 2014, October 9, 2014, October 30, 2014, and

11  October 27, 2015. See CAC ¶ 271.

12      As alleged, these disclosures are as follows: The June 26, 2014 "disclosure" was

13  the announcement by K12 that the Agora Board had elected to use an RFP process for

14  the self-management of the Agora Cyber Charter School starting in the 2015-2016 school

15  year. CAC ¶ 273. On this news, the price of K12 stock fell more than 5%, or $1.30 per

16  share, to close at $24.32 per share on June 27, 2014. CAC ¶ 274. Plaintiffs assert that

17  this announcement partially disclosed that the Agora Board was considering different

18  arrangements for the services and products it required to run Agora, but failed to disclose

19  that the Agora Board had provided K12 with notice that it did not intend to renew the

20  Agora/K12 management contract. See CAC ¶ 275.

21      The August 14, 2014 "disclosure" was the announcement that the Agora Board

22  was interested in being a "self-managed organization." CAC ¶¶ 277-278, 281-282. On

23  this news, the price of K12 stock fell 13.3%, or $2.98 a share, to close at $19.42 per

24  share on August 14, 2014. CAC ¶ 279.

25      The October 9, 2014 "disclosure" was the press release announcing that K12 had

26  been awarded a three-year contract to provide the academic curriculum for Agora, and

27  that the Agora Board would assume management duties. See CAC ¶ 284. During the

28  subsequent earnings call, K12 disclosed that as a result of this change, K12 would

experience a significant decline in revenue. CAC ¶ 285. On this news, the price of K12 stock fell 7%, or $1.12 a share, to close at $14.87 per share, and fell further the following day, to $13.82 per share. CAC ¶ 287.

The October 30, 2014 "disclosure" was K12's announcement, in a press release, that revenue and enrollments for the quarter ending September 30, 2014 were in line with the October 9, 2014 preview, K12 had experienced "disappointing' operating results. CAC ¶ 290.

Later that day K12 held an earnings call with investors and analysts, where it repeated its financial results for the quarter, and Rhyu explained that the decrease in "lower gross margin" ("difference between revenue and instructional costs and services divided by revenue") was due to K12's "continuing to invest in teachers and academic programs," with "some of the rate increases that contributed to our managed program revenue growth relate to programs where K12 incurs significant costs." CAC ¶ 290. On this news, the price of K12 stock fell more than 14%, or $2.17 per share, to close at $12.98 per share. CAC ¶ 293.

Plaintiffs allege that the question-and-answer portion of the October 30, 2014, earnings call partially revealed that although K12 was supposedly continuing to invest more in academic results, the relevant authorities were not impressed with K12's efforts to improve academic performance and that the cost to continue and magnify those improvements would further impact K12's margins, which they claim constituted a "partial materialization of the risks concealed by" defendants false and misleading statements. CAC ¶ 294.

Finally, plaintiffs describe some of the findings of the October 27, 2015, Online Charter School Study, which disclosed various problems with online charter schools like K12. See CAC ¶¶ 296-305. They assert that K12's October 27, 2015 press release, in which it announced its financial results for 1Q16 (quarter ending September 30, 2015), and the earnings call held that same day, further disclosed the impact that the loss of the Agora contract had and continued to have on K12's financial results, which they claim

45

1  constituted a "partial materialization of the risks concealed by [d]efendants' false and

2  misleading statements.  CAC ¶¶ 306-308.

3      Plaintiffs concede that the market did not immediately react to the disclosure of the

4  subpoena from the California AG, which K12 made in an SEC filing after the market

5  closed on October 27, 2015.  See CAC ¶ 310.  However, they assert that the share price

6  "slid a cumulative $0.54 per share" over a three-day period, from October 27, 2015, to

7  close at $9.71 per share on October 30, 2017, CAC ¶ 311 (which was, of course, after

8  the close of the proposed Class Period).

9      The court finds that for purposes of the present motion, the CAC adequately

10  alleges loss causation as to the Agora statements.  K12 released the true information in

11  bits and pieces – a bit in June 2014, a bit in August 2014, and a bit in October 2014.

12  Plaintiffs allege that the price of K12's stock dropped 5% on June 27, 2014; dropped

13  13.3% on August 2014; and dropped 7% on October 10, 2014, and fell slightly further the

14  following day.

15      The court does not address loss causation as to the Scantron statements.  As for

16  the quality and effectiveness statements, there is no clear loss causation alleged (as with

17  the other elements), and this must be corrected in any amended complaint.

