Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
Kara M. Wolke (SBN 241521)
Leanne H. Solish (SBN 280297)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE K12 INC. SECURITIES LITIGATION | Master File No. 4:16-cv-04069-PJH<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ........ 1

II. JURISDICTION AND VENUE ........ 3

III. PARTIES ........ 3

IV. BACKGROUND ........ 5

A. The Company and Its Business ........ 5

B. K12's Reliance on Public Education Funding for the Bulk of Its Revenue ........ 7

V. K12'S LOSS OF ITS LARGEST MANAGED CONTRACT WITH THE AGORA CYBER CHARTER SCHOOL ........ 8

A. Agora's Academic Results ........ 8

1. Agora's Historic Academic Results ........ 8

2. Agora's Academics Results During the Class Period ........ 9

B. The Agora's Boards Decision to Severely Change Its Relationship with K12 and to Become Self-Managed ........ 11

VI. THE TRUTH BEGINS TO EMERGE ........ 16

A. K12's Largest Revenue Providing School Begins Looking for New Providers ........ 16

B. K12 Discloses Agora's "Interest" In Self-Management During Its August 14, 2014 Conference Call ........ 16

C. Agora Confirms Its Intent to Become A Self-Managed School, Resulting in K12 Redefining Its Business Lines ........ 17

D. K12 Announces Disappointing Operating Costs ........ 18

E. K12 Announces Its First Quarter of Financial Results after the Loss of the Agora Managed Public School Contract ........ 19

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 19

A. Defendants' False and Misleading Statements and Omissions Concerning Agora Prior To K12 Announcing the Agora Board's Election To Use an RFP Process...... 20

B. Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding the Agora Board's RFP Process and Selection of Providers.................... 22

C. Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding Its Selection of K12's Curriculum ........................................................ 25

VIII. LOSS CAUSATION.................................................................................................. 26

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)........................................................................................................... 33

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................................................................... 35

XI. CLASS ACTION ALLEGATIONS ........................................................................... 35

XII. CLAIMS FOR RELIEF ............................................................................................. 37

XIII. PRAYER FOR RELIEF ............................................................................................ 40

XIV. JURY DEMAND....................................................................................................... 40

1. Lead Plaintiffs Babulal Tarapara and Mark Beadle ("Plaintiffs"), by and through their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of K12 Inc. ("K12" or the "Company") from October 10, 2013, through October 27, 2015, inclusive (the "Class Period").

2. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP. This investigation included, among other things, a review and analysis of: (i) K12's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of K12's investor calls; (vi) K12's press releases; (vii) interviews with former employees and other potential witnesses with relevant information (some of whom have provided information in confidence, including emails) throughout the course of counsel's investigation; (viii) pertinent court filings; and (ix) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (defined herein) or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

3. K12 is a for-profit, online education company. In a "virtual school," students can attend their classes from anywhere simply by logging in. Over the last sixteen years since its founding, K12 has become one of the largest for-profit, online educational companies. The Company's core operations, comprising approximately 85% of its revenues during the Class Period, is its management of virtual public schools for students in kindergarten through high school. For these schools, K12 contracts with a school district or non-profit school board to provide "turnkey" management of the school including: all aspects of academics; teacher and staff recruitment, training, and compensation recommendations; student marketing and

enrollment; financial and regulatory compliance; providing curricula, laptops, software, and other required services and equipment; and all administrative duties.

4. Once K12 is able to provide services in a given state via passage of laws and regulations allowing K12 and other for-profit educational providers to service schools in the state, the Company then looks for a sponsoring school district. In many cases, these school districts tend to be small and in less-populous counties. The authorizing school district tends to receive a small percent of the revenues flowing to the school for their part in overseeing the school. This creates an ideal situation for K12: in most states, a student from anywhere in the state can enroll in the K12-managed charter school, and thus, the state's per-pupil funding is not limited to the population served by the authorizing district; a large portion of this state funding ends up flowing through to K12's top line; and the percentage that the authorizing district receives for "overseeing" K12's management incentivizes the districts to let K12 continue operations, even when academic results may indicate otherwise.

5. During the majority of the Class Period one of K12's two largest schools was the Agora Cyber Charter School ("Agora") in Pennsylvania. During the Class Period, its contract with K12 was up for renewal. According to former members of Agora's school board (the "Agora Board"), the Agora Board decided not to seek renewal of its Managed Public School contract with K12, which was scheduled to terminate on June 30, 2015. The decision to part from K12's management of Agora was the result of many reasons; among these reasons, according to former Board members, were: disappointing academic improvements; an emphasis on testing that did not seem to help students; and other various reasons to leave the Agora Board unsatisfied with the various academic services and offerings that come along with a managed contract with K12. Although K12 received proper notice of the Agora Board's decision not to renew the contract, Defendants did not take this notice seriously, and concealed this decision from investors. Instead, Defendants made piecemeal announcements regarding Agora over the course of the Class Period.

6. Defendants misled Plaintiffs and investors in the statements and omissions made in K12's financial reports, earnings calls, and press releases. Generally, Defendants' made materially false and misleading statements and omissions regarding K12's relationship with Agora, the Agora Board's decision to not renew its contract with K12 for turnkey management services, the true nature of the negotiation process with Agora, and the resultant relationship after negotiations had taken place.

7. Indeed, the eventual announcements of Agora's decision to not renew its Managed Public School contract with K12 and the effects of this decision on K12's financial results resulted in drops in the Company's stock price: falling from a Class Period high of $25.98 on June 23, 2014, to just $10.25 on October 27, 2015—***an over a 60% fall in price.***

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

9. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information occurred in substantial part in this Judicial District.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

12. Lead Plaintiff Tarapara, as set forth in a previously-filed certification (Dkt. No. 22-2 at 2-3), incorporated by reference herein, purchased K12 common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Lead Plaintiff Beadle, as set forth in a previously-filed certification (Dkt. No. 22-2 at 4-5), incorporated by reference herein, purchased K12 common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant K12 is a Delaware corporation with its principal executive offices located at 2300 Corporate Park Drive, Herndon, Virginia. K12 is a technology-based education company that purportedly provides technology-based educational products and solutions to public school districts, public schools, virtual charter schools, private schools, and families. K12's common stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "LRN."

15. Defendant Nathaniel A. Davis ("Davis") was Chairman and CEO of K12 from January 1, 2014 through the end of the Class Period. Davis relinquished his position as CEO on February 8, 2016. Davis has been a K12 director since July 2009, was named Chairman in June 2012, and Executive Chairman in January 2013. After relinquishing his role as CEO, Davis returned to his Executive Chairman role in February 2016. Prior to working at K12, Davis worked for XM Satellite Radio, serving as President and then CEO until the company's merger with Sirius Radio, and serving on the board of directors of XM Satellite Radio from 1999 to 2008. Prior to his roles at XM Satellite Radio, Davis held numerous executive management positions at public and private telecommunications and media firms. He has also served on the board of several public and private firms including Unisys Corporation, Vibrant Solutions, Mutual of America Capital Management Corporation, Charter Communications, and Telica Corporation.

16. Throughout the Class Period, Davis frequently spoke to investors and analysts on conference calls. Davis possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Davis signed and certified the accuracy of K12's Form 10-K for the fiscal years ended June 30, 2014 and June 30, 2015, and certified the accuracy of K12's Forms 10-Q for each quarterly period from September 30, 2013 through September 30, 2015.

17. Defendant James J. Rhyu ("Rhyu") has been Chief Financial Officer ("CFO") and Executive Vice President of K12 since June 2013. Rhyu has more than 20 years of financial management experience. Prior to joining K12, Rhyu served as CFO and Chief Administrative Officer of Match.com, as well as Director of Match.com Europe Limited. Prior to his roles at Match.com, Rhyu served as Senior Vice President of Finance at Dow Jones & Company. Rhyu worked with Defendant Davis as Corporate Controller of SIRIUS XM Radio and its predecessor XM Satellite Radio from 2006 to 2009. He has also held positions at Graftech International, Ernst & Young, and Deloitte & Touche. Rhyu is a Certified Public Accountant.

18. Throughout the Class Period, Rhyu frequently spoke to investors and analysts on conference calls. Rhyu possessed the power and authority to control the contents of the Company's public filings with the SEC. During the class period, Rhyu signed and certified the accuracy of K12's Forms 10-K for the fiscal years ended June 30, 2014 and June 30, 2015, and Forms 10-Q for each quarterly period from September 30, 2013 through September 30, 2015.

19. Defendants Davis and Rhyu are collectively referred to as the "Individual Defendants."

20. Defendant K12 and the Individual Defendants are collectively referred to as "Defendants."

21. The Individual Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, possessed the power and authority to control the contents of K12's reports to the SEC, press releases, and presentations to the market. Individual Defendants were aware of, or recklessly disregarded, that materially false and misleading statements and omissions were being issued, and approved, ratified, or directly made these statements and omissions in violation of the federal securities laws.

## IV. BACKGROUND

### A. The Company and Its Business

22. K12 is a technology-based education company offering various educational services and tools to public school districts, public schools, virtual charter schools, private schools, and families for students primarily in kindergarten through 12th grade. In fact, K12's CEO for the majority of the Class Period, Defendant Davis, referred to K12 as a "for-profit company in a not-for-profit world." The Company was founded in 2000 by Ronald Packard and backed by Michael Milken, among others.

23. K12 operates through three business segments, the definition and classification of which evolved during the Class Period as explained herein. At the beginning of the Class Period, K12 defined these businesses as: (1) Managed Public Schools, turn-key management services sold to public schools on a contractual basis; (2) Institutional Sales, educational products and services sold à la carte to school districts, public schools and other educational institutions that K12 did not manage, such as its Fuel Education or "FuelEd" services; and (3) International and Private Pay Schools, private schools for which K12 charged tuition and made direct consumer sales. In its FY2014 Form 10-K, K12 subdivided its three main businesses in the following chart:

| Managed Public Schools | Institutional Sales | International and Private Pay Schools |
|---|---|---|
| • Virtual public schools | • $K^{12}$ curriculum | • Managed private schools |
| • Blended public schools | • FuelEd Online Courses | —$K^{12}$ International Academy |
| —Hybrid schools | • FuelEd Anywhere Learning System | —George Washington University Online HS |
| —Flex schools | • Middlebury Interactive Languages | —The Keystone School |
| —Passport schools | • Pre-kindergarten | • Independent course sales (Consumer) |

24. In October 2014, K12 changed the way it presented its revenue and enrollment figures by changing the name of, and the services encompassed by, the Managed Public Schools and Institutional Sales business lines. The three business lines were then broken down as: (1) Public School Programs; (2) Institutional Software and Services, which included K12's educational software and services; and (3) International and Private Pay Schools.

25. The boards of an increasing number Managed Public Schools decided to reclaim administrative oversight of the schools, and as a result, K12 decided to break down its Public School Programs into Managed Public Schools, and Non-managed programs, where K12 provided curriculum, technology, and/or other educational services on a contractual basis but did not offer primary administrative oversight of a school. The change in presentation was reflected in the chart K12 provided in its FY2015 Form 10-K.

| Public School Programs (Managed and Non-managed) | Institutional Sales | International and Private Pay Schools |
|---|---|---|
| • Virtual public schools | • $K^{12}$ curriculum | • Managed private schools |
| • Blended public schools | • FuelEd Online Courses | —$K^{12}$ International Academy |
| —Hybrid schools | • FuelEd Anywhere Learning System | —George Washington University Online HS |
| —Flex schools | • Middlebury Interactive Languages | —The Keystone School |
| —Passport schools | • Pre-kindergarten | • Independent course sales (Consumer) |

26. A year later, in October 2015, K12 announced that it would again be changing the presentation of its business lines by moving the Non-managed programs into K12's Institutional business line, as reflected in K12's latest Form 10-K.

| Managed Public School Programs | Institutional | Private Pay Schools and Other |
|---|---|---|
| • Virtual schools | • Non-managed Public School Programs | • Managed private schools |
| • Blended schools | • Institutional software and services | —$K^{12}$ International Academy |
| —Hybrid schools | | —George Washington University Online High School |
| —Passport schools | | —The Keystone School |
| | | • Independent course sales (Consumer) |

As discussed below, both these decisions came at times when K12 was reporting disappointing enrollment figures in its Managed Public Schools.

**B. K12's Reliance on Public Education Funding for the Bulk of Its Revenue**

27. The Managed Public Schools comprised the vast majority of K12's revenues during the Class Period– ***approximately 85%***. The Managed Public Schools were also Defendants' focus during the Class Period, as Rhyu confirmed in an earnings call on November 7, 2013 when he stated: "we're focused on our managed public schools. We think we've got a strong business still there."

28. K12 effectively runs its Managed Public Schools: for these schools, a school board contracts with the Company to provide all aspects of school management, including the creation and implementation of the academic plan, monitoring academic achievement, teacher recruitment and training, student enrollment and marketing, compensation recommendations for school personnel, implementation of student support services, financial and regulatory compliance support, and procurement of curriculum, computers and other required services and equipment. In the 2013-14 and 2015-16 school years, K12 had Managed Public Schools in 33 states and the District of Columbia; in the 2014-15 school year, the Company had Managed Public Schools in 32 states and the District of Columbia.

29. Managed School funding is provided by state governments and is generally awarded on a per pupil basis, making enrollment at and revenue derived from Managed Schools a key indicator of K12's financial success. K12 traditionally received a percentage of these funds as determined by its contract with the district. Because the districts supposedly retain oversight of the K12-managed schools, the districts received a small portion of the Managed Schools' revenues. The remainder of these state-allocated funds went to K12's top line.

30. The estimated U.S. average expenditures for a fully online school are $6,400 per student according to an October 2013 "Fun Facts" handout published on the International Association for K-12 Online Learning's website. The amount of funding per student can be much higher depending on a state's funding formula for online charter schools which may account for special needs, and in 22 states, the amount of funds per pupil is the same regardless whether a school is virtual or brick-and-mortar. For example, K12 received an average of $11,039 per student in government for its management of Agora Cyber Charter School in Pennsylvania in the 2013-14 school year, according to a November 2014 Bloomberg article entitled *K12 Backed by Milken Suffers Low Scores as States Resist*, and a December 2011 New York Times article entitled *Profits and Questions at Online Charter Schools* (the "NYT Article"), explained that

Pennsylvania spent an average of $10,000 per student enrolled in an online school, but that it cost half of that, at most, to educate those students online. Virtual charter schools collectively receive more than $1 billion in taxpayer funds annually, according to a recent Education Week article entitled *Outsized Influence: Online Charters Bring Lobbying 'A' Game to States* (the "Education Week Article").

## V. K12'S LOSS OF ITS LARGEST MANAGED CONTRACT WITH THE AGORA CYBER CHARTER SCHOOL

31. The Agora Cyber Charter School, based in King of Prussia, Pennsylvania, was K12's largest revenue providing school both before and during the Class Period: in K12's fiscal year 2010, the Agora contract accounted for more than 10% of the Company's revenues; in the fiscal years 2011-2015, Agora accounted for approximately 13-14% of K12's revenues; and in its Form 10-K for the 2013 and 2014 fiscal years, K12 admitted that a change in its contract with Agora could ***adversely affect*** the Company's business, financial condition, and results of operation. Recognizing the importance of Agora, and Pennsylvania's generous per pupil allocation of state education funds for online charter students (*see* ¶30, *supra*), K12 has spent over $1.4 million lobbying the Pennsylvania state legislature since 2007, according to expense reports available on the Pennsylvania Department of State's website.

32. Agora was founded in June 2005. In granting Agora its charter, the Pennsylvania Department of Education ("PDE") expressly cited Agora's affirmation that it would not employ an outside management organization to manage the online school. Despite these representations, Agora entered into a management contract with K12, in which K12 would receive 15% of Agora's qualified gross revenues in exchange for managing the school.

### A. Agora's Academic Results

#### 1. Agora's Historic Academic Results

33. In April 2011, the Center for Research of Education Outcomes ("CREDO") at Stanford University published "Charter School Performance in Pennsylvania," and reported that Pennsylvania's cyber schools were performing "significantly worse" in math and reading than public schools. Although not specifically named in CREDO's report, Agora was the second largest cyber charter school operating in the state at the time the report was issued.

34. Later that same year, a scathing NYT Article was published on December 12, 2011. The article appeared on page A1 of the paper, and detailed months of examination and investigation into the Company's operations, interviews, school finances, and academic performances on the paper's part. The NYT Article declared that a "portrait emerges of a company that tries to squeeze profits from public school dollars by raising enrollment, increasing teacher workload and lowering standards."

35. The NYT Article featured Agora as its centerpiece: "By almost every educational measure, the Agora Cyber Charter School is failing. Nearly 60 percent of its students are behind grade level in math. Nearly 50 percent trail in reading. A third do not graduate on time. And hundreds of children, from kindergartners to seniors, withdraw within months after they enroll." The NYT Article pointed out K12's then-current CEO's claim that Agora's results were "significantly higher than a typical school on state administered tests for growth" in an October 2011 earnings call, but noted that:

> Weeks earlier, data had been released showing that 42 percent of Agora students tested on grade level or better in math, compared with 75 percent of students statewide. And 52 percent of Agora students had hit the mark in reading, compared with 72 percent statewide. The school was losing ground, not gaining it. Mr. Packard said in a recent interview that he was not aware of the data at the time he made the comments. A spokesman said Mr. Packard was relying on older data.

**2. Agora's Academics Results During the Class Period**

36. Shortly after the beginning of the Class Period, the Agora Board of Trustees ("Agora Board") was presented with the school's Scantron Test[1] results as of October 13, 2013, based on students taking the exam at the beginning of the school year in grades 3-12. The results were attached to the Agora's Board's minutes for the meeting. In mathematics, out of a total of 92.5% of students taking the Scantron Test, overall 31% scored below average and 22% performed at low average, with 32% of returning students performing below average and 21% of returning students performing at low average. In reading, 88.9% of students had at that point been tested, with 23% of students performing below average, and 23% of returning students performing at below average.

37. On January 28, 2014, Agora parents were put on notice that the school was designated a "focus school" by the federal government. Receiving such a designation meant that Agora scored in the

[1] Scantron Performance Series® Test. Defendants explained that the Scantron Tests were a common measuring tool for a student's academic growth in a school year across states.

bottom 10% of schools serving disadvantaged students, as a result of Agora's low test scores and a less than 50% graduation rate.

38. Attached to the meeting minutes of the Agora Board's April 22, 2014 meeting was a report noting that only 42% of Agora K-5 students were on track in all core courses, 17% were not on target in any core course, and 18% were only on target in one core course. It also reported that only 73% of middle school students were passing English cumulative courses and 74% were passing math cumulative courses. In high school, it reported that only 63% were passing. It noted that every high school department had seen decreases in their passing rate from Q2 to Q3 except Business/Tech courses, with the largest decrease occurring in the English department (12%). The report also noted that in March 2014, K12 had seen a 59% increase in customer support calls related to issues with the Company's software, hardware, and other technical issues for a total of almost 3,700 calls in one month.

39. In addition, as part of its October 2014 charter renewal application, a survey of parents, teachers and staff, and board members was conducted to generally understand the perception these stakeholders had of Agora's effectiveness, as well as "to evaluate the goods and services provided by its single-source provider K12 Inc." The consultants conducting the survey concluded that "the people who are inside the operation of the school . . . are not satisfied in several areas of the operation. Specifically, they rank online curriculum for general and special education students as well as computer devices and text/classroom materials supplied by the school, below expectations" and noted that "lower satisfaction levels point to opportunities for improvement on the part of K12 Inc.-supplied goods and services."

40. The survey found that the Agora Board members' "opinions of the online curriculum for special education students, and textbooks and materials generally, were mediocre." Teachers and support staff were:

> much less complimentary about the online curriculum for general and special education students, school supplied computers and printers, as well as textbooks and other instructional materials. In fact, responses were weighted *Disagree/Strongly Disagree* on the questions about online curriculum for special education as well as the item asking about satisfaction with the supplied computer devices. Open-ended comments brought compliments but also a significant number of specific areas that deserve a focus on improvement.

(Emphasis in original). More than 50% of teachers and staff said they disagreed or strongly disagreed with the statement "the online curriculum meets the educational needs of students with disabilities" and more

than 40% disagreed or strongly disagreed with the statement "the online curriculum meets the educational needs of students."

41. The survey also contained numerous complaints from teachers and support staff. One teacher noted that "expectations are set relatively low and students are able to complete entire semester's worth of work in one week." Another teacher complaint commented that there were "just too many students per teacher. We have wonderful workshops about engaging and getting to know students but it is very difficult (no make that impossible) when I have 175 students every 9 weeks. If Agora really cares about its students the student to teacher ratio must be lowered."

42. A different teacher comment demonstrated that any efforts to help K12 improve their academics seemed to fall on deaf ears:

> We are performing a disservice to our high students by allowing them to do their school work whenever they feel like it. Completing 75% of your work the last two weeks of school and passing with a D is not educationally sound practice. We should not be allowing that. We also should have stricter policies regarding who can attend our school. We have kids attending our school to hide out. That needs to change. ***Also K12 does not change their courses to meet the needs of the students. I have been teaching the same course for a long time and there have been no updates to the course. I send mistakes to feedback and they aren't fixed. I've let them know that every test part 2 question since I've been teaching the course is on yahoo answers yet they keep giving out the same tests. Some of the questions above were difficult to answer.*** As a school we do try to meet the needs of our students but often times our hands are tied by curriculum or policy.

(Emphasis supplied). Other comments critical of K12 included, for example: "Teachers are overworked. Additional tasks are constantly added, without giving us extra time to fulfill the tasks. Administration is more driven by pleasing [K]12 management with increasing enrollment, than to fix the issues and meet the needs of our present student population[;]" and "K12 does things only to make themselves look good. We are doing ILPs--the only reason is so that K12 can put in their TV commercials that every student has an individualized learning plan. After the ILPs were created, K12 never came back to say do something with them."

**B. The Agora's Boards Decision to Severely Change Its Relationship with K12 and to Become Self-Managed**

43. Once a new board was seated in late 2009 following a tumultuous period with Agora and the PDE concerning the circumstances surrounding Agora's founding, the PDE allowed the Agora Board to submit a charter renewal application. K12 continued to manage Agora, and following PDE's approval of

Agora's renewal application, Agora and K12 renewed its turnkey management contract on November 12, 2009 (the "Agora/K12 Contract"). In response to the SEC's April 2, 2013 instruction to file the Agora agreement as an exhibit, on May 3, 2013, K12 filed that contract as exhibit 10.1 to its Form 10-Q for the quarter ended March 31, 2013.

44. The Agora/K12 Contract ended on June 30, 2015, when Agora became a self-managed school. According to the Agora/K12 Contract, it would automatically renew unless either party provided "the other with written notice of non-renewal at least eighteen (18) months before the expiration of the then-current" term. For K12, official notice was required to be given to the Executive Vice-President of School Management and Services of K12, with a copy to the General Counsel of K12. The Agora Board gave proper notice of this non-renewal. On June 28, 2012, the Agora Board sent K12 a "Notice of Non-renewal" letter, attached hereto as Exhibit A.

45. According to confidential witnesses, each a former Agora Board member that served on the Board for some time during the Class Period, there were various concerns with the services K12 was providing.[2] BM1 said there were a number of reasons why the Agora Board decided to get rid of K12, that the board had given K12 eighteen months' notice, and that official notification of the break-up was made by both written and verbal communications. BM2 stated that he/she believed all proper notifications had been given. BM3 stated that the decision to break all ties with K12 was motivated by a number of problems that had been going on at the school. BM2 also explained that K12's failure to deliver on several clauses of the contract with K12 went into the Agora Board's decision to withdraw from the contract.

46. Among the reasons BM1 listed for why the Board decided to get rid of K12 were: that the costs per student were high; staff was complaining that K12 was bullying them; K12 management was not reaching out to the community; the K12 curriculum was not compatible across the board; K12 had settled complaints involving special education students without notifying the Agora Board; a lot of school time was

[2] Each former board member ("BMs") will be identified herein by number (BM1, BM2, etc.). BM1 was an Agora Board Member from October 2009 until October 2016; BM2 was an Agora Board Member from June 2014 until in or around May 2016; BM3 was an Agora Board Member from June 2014 until September 2015; and BM4 was an Agora Board Member from in or around December 2009 until December 2013.

spent on Scantron Tests that did not help the students; students were not improving much; there was a lot of absenteeism; and the PDE had concerns about student record keeping.

47. BM1 mentioned that K12's computers were "crappy." BM3 further commented that Agora was being overcharged by K12 for computers that were not functioning. BM2 mentioned that one reason the Agora Board decided to withdraw from the contract was that K12 promised to update technology every three or four years and that this had not been done.

48. BM3 stated that K12 provided a lot of monitoring and testing, and that that when BM3 asked questions as a result of the monthly reports provided by K12, these questions went unanswered, and further explained that when BM3 asked how numbers had been calculated, the typical response was "we can't answer that right now" without any later follow up.

49. BM1 expanded on the Scantron Test, explaining that every time you turned around, K12 was testing with Scantrons, but it was not helping the students. BM1 stated that parents were complaining about Scantron testing, and that the Scantron Tests were not really preparing the Agora students for any level of state testing. BM1 recalled that K12 had told the Agora Board that the Scantron Tests were too low, and the Agora's head of school had been trying to improve the scores, but the improvements never matched K12's forecasts. BM1 explained that these forecasts were provided to the Agora Board over the duration of the Agora/K12 contract lots of times, but "they had only gotten a little bit of improvement," and when the kids took the state and common core tests, it was clear those tests didn't match the Scantron Tests.

50. BM1 explained that one of the primary reasons the Agora Board got rid of K12 was that students were not improving that much. BM4 stated that Agora Board members did have some concerns that student proficiency was not that good. In the minutes to an August 3, 2015 Agora Board meeting, in discussing lower enrollments for the coming school year, one member of the Agora Board commented: "we want to deliver the best possible education and that we knew we would shrink a bit. We have to move away from the K12 mentality focused only on enrollment numbers and focus on the education."

51. BM1 stated that around June 2014, the Agora Board discovered that Sharon Williams, the head of school and a K12 employee, settled a number of cases involving special education students without notifying the Agora Board. BM1 stated that Agora had to pay a lot of money and after questioning K12 about the cases, the Agora Board learned that a lot of the cases were K12's fault. BM3 confirmed that there

were a lot of problems with Agora's special education programs, and specifically cited the K12-managed settlements of special education cases without going to the Agora Board. BM3 further explained that a lot of the problems with special education concerned that lack of IEP (individual education plan) documents, which are required under a federal program for each special education student in order to evaluate academic levels and disabilities along with goals for the future. BM3 explained that IEPs were supposed to be created prior to a student starting the program, but that in a specific case, parents did not receive a report card for 3 years.

52. After the Agora Board gave notice to K12, BM1 explained that the Board received information about expenses, and that the services K12 were offering was not worth that much. BM4 confirmed that Agora was very dependent on K12 to provide information. BM1 stated that after the Agora Board had terminated the contract, K12 was still trying to sell the Agora Board services, and the testing services were one of the components of these expenses.

53. BM1 explained that K12 was using an old curriculum that had not been updated, but that the Company had told the Agora Board that the curriculum was compatible with Pennsylvania's Common Core. BM2 further commented that the K12 curriculum was outdated and there were issues with K12 management. BM1 explained that K12 would give presentations on the curriculum year-to-year based on updates, but that the presentations were not that great. In the February 25, 2014 Agora Board Meeting, the Agora Board hired a consultant, Jerry Brodsky, who then, according to BM1, started developing Agora's own curriculum. BM3 also confirmed that the Agora Board accepted Brodsky's proposal to design a curriculum for the school and that Brodsky completed the design, but as he was finishing the work, K12 "made him an offer of employment that he could not refuse" and K12 refused to tell Agora anything about Brodsky's new position.

54. Eventually, as discussed in more detail below in §VI.C, *infra*, K12 was awarded a three-year contract to provide Agora's curriculum beginning in the 2015-16 school year. This was because, as BM1 explained, PDE did not approve the new curriculum Agora had developed, partially because they were not aware that the change was occurring. BM1 said that the new curriculum was better than what K12 had, but it had been developed quickly and had not been thoroughly tested.

55. BM1 explained that K12 was more rigorous and panicky when the Agora Board was about to get rid of K12. BM1 stated that the Agora Board had hearsay that Agora was K12's "bread and butter" and the Agora Board members all agreed with it. BM1 said that when the Agora Board told K12, they were on eggshells, and in June 2014, there was a lot of back and forth. BM1 said from June 2014 to June 2015, K12 made a series of presentations, and didn't really accept the fact that the Agora Board was serious about getting rid of them. This is confirmed in emails provided to Lead Counsel in the course of their investigation. Just hours before the June 24, 2014 Agora Board meeting, in which the Board voted to request RFPs for various services and student learning devices as part of its desire to transition from Agora's current vendor to a self-administered school, Allison Cleveland, K12's Executive Vice President of School Management and Services, sent an email with a revised proposal based on a conversation between Nate (based on information and belief, Nate refers to Defendant Davis) with the president of the Agora Board, attached hereto as Exhibit B.[3]

56. On August 11, 2014, the president of the Agora Board sent an email, attached hereto as Exhibit C, letting the Agora Board know that K12 had contacted her to inform the Agora Board that it was aware of $1.6 million that was apparently owed to K12 but that K12 was not trying to collect on. The board president next noted that: "Nate Davis CEO of k12 called me Friday evening and told me how fearful they are that we will not get our charter because it is not a straight renewal. He suggested we allow them to manage us for another year while we get renewed and then become independent."

57. At its September 22, 2014 meeting, Agora's Board approved K12 as its online curricular content provider through the 2017-18 school year pending the formal completion of contract negotiations. Agora planned to develop its own curriculum over the following four years, beginning with middle school development, then high school, then elementary school, but would continue to use K12's curriculum in the meantime.

58. At the October 6, 2014 Board of Trustees Meeting, the Agora Board president read a statement:

[3] The email exhibits attached hereto have been redacted to protect any personal contact information as well as any attorney-client privilege and/or work product.

> Tonight we have completed a loop that began early in 2014. We began a process to self-manage Agora Cyber Charter School and at the same time seek the highest quality products and services available for the more than 11,000 students we serve. With this action tonight the Board has put in place for next year the best available systems and curriculum at the most reasonable costs possible.
>
> This agreement with K12 includes solving some important transition issues as well. For instance, in the agreement there is a mechanism for many of our current administrators and staff to opt, their choice, to be employed by K12 in some other capacity and location OR to possibly remain with us at Agora right here at their desks.
>
> We have agreed to simultaneously continue using K12 curriculum and begin the process of building our own and offering it to parents and students as an option.
>
> In addition, we are very proud of our charter renewal efforts and look forward to elaborating for the Pennsylvania Department of Education the efforts we have gone to, to balance the needs of our students and school with the accountability we have to the taxpayers of Pennsylvania.

## VI. THE TRUTH BEGINS TO EMERGE

### A. K12's Largest Revenue Providing School Begins Looking for New Providers

59. On June 26, 2014, K12 released a "statement . . . on Agora Cyber Charter School" in a press release. For the first time, Defendants announced to investors and the public that the Agora Board "elected to use an RFP process for the services and products required to operate the school." However, Defendants masked Agora Board's RFP process as simply a necessary process in Agora's required charter renewal application to the PDE:

> K12 Inc. has been working with the Board and looks forward to providing robust submissions for the provision of educational services, products, and curriculum. We are confident that this process will lead to an even stronger application to PDE for the renewal of the school's charter. We are also confident that the value K12 has brought, and can continue to bring, to the students of Agora will be clear in this process. We are proud that so many of the parents with students at Agora have expressed overall satisfaction with the school and especially with K12's curriculum.
>
> We value our long term relationship with Agora and look forward to building on the positive momentum we have created under the Board's leadership. The innovations K12 is making in curriculum, instruction and technology offer Agora students continued learning options to fit their individual needs.

### B. K12 Discloses Agora's "Interest" In Self-Management During Its August 14, 2014 Conference Call

60. On August 14, 2014 an earnings call with investors and analysts was held to discuss K12's financial results for the fourth quarter and year ended June 30, 2014. Later on the call, Davis responded to a request asking for an "update on Agora[.]" Davis responded: "Agora did have one Board meeting where they made some decisions and indicated a clear interest to be a self-managed organization."

**C. Agora Confirms Its Intent to Become A Self-Managed School, Resulting in K12 Redefining Its Business Lines**

61. On October 9, 2014, K12 released a press release "announc[ing] that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." In the press release, K12 explained that the Agora Board:

> would absorb the school's general administrative services and certain human resources functions as well as name vendors for select services which are currently provided by K12. Using the actual FY2014 enrollment volumes and reported financial results, the Company believes this new contract would have delivered approximately 25% of the revenue and 50% of the internal financial contribution when compared to K12's current contract with the Agora Board. Internal contribution is defined as revenue less direct costs for delivering the contracted services. Direct costs exclude all corporate, product, promotional, and other costs shared across all schools.

62. In a separate press release filed with the SEC attached to a Form 8-K on October 9, 2014, K12 provided student enrollment figures for its 2015 fiscal year after the October enrollment count date. In this press release, rather than just reporting enrollments in K12's managed schools as it had in previous years, for the first time K12 reported student enrollments in Public School Programs, which included both Managed Programs and Non-managed Programs, where, as explained above in ¶25, the Company did not provide primary administrative oversight of the school, but did provide curriculum, technology, and/or other educational services. In the reported figures, K12's Managed Program enrollments decreased by almost 5% from the prior school year.

63. Later that day, Defendants held an earnings call in which they further noted that enrollment data would be broken down by Managed and Non-managed Programs. In his opening remarks, Davis explained that the reduction in managed schools was due to the "new market dynamic" in which some schools decided to self-manage and due to an enrollment cap recently put in place by another state for K12's school in that state.

64. Rhyu further broke out the effect of the Agora switching from a Managed to a Non-Managed Program beginning in FY2016 in the question and answer session of the call:

> So, in fiscal 2016, when the first year of the Agora contract comes into play, . . . directionally, you are going to see obviously, I think, a fairly significant decline in revenue.
>
> And if you look at our release from earlier today, we kind of indicate that we have got about 75% of the revenue is going to largely go away as we reported for that specific contract. But we will retain a disproportionate amount of the profit margin. So structurally long-term, it will actually work to improve structural margins, but decrease revenues fairly significantly.

65. Davis assured investors to not worry over the decrease in Managed Programs enrollments in his closing remarks:

> [W]hen you are in these dark days where people look and say your enrollment in the Managed Public Schools dropped, does that mean your business is in some trouble? I would say two things to remember.
>
> Number one, I mentioned those new states; I mentioned the states that are growing. Yes, we did go through some tough times with Tennessee and Colorado and lack of growth in the high penetrated states, but I see them as states that are growing.
>
> The thing I am most proud of, though, and I will only say this -- will show you the data. We are really proud that while on the outside you cannot see the factors on the inside, I am now seeing the factors that say the things we are doing on the right things to do.
>
> * * *
>
> The things that we have been working on for the last 18 to 24 months are now starting to bear fruit. And you can't see all of that fruit yet, but I can see the indicators. And I think you are going to be pleasantly surprised over the next 24 months as this business starts to turn those things around.
>
> We have now -- and we are going to publicly start talking more about the success that we are having in academics because we are pretty proud of that. There were dark days when people criticized us a lot for our educational results, but I am really proud of the way the Company has responded. We have done much better, more schools that are in less trouble.

**D. K12 Announces Disappointing Operating Costs**

66. On October 30, 2014, K12 released its financial results for the first fiscal quarter of FY2015, ended on September 30, 2014 in a press release attached to a Form 8-K filed with the SEC. Although K12 announced revenue and enrollments for the quarter in-line with their October 9, 2014 preview, it also announced disappointing operating costs.

67. During K12's earnings call held this same day, K12 disclosed that it had a lower gross margin (the difference between revenue and instructional costs and services divided by revenue) percentage of 38% for the quarter, compared to 41.8% for the same quarter in the previous year. Rhyu assured investors though, that K12's Non-managed Programs had higher margins than the Managed Programs, and as the "non-managed piece of the business grows faster than the managed piece" the impact of the higher margins may "become more material."

### E. K12 Announces Its First Quarter of Financial Results after the Loss of the Agora Managed Public School Contract

68. On October 27, 2015, K12 issued a press release, attached as an exhibit to a Form 8-K filed with the SEC. In this press release, K12 announced its financial results for the fiscal quarter ended September 30, 2015. Among the financial highlights reported were: "Revenues of $221.2 million, compared to $236.7 million in the first quarter of FY 2015. The year over year decline is largely due to the Agora Cyber School shifting from a Managed to Non-managed program[;]" "Operating loss of $20.5 million, compared to an operating loss of $13.2 million in the first quarter of FY 2015[;]" "Net loss attributable to common stockholders of $12.8 million, compared to a net loss of $6.8 million in the first quarter of FY 2015[;]" and "Diluted net loss attributable to common stockholders per share of $0.34, compared to a diluted net loss of $0.18 in the first quarter of FY 2015."

69. Later on this day, Defendants held an earnings conference call to discuss the financial results for the quarter ended September 30, 2015. On this call, Davis reiterated the revenue for the quarter, and noted that "[e]xcluding the impact of the Agora transition from a managed to a non-managed program, revenue grew 3.9% from the first quarter of last year." Rhyu further discussed K12's financial results for the quarter as well as the underlying trends for K12's business, but did so "excluding the impact of Agora. We believe this way of looking at our results provide you with a clearer picture of the underlying trends." Rhyu also noted that K12's gross margins "declined slightly from 38% last year to 37.2% in the current period."

70. The disappointing financial results were, as evidenced by Defendants' parsing out the Agora impact, significantly impacted by the switch of Agora from a Managed to a Non-managed school. Indeed, analysts noted that the net loss was worse than expected and the impact of the Agora transition continues to pressure margins, in contrast to Defendants' October 30, 2014 assurance that although Agora's switch would pressure revenues, margins would improve.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

71. During the Class Period, K12 filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. The following chart identifies the date, signatories, and period covered by each report:

| K12'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| **FORM** | **PERIOD** | **DATE FILED** | **SIGNATORIES** | **REFERRED TO BELOW AS** |
| 10-Q | 2014 Fiscal 1st Quarter | November 7, 2013 | Defendant Rhyu | 1Q2014 10-Q |
| 10-Q | 2014 Fiscal 2nd Quarter | February 4, 2014 | Defendant Rhyu | 2Q2014 10-Q |
| 10-Q | 2014 Fiscal 3rd Quarter | April 29, 2014 | Defendant Rhyu | 3Q2014 10-Q |
| 10-K | 2014 Fiscal Year | August 15, 2014 | Defendants Davis and Rhyu | FY2014 10-K |
| 10-Q | 2015 Fiscal 1st Quarter | October 30, 2014 | Defendant Rhyu | 1Q2015 10-Q |
| 10-Q | 2015 Fiscal 2nd Quarter | January 29, 2015 | Defendant Rhyu | 2Q2015 10-Q |
| 10-Q | 2015 Fiscal 3rd Quarter | April 28, 2015 | Defendant Rhyu | 3Q2015 10-Q |
| 10-K | 2015 Fiscal Year | August 4, 2015 | Defendants Davis and Rhyu | FY2014 10-K |
| 10-Q | 2016 Fiscal 1st Quarter | October 27, 2015 | Defendant Rhyu | 1Q2016 10-Q |

72. Defendants also frequently spoke to investors and the public during the Class Period in earnings conference calls and in press releases both filed with the SEC and published on K12's website. These actionable statements and omissions concern Agora.

### A. Defendants' False and Misleading Statements and Omissions Concerning Agora Prior To K12 Announcing the Agora Board's Election To Use an RFP Process

73. The Company's October 10, 2013 press release, 1Q2014 10-Q, 2Q2014 10-Q, 3Q2014 10-Q, and FY2014 10-K each omitted to state the risk that K12's contract with Agora would either not be renewed, or that the nature of this contract would materially change. At the time each of the Company's October 10, 2013 press release, 1Q2014 10-Q, 2Q2014 10-Q, 3Q2014 10-Q, and FY2014 10-K were filed, Defendants knew, or were deliberately reckless in not knowing, that the Agora Board did not intend to renew the Agora/K12 Contract, as demonstrated by Agora providing the required eighteen months' notice per the Agora/K12 Contract (¶44) according to former Agora Board member accounts (¶45). The omission of this fact was material under Item 601(b)(10)(ii)(B) of Regulation S-K, which requires a company to file as an exhibit, or incorporate by reference, any material contract, including "[a]ny contract upon which the registrant's business is substantially dependent, as in the case of continuing contracts to . . . purchase the

major part of registrant's requirements of goods, services or raw materials . . . upon which registrant's business depends to a material extent[.]" Defendants also acknowledged the materiality of this information:

a. K12 filed the Agora/K12 Contract as an exhibit to its Form 10-Q for the fiscal quarter ended March 31, 2013, and filed with the SEC on May 3, 2013. K12 filed this exhibit in response to an April 2, 2013 letter from the SEC to K12's then-current CFO, in which the SEC requested that K12 file the Agora/K12 Contract as an exhibit to K12's financial statements or otherwise provide an analysis of why K12 was not substantially dependent on the contract.

b. Defendants incorporated the Agora/K12 Contract as an exhibit to K12's Form 10-K for the fiscal year ended June 30, 2013, filed on August 29, 2013 and K12's FY2014 10-K.

c. A letter to the SEC, dated June 18, 2014 and uploaded to the SEC's public website on September 2, 2014, from K12's counsel on behalf of the Company regarding K12's Form 10-K for the fiscal year ended June 30, 2013 and the 3Q2014 10-Q (the "June 18, 2014 SEC Letter"), stated "[a]s we disclosed in our FY 2013 Form 10-K, we still have two contracts in FY 2014 that meet the definition of "material agreements" under Item 601(b)(10)(ii)(B) of Regulation S-K, . . . and the other with the Agora Cyber Charter School, which represent approximately . . . 14% of our overall revenue for the year to date[.]" The letter next stated that the Company would not disclose the existence of the possible risk that the Agora/K12 Contract would not be renewed:

> [W]e do not plan to disclose the existence of any contract renewal negotiations with a school—which will only invite a competitor or other school constituent to disrupt or interfere with those negotiations and potentially create a risk of non-renewal. To the extent we become aware of a probable risk of non-renewal of a material contract we would disclose such circumstances at the appropriate time.

74. On the February 4, 2014 earnings call with investors and analysts, Davis responded to an analyst's request for an update on any state issues, including legislation or fund. The analyst also specifically asked if there was any update on Pennsylvania:

> NATE DAVIS: This is Nate speaking, hi Suzi. It's always difficult to predict what a legislature is going to do and what's going to happen. Of course the Pennsylvania legislation has some proposals in it that would affect us negatively. I don't know if that legislation will go through or won't go through. We monitor it closely. We make sure that we give our input and the schools give their input.
>
> So I can't handicap it and tell you that in fact it's going to happen or isn't going to happen. We monitor it closely, and our current thinking is that if it happens it would only happen late in the year. It would not affect us in much in the current year. That's the only one that I

> would -- that I highlight. I don't think there are any others that I see that have significant risk at this time. So we think we are in a pretty positive environment.
>
> As the economy's gotten better, a number of states have thought about the things that they need to do to continue to support education better. So we get the benefit of that. But I don't see a significant negative opportunity out --negative risk out there today.

75. This statement omitted material facts necessary to make the statement not misleading because at this time, there was an issue in Pennsylvania: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶44, 45), a fact that was material to investors (*e.g.*, ¶31 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶55 (Agora Board members heard Agora was K12's "bread and butter"), ¶73 (Defendants admit the materiality of the Agora/K12 Contract)).

76. Additionally, in the question and answer session of the April 29, 2014 earnings call, Defendants were asked to "spend a minute on Pennsylvania as we move into the potential renewal on that contract?" In response, Davis stated:

> In terms of our own school, as everybody knows, in the next year, year and a half, we will have -- actually we will file this year and next year in 2015, and then we will seek an approval for our Agora school. That approval is something we continue to work on. We negotiate a new service contract, and then they will get a charter renewal process going in the state of Pennsylvania, as well.
>
> We watch what others are doing as they go through the process and make sure that our service contracts will be compliant with everything that the state wants. I think we are a good partner for Agora, and I think they are happy with what we have done.

77. This statement omitted material facts necessary to make the statement not misleading because: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶44, 45), a fact that was material to investors (*e.g.*, ¶31 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶55 (Agora Board members heard Agora was K12's "bread and butter"), ¶73 (Defendants admit the materiality of the Agora/K12 Contract)).

**B. Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding the Agora Board's RFP Process and Selection of Providers**

78. On June 26, 2014, K12 released a "statement . . . on Agora Cyber Charter School" in a press release available on its website:

> As required by the existing charter agreement, this Fall, the Agora Cyber Charter School in PA ("Agora") must submit an application for the renewal of its charter agreement with the Pennsylvania Department of Education (PDE), to continue operations for the 2015-2016 school year and beyond.

> The Agora Board has elected to use an RFP process for the services and products required to operate the school. Proposals are due to the Agora Board on July 25, 2014.
>
> K12 Inc. has been working with the Board and looks forward to providing robust submissions for the provision of educational services, products, and curriculum. We are confident that this process will lead to an even stronger application to PDE for the renewal of the school's charter. We are also confident that the value K12 has brought, and can continue to bring, to the students of Agora will be clear in this process. We are proud that so many of the parents with students at Agora have expressed overall satisfaction with the school and especially with K12's curriculum.

79. This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶44, 45), a fact that was material to investors (*e.g.*, ¶31 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶55 (Agora Board members heard Agora was K12's "bread and butter"), ¶73 (Defendants admit the materiality of the Agora/K12 Contract)),

80. The statement in ¶78 was also materially misleading when made by attempting to minimize the severity of Board's decision by asserting that the RFP Process was initiated in connection with Agora's charter renewal.

81. During the question and answer session of the August 14, 2014 earnings call, an analyst asked for an update on Agora, to which Davis responded:

> They had one Board meeting. Agora did have one Board meeting where they made some decisions and indicated a clear interest to be a self-managed organization.
>
> Beyond that, we don't really know, because we're not going to hear until the next board meeting, which is August 25, I believe. After that Board meeting, I'm sure we'll hear more. There really isn't much to update you on other than the next Board meaning is August 25 and we will learn more then.

82. This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because although Davis revealed to investors and analysts that the Agora Board had an interest in being a self-managed organization, he did not fully disclose that the Agora Board had already informed K12 that the Agora Board did not intend on renewing its contract with K12 (¶¶44, 45), a fact that was material to investors (*e.g.*, ¶31 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶55 (Agora Board members heard Agora was K12's "bread and butter"), ¶73 (Defendants admit the materiality of the Agora/K12 Contract)).

83. Under the subheading. "Risks Related to Our Business and Our Industry" of K12's Risk Factors listed in the Company's FY2014 10-K, there was a discussion of the risk on non-renewal of a Managed Public School Contract, citing the Agora Board negotiations as an example: "in fiscal year 2014, the Agora Cyber Charter School . . . elected to use a request for proposal process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application." Later under this same subheading, the Form 10-K stated: "As noted above, the Agora School recently commenced a RFP process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application."

84. The FY2014 10-K, again discussed the Agora Board's election of an RFP under "Management's Discussion and Analysis of Financial Condition and Results of Operations," stating: "In fiscal year 2014, Agora elected to use a request for proposal process for the services and products required to operate the school for the 2015-16 school year in connection with its charter renewal application."

85. These statements in ¶¶83 and 84 and were materially misleading when made, and/or omitted material facts necessary to make the statements not misleading because: the Agora Board had informed K12 that it did not intend on renewing its contract with K12 (¶¶44, 45, 73), a fact that was material to investors (*e.g.*, ¶31 (Agora comprised 13-14% if K12's revenues during the Class Period, ¶55 (Agora Board members heard Agora was K12's "bread and butter"), ¶73 (Defendants admit the materiality of the Agora/K12 Contract)), but Defendants attempted to minimize by discussing the use of an RFP Process in connection with its charter renewal.

86. These statements in ¶¶83 and 84 and were also materially misleading when made by attempting to minimize the severity of Board's decision by asserting that the RFP Process was initiated in connection with Agora's charter renewal.

87. On October 9, 2014, K12 released a press release, available on its website, "announc[ing] that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." The press release further stated:

> Over the last several weeks, K12 has been working with the Agora School Board in a Request-for-Proposal (RFP) process for the services and products required to operate one of the state's largest online public schools. During the RFP evaluation process, K12 was selected to be the content provider for the school year beginning September 2015. The nationally recognized K12 curriculum uses a combination of online lessons and traditional

> materials to provide an innovative learning platform for students. The online lessons blend text, photos, illustration, animation, audio, and interactivity, giving students an engaging educational experience.

88. This statement was materially misleading when made, and/or omitted material facts necessary to make the statement not misleading because: (1) the Agora Board had informed K12 that the it did not intend on renewing its contract with K12 well before the "last several weeks" (¶¶44, 45, 73); and (2) although Agora entered into a three-year contract with K12 for curriculum, Agora had expressed disappointment with K12's curriculum and was developing its own curriculum to eventually replace K12 and would be provided as an option to Agora students as soon as possible (¶¶53, 54, 57, 58).

**C. Defendants' False and Misleading Statements and Omissions Concerning Agora Regarding Its Selection of K12's Curriculum**

89. In the question and answer session of the October 30, 2014 earnings call, in responding to a question, Davis explained that there "is always a risk that a school can decide to go self-manage" but that "[t]he good news is, what we found is that when they made those changes they have stayed with the K12 curriculum which is the highest margin part of the business for us, and the part of the business that we believe is the core of the services we provide."

90. In Note 14, "Subsequent Event," to the Financial Statements, of the 1Q2015 stated: "On October 9, 2014, the Company entered into a three year contract to provide academic curriculum to Agora for a reduced scope of services that will include the academic curriculum beginning in the 2015-16 school year."

91. On the January 29, 2015 earnings call, after Rhyu responded to a request for financial guidance on the Agora impact, Davis chimed in to add "more information for you" regarding Agora, stating "They're still going to use the K12 curriculum and that is the highest-margin business we have."

92. In each of the Company's 2Q2015 10-Q and 3Q2015 10-Q, the Company's discussion of revenue recognition included: "On October 9, 2014, the Company entered into a three year contract with Agora for a reduced scope of services that will include providing the academic curriculum to Agora beginning in the 2015-16 school year." Additionally, both the Executive Summaries of Management's Discussion and Analysis of Financial Condition and Results of Operations also discussed Agora: "Agora

Cyber Charter School recently renegotiated its service agreement at renewal and entered into a three-year contract with us to provide Agora students with the K12 curriculum starting in the 2015-2016 school year[.]"

93. Agora's switch to curriculum was again discussed in K12's FY2015 10-K in various sections:

a. Under the heading "Risks Related to our Business and Our Industry," the FY2015 10-K stated: "in fiscal year 2015, the Agora Cyber Charter School ('Agora') renegotiated its service agreement and entered into a three-year contract with us to purchase our curriculum[.]"

b. Under the subheading describing the "Public School Programs" as part of "Management's Discussion and Analysis of Financial Condition and Results of Operations," the FY2015 10-K stated: "In fiscal year 2015, Agora renegotiated its service agreement and entered into a three-year contract with us to purchase our curriculum and certain technology services[.]"

c. In the Summary of Significant Accounting Policies to the "Notes to the Consolidated Financial Statements," the FY2015 10-K stated: "In fiscal year 2015, Agora renegotiated its service agreement and entered into a three-year contract with the Company to purchase the Company's curriculum and certain technology services[.]"

94. In the 1Q2016 10-Q, the Company's discussion of revenue recognition included: "In fiscal year 2015, the Agora Cyber Charter School ('Agora') renegotiated its service agreement and entered into a three-year contract with the Company to purchase the Company's curriculum and certain technology services[.]"

95. The statements in ¶¶89-94 were materially misleading when made, and/or omitted material facts necessary to make the statements not misleading because, although Agora entered into a three-year contract with K12 for curriculum, Agora had expressed disappointment with K12's curriculum and was developing its own curriculum to eventually replace K12 and would be provided as an option to Agora students as soon as possible (¶¶53, 54, 57, 58).

## VIII. LOSS CAUSATION

96. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

97. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other Class members.

98. During the Class Period, Plaintiffs and other Class members purchased or acquired K12 securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly on heavy trading volume when information disclosed to the market for the first time was partially revealed and/or the concealed risks materialized on or about: June 26, 2014; August 14, 2014; October 9, 2014; October 30, 2014; and October 27, 2015.

99. On June 26, 2014, after the market closed, K12 announced that the Agora Board elected to use an RFP process for the management of the Agora Cyber Charter School for operations of the school in the 2015-2016 school year and beyond.

100. On this news, the price of K12's stock fell more than 5%, or $1.30 per share, to close at $24.32 per share on June 27, 2014, on unusually heavy trading volume.

101. The June 26, 2014 announcement partially revealed that the Agora Board was considering different arrangements for the services and products required to run Agora for the 2015-16 and later school years, and thus that there was a chance of K12 losing a significant amount of revenue in the future, a risk that had been concealed by Defendants' decision not to disclose that the Agora Board had provided K12 notice of non-renewal of the Agora/K12 Contract (*see* ¶¶44, 45, 73, *supra*). However, the June 26, 2014 announcement failed to disclose, among other things, that the Agora Board did not intend on renewing its contract with K12, in part due to the Agora Board's disappointment with K12's management of Agora, its failure to provide services to Agora students, its failure to bring about improved academic outcomes, and that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results. In fact, the June 26, 2014 announcement further misled the market concerning these risks by stating that the RFP process was necessary for Agora's renewal and by implying that K12 maintained a positive relationship with the Agora Board while continuing to hide the fact that the Agora Board had provided a notice of non-renewal.

102. The significance of the June 26, 2014 announcement is illustrated in analysts' commentary. For instance, in a BMO Flash report published on June 26, 2014, BMO noted that "While the board was required to submit an application to renew its charter this cycle, it was not necessarily required to use an RFP process to select a manager—***something we believe has not been done before***." BMO explained that Agora was K12's largest managed school, generating 14% of its FY2013 revenues but had less than 14%

enrollments for the Company—essentially indicating that losing Agora would have a greater negative impact on revenues than it would a positive impact on costs. In its June 27, 2014 report, Wells Fargo similarly reported that "complete loss of the contract would likely reduce FY2016E Adjusted EBITDA by 25-30%." However, both analysts were reassured by Defendants' assurances that the Agora Board likely chose to be proactive in its charter renewal process and loss of the complete contract was, as Wells Fargo commented, "highly unlikely given strong existing relationships" between K12 and the Agora Board.

103. On August 14, 2014, Defendants held an earnings call with investors and analysts after announcing K12's financial results for the fourth quarter and year ended June 30, 2014 in a press release, also an attached exhibit to a Form 8-K filed with the SEC. During the question and answer session of the earnings call, Davis responded to an update request concerning the Agora Board's RFP process, explaining that in the Agora Board's most recent meeting the board "made some decisions and indicated a clear interest to be a self-managed organization. Beyond that, we don't really know, because we're not going to hear until the next board meeting."

104. On this news, the price of K12's stock fell 13.3%, or $2.98 per share, to close at $19.42 per share on August 14, 2014, on extremely heavy trading volume.

105. Investors and analysts, although impressed by K12's financial results for the quarter and year ended June 30, 2014 that beat consensus estimates, were shocked by Defendants' preview of low enrollment growth as a result of the loss of new enrollments due in part to the Agora Board's interest in self-management. For example, in a "Flash" report prior to the earnings call, BMO analysts stated that "the stock should react positively to this report[;]" however, that tune changed in BMO's report published after the earnings call: "[e]nrollment trends came in below expectations[.]" Barrington Research in its report also pointed to Defendants' earnings calls 2014-15 enrollment "headwinds" as the cause of the nearly $3 stock sell-off. In its August 15, 2014 report, Wells Fargo highlighted the risk of losing the Agora contract as an example as to why it downgraded K12.

106. The August 14, 2014 announcement regarding the Agora Board's interest in being self-managed partially revealed that the Agora Board was considering different arrangements for the services and products required to run Agora for the 2015-16 and later school years, and thus that there was a significant chance of K12 losing a significant amount of revenue in the future, a risk that had been concealed and

understated by Defendants' prior misleading statements, including the June 26, 2014 announcement. However, the August 14, 2014 announcement failed to disclose, among other things, that the Agora Board did not intend on renewing its contract with K12, in part due to the Agora Board's disappointment with K12's management of Agora, its failure to provide services to Agora students, its failure to bring about improved academic outcomes, and that schools did not place as great of an importance on Scantron Test results, in contrast to Defendants' frequent touting of these results. Nor did the August 14, 2014 announcement reveal what K12's relationship with Agora would be in the future, as the Agora Board still had outstanding decisions from its RFP process.

107. On October 9, 2014, in a press release attached to a Form 8-K filed with the SEC, K12 disclosed its financial guidance for the first quarter and 2015 fiscal year. In the press release, K12 also "provided expanded disclosure on student enrollment for FY2015," detailing the student enrollments as of the October count date. For the first time, rather than reporting Managed Public Schools enrollments for the year, K12 reported student enrollments in Public School Programs, which included both Managed Programs and Non-managed Programs, where, as explained above in ¶¶24-25, the Company did not provide primary administrative oversight of the school, but did provide curriculum, technology, and/or other educational services. In these figures, K12's Managed Program enrollments decreased by almost 5% from the prior school year, but with the addition of Non-managed Programs, total enrollments only decreased by 20 student for FY2015 from FY2014.

108. In a separate press release on October 9, 2014, published on K12's website and via GlobeNewswire, the Company "announced that it was awarded a three-year contract to provide the academic curriculum for Pennsylvania's Agora Cyber Charter School commencing in the 2015-2016 school year." In the press release, K12, for the first time, detailed that the Agora Board:

> would absorb the school's general administrative services and certain human resources functions as well as name vendors for select services which are currently provided by K12. Using the actual FY2014 enrollment volumes and reported financial results, the Company believes this new contract would have delivered approximately 25% of the revenue and 50% of the internal financial contribution when compared to K12's current contract with the Agora Board. Internal contribution is defined as revenue less direct costs for delivering the contracted services. Direct costs exclude all corporate, product, promotional, and other costs shared across all schools.

109. Later that day, Defendants held an earnings call in which they reiterated the financial results and explained that revenue and enrollment data would be broken down by Managed and Non-managed Programs. In his opening remarks, Davis linked the reduction in managed schools to the "new market dynamic" in which some schools decided to self-manage or put into place an enrollment cap . In the question and answer session of the call, Rhyu further parsed out the effect of the Agora contract switching from a Managed to a Non-Managed Program beginning in FY2016:

> So, in fiscal 2016, when the first year of the Agora contract comes into play, . . . directionally, you are going to see obviously, I think, a fairly significant decline in revenue.
>
> And if you look at our release from earlier today, we kind of indicate that we have got about 75% of the revenue is going to largely go away as we reported for that specific contract. But we will retain a disproportionate amount of the profit margin. So structurally long-term, it will actually work to improve structural margins, but decrease revenues fairly significantly.

110. However, in his closing remarks, Davis assured investors to not worry over the decrease in Managed Programs enrollments:

> [W]hen you are in these dark days where people look and say your enrollment in the Managed Public Schools dropped, does that mean your business is in some trouble? I would say two things to remember.
>
> Number one, I mentioned those new states; I mentioned the states that are growing. Yes, we did go through some tough times with Tennessee and Colorado and lack of growth in the high penetrated states, but I see them as states that are growing.
>
> The thing I am most proud of, though, and I will only say this -- will show you the data. We are really proud that while on the outside you cannot see the factors on the inside, I am now seeing the factors that say the things we are doing on the right things to do.
>
> * * *
>
> The things that we have been working on for the last 18 to 24 months are now starting to bear fruit. And you can't see all of that fruit yet, but I can see the indicators. And I think you are going to be pleasantly surprised over the next 24 months as this business starts to turn those things around.
>
> We have now -- and we are going to publicly start talking more about the success that we are having in academics because we are pretty proud of that. There were dark days when people criticized us a lot for our educational results, but I am really proud of the way the Company has responded. We have done much better, more schools that are in less trouble.

111. On this news, the price of K12's stock fell 7%, or $1.12 per share, to close at $14.87 per share, on unusually heavy trading volume. The stock continued to tumble the following day, dropping another 7.06%, or $1.05 per share, to close at $13.82 per share.

112. The October 9, 2014 announcements partially revealed that Agora's switch reflected a trend of schools moving from K12's Managed to Non-managed Programs as their relationship with K12 evolved, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements. Indeed, this trend was the primary takeaway of analysts: an October 13, 2014 BMO report noted that the "market-wide shift away from fully managed public school programs as schools and districts . . . become competitors to the company by providing their own programs . . . ; the company disclosed new enrollment metrics as it transitions to the changing environment." Wells Fargo, in their October 10, 2014 analyst report summarized that as schools mature, they seek "greater control" as evidenced by Agora's and one other school's contract changes that "fired K12 as a school manager"; that charter boards and authorizers want greater transparency from K12; and that these trends "are likely to transform the economics of [K12's] business over time[.]"

113. However, the October 9, 2014 announcements did not reveal the full extent of the loss to the Company's bottom line brought about by Agora's switch. Nor did the announcements reveal the reasons why the Agora Board decided to take over control of the schools' management, which in large part were K12's failure to provide services to Agora students and its failure to bring about improved academic outcomes.

114. On October 30, 2014, K12 announced its financial results for the first fiscal quarter of FY 2015, ended on September 30, 2014, in a press release attached to a Form 8-K filed with the SEC. Although K12 announced revenue and enrollments for the quarter in-line with their October 9, 2014 preview, it also announced disappointing operating costs. Later that day, K12 held an earnings call with investors and analysts in which it repeated its financial results for the quarter, including a lower gross margin (the difference between revenue and instructional costs and services divided by revenue) percentage of 38% compared to 41.8% for the same quarter in the previous year. Rhyu explained that this decrease was due to K12 "continu[ing] to invest in teachers and academic programs" and that "some of the rate increases that contributed to our managed program revenue growth relate to programs where K12 incurs significant costs." Rhyu, however, assured investors, stating that K12's Non-managed Programs had higher margins than the Managed Programs, and as the "non-managed piece of the business grows faster than the managed piece" the impact of the higher margins may "become more material."

115. On this news, the price of K12's stock fell more than 14%, or $2.17 per share, to close at $12.98 per share, on unusually heavy trading volume. The stock continued to tumble the following day, dropping another 4.47%, or $0.58 per share, to close at $12.40 per share, on unusually heavy trading volume.

116. On October 27, 2015, K12 issued a press release, attached as an exhibit to a Form 8-K filed with the SEC, in which K12 announced its financial results for the fiscal quarter ended September 30, 2015. Among the financial highlights reported were: "Revenues of $221.2 million, compared to $236.7 million in the first quarter of FY 2015. The year over year decline is largely due to the Agora Cyber School shifting from a Managed to Non-managed program[;]" "Net loss attributable to common stockholders of $12.8 million, compared to a net loss of $6.8 million in the first quarter of FY 2015[;]" and "Diluted net loss attributable to common stockholders per share of $0.34, compared to a diluted net loss of $0.18 in the first quarter of FY 2015."

117. Later on this day, Defendants held an earnings conference call to discuss the financial results for the quarter ended September 30, 2015. On this call, Davis reiterated the revenue for the quarter, and noted that "[e]xcluding the impact of the Agora transition from a managed to a non-managed program, revenue grew 3.9% from the first quarter of last year." Rhyu further discussed K12's financial results for the quarter as well as the underlying trends for K12's business, but did so "excluding the impact of Agora. We believe this way of looking at our results provide you with a clearer picture of the underlying trends." Rhyu also noted that K12's gross margins "declined slightly from 38% last year to 37.2% in the current period."

118. The disclosures in K12's press release and earnings conference call on October 27, 2015, the first quarter after Agora's switch, revealed the impact of Agora's change in relationship with K12 from being a fully managed school to contracting with K12 for its curriculum on K12's financial results, constituting a partial materialization of the risks concealed by Defendants' false and misleading statements. BMO, in its October 27, 2015 report, commented that the "impact of the Agora transition continues to pressure . . . margins." Barrington Research noted that net losses per share were below estimate in its October 28, 2015 report.

119. On this news, the price of K12's stock fell 15.85%, or $1.93 per share, to close at $10.25 per share, on unusually heavy trading volume.

120. The foregoing allegations describe Plaintiffs' general theory of damages, demonstrate that Plaintiffs' damages were caused by Defendants' misrepresentations and omissions as alleged herein, and negate any inference that Plaintiffs' losses were the result of general market conditions or other factors unrelated to Defendants' misrepresentations and omissions alleged herein..

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

121. The market for K12's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, K12's securities traded at artificially inflated prices during the Class Period. On June 23, 2014, the Company's stock closed at a Class Period high of $25.98 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of K12's securities and market information relating to K12, and have been damaged thereby.

122. During the Class Period, the artificial inflation of K12's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about K12's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of K12 and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

123. At all relevant times, the market for K12's securities was an efficient market for the following reasons, among others:

a. K12 stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, K12 filed periodic public reports with the SEC and/or the NYSE;

c. K12 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. K12 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e. The average daily trading volume for K12 securities during the Class Period was approximately 326,625 shares, with more than 38.9 million shares of stock outstanding as of October 21, 2015, and a market capitalization reaching almost $1.03 billion during the Class Period.

124. As a result of the foregoing, the market for K12's securities promptly digested current information regarding K12 from all publicly available sources and reflected such information in K12's stock price. Under these circumstances, all purchasers of K12's securities during the Class Period suffered similar injury through their purchase of K12's securities at artificially inflated prices and a presumption of reliance applies.

125. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

126. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

127. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

128. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of K12 who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

129. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased K12's securities between October 10, 2013 and October 27, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

130. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, K12's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of K12 shares were traded publicly during the Class Period on the NYSE. As of October 21, 2015, K12 had

38,939,704 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by K12 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

133. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of K12;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether the price of K12 securities were artificially inflated because of Defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

134. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendant K12 and the Individual Defendants**

135. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase K12's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

137. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for K12's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

138. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about K12's financial well-being and prospects, as specified herein.

139. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of K12's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about K12 and its business operations and future prospects in light of the circumstances under which they were made, not

misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

140. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

141. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing K12's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

142. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of K12's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by

Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired K12's securities during the Class Period at artificially high prices and were damaged thereby.

143. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that K12 was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their K12 securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

144. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

145. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of
## The Exchange Act Against the Individual Defendants

146. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

147. The Individual Defendants acted as controlling persons of K12 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and

other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

148. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

149. As set forth above, K12 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b) awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d) awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 2, 2017

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Kara M. Wolke*

Lionel Z. Glancy
Robert V. Prongay
Kara M. Wolke
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiffs and the Putative Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. October 2, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 2, 2017, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 4:16-cv-04069-PJH In re K12 Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Anklam**
  james.anklam@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com
- **Stephen Paul Barry**
  stephen.barry@lw.com
- **Alexander Guy Davis**
  adavis@allenmatkins.com
- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com
- **Kevin H. Metz**
  Kevin.Metz@lw.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,kevin-metz-9957@ecf.pacerpro.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,lsolish@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Kevin Francis Ruf**
  info@glancylaw.com,kevinruf@gmail.com
- **Casey Edwards Sadler**
  csadler@glancylaw.com
- **Leanne Heine Solish**
  lheine@glancylaw.com
- **Avraham Noam Wagner**
  avi@thewagnerfirm.com
- **Peter Allen Wald**
  peter.wald@lw.com,peter-wald-7073@ecf.pacerpro.com,#sflitigationservices@lw.com
- **Marshall C. Wallace**
  mwallace@allenmatkins.com,gpeck@allenmatkins.com
- **Marshall C. Wallace**
  mwallace@allenmatkins.com
- **James D Wareham**
  james.wareham@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)