18      5.      Control-person liability under § 20(a)

19      Finally, defendants assert (again, in a footnote) that the CAC fails to state a claim

20  for § 20(a) control person liability, "[b]ecause [p]laintiffs have not established a primary

21  violation of the federal securities laws[.]"  Plaintiffs' only response to defendants'

22  argument is that they have stated a claim under § 20(a) because they have stated a

23  claim of primary liability under § 10(b) and Rule 10b-5.

24      In order to establish a prima facie case under § 20(a), a plaintiff must show (1) a

25  primary violation of federal securities laws, and (2) that the defendant exercised actual

26  power or control over the primary violator.  Howard v. Everex Sys., Inc., 228 F.3d 1057,

27  1065 (9th Cir. 2000).  In general, whether the defendant is a controlling person is a

28  factual question, "involving scrutiny of the defendant's participation in the day-to-day

46

affairs of the corporation and the defendant's power to control corporate actions." Id. (quoting Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir.1994)). Thus, the § 20(a) claim is derivative – if there is no primary claim stated, there can be no control-person claim.

Here, while the court finds that plaintiffs have stated a claim of primary liability based on the "Agora statements," neither side has addressed the elements of a § 20(a) claim, arguing only that there is or is not a § 20(a) claim based on their view as to whether there is or is not a viable claim of primary liability.

While it appears likely from the allegations at CAC ¶¶ 26-33, 36, 340-342 that plaintiffs may have stated a claim under § 20(a), defendants did not adequately address this issue in their motion, as they did little more than raise it in a footnote, and the court declines to analyze the issue or rule on it in this order.

### CONCLUSION

In accordance with the foregoing, defendants' motion is GRANTED in part and DENIED in part. With regard to falsity, scienter, and loss causation, the court finds that plaintiffs have stated a claim with regard to the Agora statements (or at least with regard to the failure to disclose the non-renewal of the contract), have not stated a claim with regard to the Scantron statements (and cannot), and have not stated a claim with regard to the quality and effectiveness statements (but might be able to do so in an amended complaint).

Thus, the motion to dismiss the CAC as it pertains to the Agora statements is DENIED. The motion to dismiss the CAC as it pertains to the Scantron statements is GRANTED. The dismissal is WITH PREJUDICE. The motion to dismiss the CAC as it pertains to the quality and effectiveness Statements is GRANTED, with LEAVE TO AMEND.

Any amended complaint shall be filed no later than October 2, 2017. No new parties or claims shall be added without leave of court. In addition, apart from the above ruling, plaintiffs should focus on shortening the complaint by eliminating allegations that are not essential or relevant to their securities fraud claim. In the court's view, when each

side finds it necessary to submit a lengthy "Appendix" – 38 pages for defendants and 53 pages for plaintiffs – in connection with a motion to dismiss, that in itself is a sure indication that the complaint is overly long and convoluted.

The CAC includes numerous lengthy passages which appear to have as their sole purpose to criticize the quality of the educational services provided by K12. But many of those passages are of only marginal relevance to the § 10(b) claims because none of the alleged false statements or omissions directly relate to those particular allegations. Plaintiffs have also included numerous allegations relating to events that occurred before and after the proposed Class Period, without clarifying what – if any – connection there may be between those events and the events alleged to have occurred during the Class Period.

Thus, while the CAC may not be a true "puzzle-style" complaint, taken as a whole it is far from being a complaint that complies with Rule 8(b)'s requirement that the plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief."

In particular, the court notes that the CAC includes numerous details relating to events that occurred before and after the Class Period, as well as details of events that do not seem to have any bearing on the claims asserted in the complaint other than to emphasize plaintiffs' underlying contention that K12 was offering a mediocre product which it was touting as a premier product.

This includes most of the references to the Colorado Virtual Academy, CAC ¶¶ 11, 81-89; the references to the Tennessee Virtual Academy, CAC ¶¶ 90-99; the references to the California Virtual Academies, CAC ¶¶ 100-119; the lengthy summary of the Online Schools report published October 27, 2015 (last day of the Class Period), CAC ¶¶ 16, 166-179; and the description of the settlement of the case filed against K12 by the California AG and the provisions of the July 2016 judgment, CAC ¶¶ 15,186-191.

If it is plaintiffs' belief that some of these seemingly irrelevant allegations do in fact support the elements of the claims of alleged false statements or omissions, they must

make that connection clear in the amended complaint.  If no connection can be made, such allegations should be omitted.

**IT IS SO ORDERED.**

Dated:  August 30, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge