Joseph D. Cohen (SBN 155601)
Kara M. Wolke (SBN 241521)
Leanne H. Solish (SBN 280297)
Melissa C. Wright (SBN 291120)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*and the Settlement Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE K12 INC. SECURITIES LITIGATION | Master File No. 4:16-cv-04069-PJH |
| | **CLASS ACTION** |
| | **LEAD PLAINTIFF'S: (1) NOTICE OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Hearing Date:   July 10, 2019<br>Time:   9:00 a.m.<br>Location:   Courtroom 3 - 3rd Floor<br>Judge:   Hon. Phyllis J. Hamilton |

1

2

### <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ................................................................................ 2

II.     THE LITIGATION AND SETTLEMENT ............................................................... 3

        A.      The Litigation ................................................................................................ 3

        B.      The Mediation and Settlement ...................................................................... 5

III.    STANDARDS     GOVERNING     APPROVAL     OF     CLASS     ACTION
        SETTLEMENTS ...................................................................................................... 6

IV.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE............................ 7

        A.      Lead Plaintiff and Lead Counsel Have Adequately Represented the
                Settlement Class ............................................................................................ 7

        B.      The Settlement Was Reached After Substantial Litigation and Arm's
                Length Negotiations Between Experienced Counsel Conducted Under the
                Auspices of a Well-Respected Mediator ...................................................... 8

        C.      The Settlement Relief Provided to the Settlement Class is Adequate in Light
                of the Costs and Risks of Further Litigation and Other Relevant Factors ............ 11

                1.      The Strength of Lead Plaintiff's Case and the Significant Risks of
                        Continued Litigation ............................................................................ 12

                2.      The Risks of Maintaining Class Action Status Throughout Trial ............ 15

                3.      The Amount Obtained in the Settlement Supports Approval ................... 16

                4.      The Complexity, Expense, and Likely Duration of Litigation ................. 17

                5.      Other Factors Established by Rule 23(e)(2)(C) Support Final
                        Approval ............................................................................................. 19

        D.      The Settlement Treats Class Members Equitably Relative to Each Other ............ 20

        E.      The Positive Reaction of the Settlement Class Supports Settlement
                Approval ..................................................................................................... 20

V.      THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE ......... 21

VI.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ........................... 23

VII.    NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS
        OF RULE 23 AND DUE PROCESS .......................................................................... 23

VIII.   CONCLUSION ............................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Aarons v. BMW of N. Am., LLC,*
    2014 WL 4090564 (C.D. Cal. Apr. 29, 2014)............................................................... 18

*Amchem Prods., Inc., v. Windsor,*
    521 U.S. 591 (1997) ............................................................................................... 23

*Barani v. Wells Fargo Bank, N.A.,*
    2014 WL 1389329 (S.D. Cal. Apr. 9, 2014) ............................................................ 24

*China Agritech, Inc. v. Resh,*
    138 S.Ct. 1800 (2018) ............................................................................................ 13

*Churchill Village L.L.C. v. Gen. Elec.,*
    361 F.3d 566 (9th Cir. 2004) .................................................................................... 7

*Destefano v. Zynga, Inc.,*
    2016 WL 537946 (N.D. Cal. Feb. 11, 2016) .................................................... 16, 18

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) ............................................................................................... 24

*Feyko v. aAD Partners LP,*
    2014 WL 12572678 (C.D. Cal. Mar. 7, 2014) .......................................................... 9

*Garner v. State Farm Mut. Auto. Ins. Co.,*
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .......................................................... 6

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ......................................................................... *passim*

*Hayes v. MagnaChip Semiconductor Corp.,*
    2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) ....................................................... 14

*IBEW v. Int'l Game Tech., Inc.,*
    2012 WL 5199742 (D. Nev. Oct. 19, 2012) ........................................................... 17

*In re Advanced Battery Techs., Inc. Sec. Litig.,*
    298 F.R.D. 171 (S.D.N.Y. 2014).............................................................................. 24

*In re Am. Bank Note Holographics, Inc.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ..................................................................... 14

*In re Amgen Inc. Sec. Litig.,*
    2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) .................................................. 9, 15

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .............................................. 18

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ........................................................... 9, 11

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
   2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ...................................... 20

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................... 11, 18, 21

*In re LinkedIn User Privacy Litig.*,
   309 F.R.D. 573 (N.D. Cal. 2015) ...................................................... 18

*In re LJ Int'l Inc. Sec. Litig.*,
   2009 WL 10669955 (C.D. Cal. Oct. 19, 2009) ..................................... 17

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ........................................................... 16

*In re Netflix Privacy Litig.*,
   2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ........................................ 9

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................. 6, 16, 20, 21

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) ............................................................ 8

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ............................................................ 6

*In re Vivendi Universal, S.A., Sec. Litig.*,
   2012 WL 362028 (S.D.N.Y. Feb. 6, 2012) .......................................... 18

*Knapp v. Art.com, Inc.*,
   283 F. Supp. 3d 823 (N.D. Cal. 2017) .......................................... 12, 13

*Mauss v. NuVasive, Inc.*,
   2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ........................................ 18

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal 2004) ....................................................... 9, 11

*Nobles v. MBNA Corp.*,
   2009 WL 1854965 (N.D. Cal. June 29, 2009) ...................................... 18

*Officers for Justice v. Civil Serv. Comm'n,*
  688 F.2d 615 (9th Cir. 1982) ................................................................................ 16

*Robbins v. Koger Props., Inc.,*
  116 F.3d 1441 (11th Cir. 1997) ............................................................................ 15

*Rodriguez v. W. Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009) .................................................................................. 9

*Satchell v. Fed. Express Corp.,*
  2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ........................................................ 9

*Silverman v. Motorola, Inc.,*
  2012 WL 1597388 (N.D. Ill. May 7, 2012) .......................................................... 10

*Stewart v. Applied Materials, Inc.,*
  2017 WL 3670711 (N.D. Cal. Aug. 25, 2017) ........................................................ 9

*Torrisi v. Tucson Elec. Power Co.,*
  8 F.3d 1370 (9th Cir. 1993) .................................................................................. 17

*Van Bronkhorst v. Safeco Corp.,*
  529 F.2d 943 (9th Cir. 1976) .................................................................................. 6

<u>STATUTES</u>

15 U.S.C. § 78u-4(a)(7) ............................................................................................ 25

28 U.S.C. § 1658(b) ................................................................................................ 13

<u>RULES</u>

Fed. R. Civ. P. 23 .......................................................................................... *passim*

### NOTICE OF MOTION FOR FINAL APPROVAL
### OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's Order Granting Preliminary Approval of Class Action Settlement ("Preliminary Approval Order," ECF No. 109), on July 10, 2019, at 9:00 a.m., or as soon thereafter as counsel may be heard, at the United States Courthouse, Courtroom 3 – 3rd Floor, 1301 Clay Street, Oakland, CA 94612, before the Honorable Phyllis J. Hamilton, Chief District Judge, Lead Plaintiff Babulal Tarapara ("Lead Plaintiff") will and hereby does move the Court for: (1) entry of the [Proposed] Judgment Approving Class Action Settlement; and (2) entry of the [Proposed] Order Approving Plan of Allocation of the Net Settlement Fund.[1]

This Motion is supported by the following Memorandum of Points and Authorities; the Solish Declaration; the Stipulation; all prior pleadings and papers in this Action; and such additional information or argument as may be required by the Court.

### STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should approve the proposed $3.5 million cash Settlement of this Action as fair, reasonable, and adequate under Rule 23(e).

2. Whether the Court should approve the Plan of Allocation as fair and reasonable.

3. Whether the Court should finally certify the Action as a class action pursuant to Rules 23(a) and (b)(3) for the purposes of the Settlement only.

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated November 26, 2018 (ECF No. 106-1) (the "Stipulation") or the concurrently filed Declaration of Leanne H. Solish in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Solish Declaration" or "Solish Decl."). Citations herein to "¶ __" and "Ex. __" refer, respectively, to paragraphs in, and exhibits to, the Solish Declaration.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff submits this memorandum in support of his motion for final approval of the Settlement of the above-captioned action (the "Action") for $3,500,000 in cash (plus interest earned) and for approval of the Plan of Allocation.  The terms of the Settlement are set forth in the Stipulation (ECF No. 106-1), which was preliminarily approved by the Court on February 14, 2019.  ECF No. 109.

The $3.5 million Settlement is procedurally fair, as it is the product of arms'-length negotiations overseen by an experienced and highly respected mediator, and was achieved only after years of hard fought litigation against skilled defense counsel.  The Settlement is also substantively fair, reasonable, and adequate, as demonstrated by application of Rule 23 of the Federal Rules of Civil Procedure and the Ninth Circuit "*Hanlon* factors" for assessing class action settlements.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).

Prior to reaching the Settlement, Lead Counsel developed a thorough understanding of both the strengths and the weaknesses underlying the claims in this Action, and meaningfully assessed the risks of establishing liability and damages, the risk of an adverse ruling on the fully briefed class certification motion that could have greatly truncated the proposed class period and damages,[2] and the risk that Lead Plaintiff's claims may be time-barred under the governing statute of limitations.  ¶¶ 47-65.  Based on this substantial work and Lead Counsel's experience, Lead Plaintiff and Lead Counsel believe that the Settlement—which eliminates the significant costs and risks of continuing litigation and instead provides a fair and immediate cash recovery—is in the best interests of the Settlement Class.  ¶¶ 4-7; *see also* Ex. 2 ("Tarapara Decl."), at ¶¶ 7-8.

While the deadline to file an objection has not yet passed, the reaction of the Settlement Class also supports final approval.  Almost 12,500 copies of the Postcard Notice have been sent to potential Settlement Class Members and, to date, no objections or  requests for exclusion have

---

[2] Defendants argued for a vastly smaller class period in their opposition to class certification. Lead Plaintiff's estimate for maximum total recoverable damages under Defendants' proposed class period drops to $6.56 million.  Under this scenario, the $3.5 million Settlement represents a **53.4% recovery**.  ¶¶ 5, 59, 63.

MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND PLAN OF ALLOCATION

Master File No. 4:16-cv-04069-PJH

1  been received or entered on the docket.  ¶¶ 69, 73 & Ex. 3 ("Villanova Decl.").

2  Finally, the Plan of Allocation was developed by Lead Counsel in consultation with Lead

3  Plaintiff's damages expert and reflects an assessment of the damages that Lead Plaintiff contends

4  could have been recovered under the theories of liability and damages asserted in the Action.  ¶

5  76.  The Plan of Allocation ties each participating Settlement Class Member's recovery to when

6  the securities were acquired and sold, and is a fair and reasonable method for distributing the Net

7  Settlement Fund. ¶ 79.  The Plan of Allocation thus warrants approval.

8  For these reasons, Lead Plaintiff respectfully requests that the Court grant final approval of

9  the Settlement and Plan of Allocation and grant final certification of the Settlement Class for

10  settlement purposes.

11  **II.     THE LITIGATION AND SETTLEMENT**[3]

12  **A.     The Litigation**

13  On July 20 and September 15, 2016, respectively, two class action complaints were filed in

14  the United States District Court for the Northern District of California, styled *Tarapara v. K12*

15  *Inc., et al.*, Case No. 4:16-cv-04069-PJH (the "*Tarapara* Action") and *Tuinenburg v. K12 Inc., et*

16  *al.*, Case No. 4:16-cv-05305-PJH (the "*Tuinenburg* Action").  Both complaints alleged violations

17  of the federal securities laws.  On October 6, 2016, the Court issued an Order: (1) consolidating

18  the *Tarapara* and *Tuinenburg* Actions, which were re-captioned as *In re K12 Inc. Sec. Litig.*,

19  Master File No. 4:16-cv-04069-PJH; (2) appointing Babulal Tarapara and Mark Beadle as lead

20  plaintiffs (collectively, "Plaintiffs") for the consolidated action; and (3) approving Plaintiffs'

21  selection of Glancy Prongay & Murray LLP ("GPM") as Lead Counsel for the proposed class.

22  Shortly thereafter, on December 2, 2016, Plaintiffs filed the highly-detailed 105-page

23  Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the

24  "FAC"), alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

25

26  [3] The Solish Declaration is an integral part of this submission and, for the sake of brevity in this
   memorandum, the Court is respectfully referred to it for a more fulsome description of, *inter alia*,
27  the factual and procedural history of the Action (¶¶ 11-46); the nature of the claims asserted (¶¶
   12, 18, 29); the negotiations leading to the Settlement (¶¶ 39-44); and the terms of the Plan of
28  Allocation (¶¶ 74-80).

(the "Exchange Act") and Rule 10b-5 promulgated thereunder.  ¶¶ 6, 16-19.  Defendants filed their motion to dismiss on January 30, 2017, primarily arguing that Plaintiffs had not alleged facts sufficient to establish falsity, scienter, and loss causation.  ¶¶ 20-22.  Plaintiffs filed their opposition to the motion to dismiss on March 1, 2017, along with an opposition to Defendants' request for judicial notice.  ¶¶ 6, 23.  Defendants filed their reply in support of their motion on March 31, 2017, and the Court heard oral argument on the motion to dismiss on April 19, 2017. ¶¶ 6, 24.  On August 30, 2017, the Court granted in part, and denied in part, Defendants' motion to dismiss.  ¶¶ 25-26.

Pursuant to the Parties' stipulation, on October 2, 2017, Plaintiffs filed and served the Consolidated Second Amended Complaint for Violations of the Federal Securities Laws ("SAC"). The SAC is the operative complaint in the Action, and alleges claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 against K12 Inc. ("K12" or the "Company"), and two of its officers, Nathaniel Davis ("Davis") and James Rhyu ("Rhyu") (collectively, with K12, "Defendants").[4]  The SAC contains allegations pertaining solely to Defendants' alleged misstatements and omissions regarding K12's contractual relationship with the Agora Cyber Charter School ("Agora"), that Plaintiffs claimed artificially inflated the Company's stock price throughout the Settlement Class Period.  More specifically, the SAC alleges that Defendants failed to disclose that they received a notice from Agora in 2012 exercising its rights under the parties' then-existing management contract to terminate the contract's automatic renewal (the "Agora Notice"), and misrepresented the financial impact of the parties' new contract.  Plaintiffs allege that when this information was disclosed, K12's stock price declined, allegedly damaging investors. ¶¶ 12, 28-29.  Defendants answered the SAC on November 16, 2017. ¶ 30.

Fact discovery commenced on January 18, 2018, and the Parties thereafter served discovery requests.  ¶ 32.  Pursuant to the Parties' discovery requests, Plaintiffs produced over 19,000 pages of documents and responded to interrogatories.  ¶ 33.  Defendants produced

---

[4] Pursuant to the Parties' stipulation (ECF No. 67), Plaintiffs agreed to dismiss claims against two individuals who were originally named as defendants in the FAC.  ¶¶ 6 (iv), 27.  Thus, the Defendants remaining in the Action, and as parties to the Stipulation, include only K12, Davis, and Rhyu.

1   approximately 79,000 pages of documents, which Lead Counsel reviewed and analyzed.  *Id.*

2        On March 1, 2018, Lead Plaintiff filed his motion for class certification along with an

3   expert report on market efficiency by Dr. Adam Werner.  ECF Nos. 83, 84.  Following the

4   depositions of both Lead Plaintiff and Dr. Werner, Defendants filed their opposition to class

5   certification on June 15, 2018.  Lead Plaintiff filed his reply in support of class certification on

6   August 8, 2018.  The class certification hearing was initially scheduled for September 12, 2018,

7   but later vacated after the Parties reached a tentative settlement agreement.  ¶¶ 37-38.

8        **B.**    **The Mediation and Settlement**

9        On August 15, 2018, the Parties participated in a full-day mediation session overseen by

10  Judge Daniel Weinstein (Ret.), a highly experienced, neutral mediator.  ¶ 39.  In advance of the

11  mediation, the Parties each submitted and exchanged detailed mediation statements, together with

12  exhibits, outlining their respective analyses of the claims and defenses in the Action.  ¶ 40.  The

13  session ended without an agreement; however, over the weeks following the mediation, Judge

14  Weinstein and his staff conducted further discussion with the Parties, culminating in a mediator's

15  proposal that both Parties accepted on September 4, 2018.  ¶ 42; *see also* Ex. 1 ("Weinstein

16  Decl.").  The Parties then notified the Court of the settlement and requested that the motion for

17  class certification be taken off calendar.  ¶ 38.  On November 26, 2018, the Parties executed the

18  Stipulation setting forth the terms and conditions of the Settlement, and on February 14, 2019, the

19  Court entered the Preliminary Approval Order, which preliminarily approved the Settlement,

20  certified the Settlement Class for settlement purposes, appointed Lead Plaintiff as the class

21  representative, and appointed Lead Counsel as class counsel.  ¶¶ 44-46; ECF No. 109.

22       Notice of the Settlement was given as required by the Preliminary Approval Order.  As

23  part of the notice process, 12,492 Postcard Notices were mailed to potential Settlement Class

24  Members.  ¶ 69; Villanova Decl. ¶ 8.  To date, the Claims Administrator has received 44 Claim

25  Forms, and no requests for exclusion.  ¶¶ 70, 73; Villanova Decl. ¶¶ 15, 17.  Moreover, as of the

26  date of this filing, no objections have been filed regarding any aspect of the Settlement.  ¶ 73.[5]

27  _____

28  [5] The deadline to submit claims is July 13, 2019; Lead Counsel expects that numerous additional
    Claim Forms will be submitted.  The deadline to file objections or request exclusion is June 19,

## III.      STANDARDS GOVERNING APPROVAL OF CLASS ACTION SETTLEMENTS

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims and states that a class action settlement should be approved if the court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

In the Ninth Circuit and throughout the country, "there is a strong judicial policy that favors settlements particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).[6]  Class actions readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of litigation; the settlement of such complex cases greatly contributes to the conservation of scarce judicial resources.  *See, e.g.*, *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Avoiding such unnecessary and unwarranted expenditure of resources and time would benefit all Parties and the Court.").

On December 1, 2018, amendments to Rule 23(e)(2) went into effect that provide the Court with four specific factors to consider when determining whether a proposed settlement is fair, reasonable, and adequate:

    (A)     the class representatives and class counsel have adequately represented the class;

    (B)     the proposal was negotiated at arm's length;

    (C)     the relief provided for the class is adequate, taking into account:

          (i)     the costs, risks, and delay of trial and appeal;

          (ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

          (iii)     the terms of any proposed award of attorneys' fees, including timing of payment; and

          (iv)     any agreement required to be identified under Rule 23(e)(3); and

    (D)     the proposal treats class members equitable relative to each other.

---

2019.  To the extent objections or exclusions are received after the date of this filing, they will be addressed in Lead Plaintiff's reply filing on June 26, 2019.

[6] *See also Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) ("[T]here is an overriding public interest in settling and quieting litigation," and this is "particularly true in class action suits."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("the court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits.").

1     Fed. R. Civ. P. 23(e)(2).

2        As discussed in detail below, each of the above factors supports final approval of the

3     Settlement.   These Rule 23(e) factors are not intended to "displace" any previously adopted

4     factors, but "rather to focus the court and the lawyers on the core concerns of procedure and

5     substance that should guide the decision whether to approve the proposal."   *See* Advisory

6     Committee Notes to the 2018 Amendments to the Federal Rules of Civil Procedure.

7        To evaluate the substantive fairness of the settlement, courts in the Ninth Circuit have

8     considered the "*Hanlon* factors":

9
10
11
12
       (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

13     *Hanlon*, 150 F.3d at 1026; *Churchill Village L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir.

14     2004).

15        As explained below and in the Solish Declaration, application of each of the four factors

16     specified in Rule 23(e)(2), and the relevant, non-duplicative *Hanlon* factors, demonstrates that the

17     Settlement warrants Court approval.

18     **IV.**      **THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

19
20
       **A.**      **Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class**

21        The Court should consider whether the "class representative[] and class counsel have

22     adequately represented the class" when determining whether to approve a class action settlement.

23     Fed. R. Civ. P. 23(e)(2)(A).   "Resolution of two questions determines legal adequacy: (1) do the

24     named plaintiffs and their counsel have any conflicts of interest with other class members and

25     (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

26     class?"   *Hanlon*, 150 F.3d at 1020.

27        Here, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class

28     both during the litigation of this Action and during its settlement.   Lead Plaintiff's claims are

typical of and coextensive with the claims of the Settlement Class, and he has no antagonistic interests; rather, Lead Plaintiff's interest in obtaining the largest possible recovery in this Action is aligned with the other Settlement Class Members. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Additionally, Lead Plaintiff was highly involved in each stage of the litigation and worked closely with Lead Counsel throughout the pendency of this Action to achieve the best possible result for himself and the Settlement Class. *See* ¶ 104; Tarapara Decl. ¶¶ 3-6.

Lead Plaintiff also retained counsel who are highly experienced in securities litigation, and who have a long and successful track record of representing investors in such cases. Lead Counsel, GPM, has successfully prosecuted securities class actions and complex litigation in federal and state courts throughout the country. *See* Ex. 5 (GPM firm resume). Moreover, in this case, Lead Counsel vigorously prosecuted the Settlement Class's claims throughout the litigation, including by conducting an extensive investigation of the claims through a detailed review of all publicly available documents, drafting a detailed FAC and SAC, successfully obtaining a partial denial of Defendants' motion to dismiss, engaging in fact discovery, and fully briefing class certification. ¶¶ 16-38.

Accordingly, as the Court previously found in conditionally certifying the Settlement Class and appointing Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class. *See* Preliminary Approval Order, ECF No. 109 at 2-3. This factor supports final approval of the Settlement.

> **B.     The Settlement Was Reached After Substantial Litigation and Arm's Length Negotiations Between Experienced Counsel Conducted Under the Auspices of a Well-Respected Mediator**

The Court must also consider whether the settlement was "negotiated at arm's length" in weighing approval of a class-action settlement. Fed. R. Civ. P. 23(e)(2)(B). Circumstances related to this "procedural" fairness determination of a settlement traditionally include

(i) understanding of the strength [and weakness] of the plaintiff's case[7] based on factors like "the extent of discovery completed and the stage of the proceedings";[8] (ii) the "experience and views of counsel";[9] and (iii) the absence of any indicia of collusion.[10]   Each of these factors supports approval of the Settlement.

The Ninth Circuit, as well as courts in this District, "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in approving a class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *see also In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) ("Courts have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"); *Stewart v. Applied Materials, Inc.*, 2017 WL 3670711, at *6 (N.D. Cal. Aug. 25, 2017) ("[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness."). Courts also recognize that the "assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive. *Satchell v. Fed. Express Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).

Here, the Settlement merits a presumption of fairness because it is the product of extensive arm's length negotiations among counsel with extensive experience in securities class action litigation, following vigorous litigation, including a carefully conducted investigation, motion practice, a significant amount of discovery, and with the recommendation of an experienced and neutral mediator. ¶¶ 16-44; *see In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016); *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal 2004) (finding that "a settlement following sufficient discovery and genuine arms-length negotiation is presumed fair"); *see also Feyko v. aAD Partners LP*, 2014 WL 12572678, at *7 (C.D. Cal. Mar. 7, 2014) ("Settlements reached with the help of a mediator are likely non-

---

[7] *Hanlon*, 150 F.3d at 1026 (first factor).

[8] *See id.* (fifth factor).

[9] *See id.* (sixth factor).

[10] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

MOTION FOR FINAL APPROVAL OF CLASS                    Master File No. 4:16-cv-04069-PJH
ACTION SETTLEMENT AND PLAN OF ALLOCATION

collusive.").   Indeed, the mediation process was led by a well-respected mediator, Judge Daniel Weinstein (Ret.), who has significant experience mediating securities class actions and other complex litigation.  *See Silverman v. Motorola, Inc.*, 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012) (approving settlement and describing Judge Weinstein as "a nationally-recognized and highly-respected mediator"), *aff'd,* 739 F.3d 956 (7th Cir. 2013).   Judge Weinstein not only mediated the Settlement, he also supports it.  *See* Weinstein Decl., ¶¶ 8-10.

Additionally, the Parties and their counsel were knowledgeable about the strengths and weaknesses of this case before reaching an agreement to settle.   Lead Counsel conducted a detailed, substantive investigation into the allegations of the FAC and the SAC by, among other things: (1) reviewing and analyzing K12's SEC filings, press releases, investor conference calls, blog posts, and other public statements, as well as (a) publicly available documents, reports, announcements, and news articles concerning K12 and/or Agora, (b) research reports prepared by securities and financial analysts regarding K12, and (c) thousands of pages produced by the Pennsylvania Department of Education pursuant to a Right to Know Request; (2) working with a damages and loss causation expert to analyze K12's stock price movement; (3) retaining and working with a private investigator who conducted numerous interviews with former employees and other third parties; (4) reviewing and analyzing court filings and other publicly available material related to state legislative and regulatory actions and interactions with K12; and (5) consulting with an accounting expert.   ¶¶ 6, 16.  Lead Counsel also performed extensive legal research in briefing Defendants' motion to dismiss and Lead Plaintiff's motion for class certification.   ¶¶ 6, 23, 34.  And, as part of the class certification briefing, Lead Counsel submitted an expert report on market efficiency by Dr. Adam Werner.   ¶¶ 6, 35.  After this Action passed the motion to dismiss stage, a substantial amount of fact discovery was exchanged, including approximately 79,000 pages of documents produced by Defendants, which Lead Counsel reviewed and analyzed, as well as Plaintiff's production of approximately 19,000 pages of documents to Defendants.   ¶¶ 31-33.  Finally, the Parties engaged in substantial settlement negotiations, including the exchange of mediation statements addressing the Action's merits and damages on a class-wide basis, and continued discussions with the mediator and his staff

following the unsuccessful mediation session.  ¶¶ 39-44.

Lead Counsel's conclusion that the Settlement is fair and reasonable and in the best interests of the Settlement Class thus supports its approval.  Indeed, "[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *In re Heritage Bond Litig*., 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) (quotations omitted).  This makes sense, as counsel is "most closely acquainted with the facts of the underlying litigation." *Id.* (quotations omitted).  Such is the case here, where Lead Counsel, as discussed above, has a thorough understanding of the strengths and weakness of the claims, as well as extensive prior experience litigating securities class action cases.  It is also important to note that the Lead Plaintiff, who was thoroughly involved in all aspects of the litigation, also supports the Settlement.  *See* Tarapara Decl. ¶¶ 7-8.  Lead Plaintiff's support for the Settlement should be afforded "special weight" because a plaintiff "ha[s] a better understanding of the case than most members of the class." *DirecTV*, 221 F.R.D. at 528.

Finally, the Settlement has none of the indicia of collusion identified by the Ninth Circuit. *See Bluetooth Headset*, 654 F.3d at 947 ("subtle signs" of collusion include a "disproportionate distribution of the settlement" between the class and class counsel, "a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," or an agreement for "fees not awarded to revert to defendants rather than be added to the class fund").

### C.     The Settlement Relief Provided to the Settlement Class is Adequate in Light of the Costs and Risks of Further Litigation and Other Relevant Factors

Under Rule 23(e)(2)(C), when evaluating the fairness, reasonableness, and adequacy of a settlement, the Court must also consider whether "the relief provided for the class is adequate, taking into account … the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  This factor essentially incorporates four of the tradition *Hanlon* factors: (1) the strength of Lead Plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout the trial; and (4) the amount offered in the settlement.  *See Hanlon*, 150 F.3d at 1026.  As demonstrated below, each of these factors supports approval of the Settlement.

1

2

**1.     The Strength of Lead Plaintiff's Case and the Significant Risks of Continued Litigation**

3

4

In assessing whether the proposed Settlement is fair, reasonable, and adequate, the Court

5

"must balance against the continuing risk of litigation, including the strengths and weaknesses of

6

plaintiff's case, against the benefits afforded to class members, including the immediacy and

certainty of a recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

7

Lead Plaintiff and Lead Counsel believe the asserted claims have considerable merit, but

8

also recognize that the risks of continued litigation were substantial.  With class certification fully

9

briefed and with the class certification hearing on calendar at the time of settlement, overcoming

10

this hurdle was the most immediate and critical next step for Lead Plaintiff.  While Lead Counsel

11

was confident that all of the elements required under Rule 23 had been met and that the class

12

would be certified, Defendants' arguments to the contrary created significant uncertainty as to

13

whether the potential Class would receive any recovery.  ¶ 47.  Furthermore, Defendants' motion

14

for summary judgment was anticipated.  Lead Plaintiff and Lead Counsel were cognizant that an

15

adverse decision on either motion would have presented a significant hurdle to recovering

16

damages on behalf of the Settlement Class, and may well have resulted in a much smaller recovery

17

or no recovery at all.

18

In their opposition to Lead Plaintiff's motion for class certification, Defendants argued that

19

the market learned of any previously omitted material facts regarding K12's relationship with

20

Agora on June 26, 2014, when K12 issued a press release confirming that the Agora Board was

21

soliciting vendor bids for the 2015-2016 school year.  ¶ 54.  Defendants further argued that the

22

disclosure of Agora's RFP process informed the market that the Agora Board did not intend to let

23

the existing management contract automatically renew and, therefore, no investor loss flowed

24

from the statements following that date.  As such, Defendants argued that the end of the alleged

25

class period should be no later than June 26, 2014.  *Id.*  Defendants also argued that the alleged

26

class period (and now Settlement Class Period)—October 10, 2013 through October 27, 2015,

27

inclusive—started too early.  Defendants argued that the start of the alleged class period should

28

begin no earlier than November 7, 2013, when Lead Plaintiff alleged that Defendants failed to

1   inform investors of the risk that K12's contract with Agora would either not be reviewed, or that

2   the nature of the contract would materially change.  *Id.*  If Defendants successfully convinced the

3   Court that the appropriate class period was in fact November 7, 2013 through June 26, 2014,

4   inclusive, Lead Plaintiff's maximum estimated recoverable damages would have been reduced to

5   $6.56 million.  ¶ 5.  Furthermore, had Defendants' proposed class period prevailed, then Lead

6   Plaintiff's claims could be time-barred under the two-year statute of limitations governing federal

7   securities fraud claims.  *See* 28 U.S.C. § 1658(b); *see also China Agritech, Inc. v. Resh*, 138 S.Ct.

8   1800, 1804 (2018) ("The Exchange Act has a two-year statute of limitations that begins to run

9   upon discovery of the facts constituting the violation."); ¶ 59.

10       Likewise, in order to defeat a summary judgment motion and to prevail at trial, Lead

11   Plaintiff and Lead Counsel would have to prove that K12's statements and omissions were false

12   and misleading, that Defendants knew or were reckless in not knowing that their statements and

13   omissions were false and misleading at the time made, and that those statements and omissions

14   were corrected and caused recoverable damages for the Settlement Class.  Lead Plaintiff

15   anticipated that Defendants would present strong arguments challenging Lead Plaintiff's pleading

16   and proof on all of those elements in their expected motion for summary judgment and/or at trial.

17       **Falsity:** Defendants argued in their motion to dismiss, and would undoubtedly argue in a

18   motion for summary judgment or at trial, that Lead Plaintiff failed to allege actionable

19   misrepresentations under the federal securities laws.  ¶ 49.  Defendants argued that the notice of

20   non-renewal received from Agora did not constitute material information that K12 had a duty to

21   disclose, but was in fact merely a notification to K12 that the management contract between the

22   two parties would not ***automatically*** renew, thereby allowing for re-negotiation of certain terms as

23   reflected in the new contract that K12 and Agora ultimately announced in October 2014.  *Id.*

24       As in their motion to dismiss, Defendants also would have argued that certain statements

25   made regarding the Agora management contract were factually true at the time made and that

26   Lead Plaintiff admits as much.  ¶ 50.  Thus, Defendants would surely argue that Lead Plaintiff's

27   allegations that Defendants misled investors by downplaying Agora's RFP process or announcing

28   K12's new contract with Agora in October 2014 were not actionable misrepresentations.  *Id.*

**Scienter:** Defendants would have almost certainly moved for summary judgment on the element of scienter.  Proving scienter in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence or an admission.  *See, e.g., Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at \*5 (N.D. Cal. Nov. 21, 2016); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001).  Here, while Lead Plaintiff believes that the evidence would have established Defendants' scienter, there were no admissions of wrongdoing, no suspicious stock sales, and Defendants continue to insist that their Settlement Class Period statements concerning K12's contract with Agora were made in good faith and that the Agora Board expressly disclaimed any intention of inhibiting negotiations with K12 by virtue of the 2012 notice of non-automatic renewal, and that the two parties actively pursued discussions throughout 2014, which in fact led to a new contract that year.  Defendants also could have claimed that they did not have a motive to commit fraud based on the fact that no Defendant sold K12 stock during the Settlement Class Period or is otherwise alleged to have benefitted personally from any alleged misstatement or omission challenged in the SAC.  ¶ 52.

**Loss Causation and Damages:** Lead Plaintiff also faced substantial challenges in proving that the revelation of the truth about Defendants' alleged false and misleading statements and omissions caused declines in the price of K12's common stock, and in establishing class-wide damages.  ¶¶ 53-58.  Even if unsuccessful in opposing class certification, Defendants would have most certainly argued that the June 2014 disclosure of Agora's RFP process and/or the October 2014 announcement of K12's new curriculum contract with Agora informed the market that the Agora Board did not intend to let its existing management contract with K12 automatically renew, and therefore, none of the stock price declines associated with Lead Plaintiff's subsequent alleged disclosures could satisfy the applicable loss causation standards.  ¶¶ 54-55.  As explained above, if Defendants' argument concerning the June 2014 disclosure was accepted by the Court or a jury, then the Settlement Class's damages would have been reduced by almost 90%.  Similarly, a ruling capping damages as of the October 2014 disclosure would have significantly reduced the Settlement Class's potential recovery.  ¶ 54.

Additionally, Lead Plaintiff would have to proffer expert testimony to prove: (i) what the

"true value" of K12 Securities would have been had there been no alleged material misstatements or omissions concerning Defendants' receipt of the non-automatic renewal notice from Agora; (ii) the amount by which K12 shares were inflated by the alleged material misstatement and omissions; and (iii) the amount of inflation removed by the disclosures on June 26, 2014, August 14, 2014, October 9, 2014, and October 27, 2015 of the alleged true facts.  Defendants almost certainly would have presented their own damages expert(s) to present conflicting conclusions and theories as to the reason(s) for K12's share price decline, requiring a jury to decide the "battle of the experts" – an intrinsically expensive and unpredictable process.  ¶ 56. Courts have recognized that such a "battle of experts" is a significant litigation risk, and weights in favor of approving a settlement. *Amgen*, 2016 WL 10571773, at *3.

Finally, even if the Court certified the class as proposed by Lead Plaintiff and he prevailed on liability and the Settlement Class was awarded damages, Defendants likely would appeal the verdict and award.  The appeals process would have likely spanned several years including an appeal to the Ninth Circuit, and, potentially, an *en banc* review from the Ninth Circuit or a writ of certiorari from the Supreme Court, or both.  During this time on potential appeals, the Settlement Class would receive no distribution of any damage award.  In addition, an appeal of any judgment would carry the risk of reversal, in which case the Settlement Class would receive no recovery even after having prevailed on their remaining claim at trial.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); ¶ 60.

### 2.     The Risks of Maintaining Class Action Status Throughout Trial

At the time the Settlement was reached, Lead Plaintiff's motion for class certification was fully briefed, but not yet decided.  Although Lead Plaintiff believes his motion was meritorious, there is no guarantee that the Court would have agreed.  Moreover, Defendants vehemently opposed Lead Plaintiff's proposed class period—the same as the Settlement Class Period— arguing that this proposed class period begins too early and ends too late.  ¶¶ 54-55, 59.  If the Court agreed with Defendants' arguments and certified a class pursuant to Defendants' proposed class period, November 7, 2013 through June 26, 2014, the vast majority of the Settlement Class

1  Period (and damages) would have been precluded from the case.  *See, e.g.*, *Destefano v. Zynga,*
2  *Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016) (noting that a certification for purposes of
3  settlement that was broader than the certification of a class if litigation were to continue weighed
4  in favor of settlement).  Similarly, even if the Court were to accept Defendants' arguments only in
5  part and impose a class period end date of October 8, 2014, this would have shortened the
6  proposed class period by more than a year and substantially curtailed the Settlement Class's
7  possible damages recovery.  ¶ 54.

8       Furthermore, Rule 23 provides that a class certification order may be altered or amended
9  any time before a decision on the merits.  Thus, in any class action suit, there is always a risk that
10 a class will be modified or decertified prior to a decision on the merits.  *See, e.g., Omnivision*, 559
11 F. Supp. 2d at 1041 (even if a class is certified, "there is no guarantee the certification would
12 survive through trial, as Defendants might have sought decertification or modification of the
13 class").  Thus, the serious risks of obtaining and maintaining class certification support approval
14 of the Settlement in this case.

15            **3.       The Amount Obtained in the Settlement Supports Approval**

16      The $3.5 million Settlement constitutes a meaningful percentage of the maximum possible
17 recovery for the Settlement Class, especially taking into account the uncertainty, risks, and costs
18 associated with any attempt to obtain a greater amount.  "It is well-settled law that a cash
19 settlement amounting to only a fraction of the potential recovery does not per se render the
20 settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.
21 2000).  Moreover, a settlement is "not to be judged against a hypothetical or speculative measure
22 of what *might* have been achieved by the negotiators."  *Officers for Justice v. Civil Serv. Comm'n*,
23 688 F.2d 615, 625 (9th Cir. 1982) (emphasis in original).

24      Here, as this Court preliminarily determined in its Preliminary Approval Order, the
25 Settlement Amount—$3.5 million in cash—is within the range of reasonableness under the
26 circumstances so as to warrant approval of the Settlement.  Lead Plaintiff's damages expert
27 estimates that if Lead Plaintiff had fully prevailed in each of his claims at both summary judgment
28 and after a jury trial, if the Court certified the same class period as the Settlement Class Period,

1  and if the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss

2  causation as to each of the four stock price drop dates alleged in this case—*i.e.*, Lead Plaintiff's

3  ***best case scenario***, the total ***maximum*** damages would be $65.926 million.  Thus, the $3.5 million

4  Settlement Amount represents approximately 5.3% of the total ***maximum*** damages *potentially*

5  available in this Action.  ¶¶ 5, 47, 54-55.  In comparison, the median recovery in securities class

6  actions in 2018 was approximately 2.6% of estimated damages, and the median recovery in

7  securities class actions from 1996 through 2018 was 4.7% of estimated damages ranging between

8  $50-99 million.  *See* Ex. 4 (Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities

9  Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019)) at p. 36, Fig. 28 and p.

10  35, Fig. 27; *see also In re LJ Int'l Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19,

11  2009) (approving securities fraud class action settlement where recovery was 4.5% of maximum

12  damages); *IBEW v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012)

13  (approving securities fraud class action settlement where recovery was 3.5% of maximum

14  damages and noting "this amount is within the median recovery in securities class actions settled

15  in the last few years").

16        Moreover, as discussed *supra* in Sections IV.C.1 and IV.C.2, Lead Plaintiff and Lead

17  Counsel were extremely cognizant of the risk that the Court would accept Defendants' argument

18  that the proposed class period should be limited to November 7, 2013 through June 26, 2014,

19  which would substantially diminish the maximum recoverable damages available to the Settlement

20  Class to just $6.56 million.  Under this scenario, the $3.5 million Settlement represents a 53.4%

21  recovery.  ¶ 5.  When viewed in this context and in light of these substantial risks, the recovery is

22  an extremely favorable result for the Settlement Class.

23        **4.**      **The Complexity, Expense, and Likely Duration of Litigation**

24        The expense, complexity, and likely duration of continued litigation are also key

25  considerations in evaluating the reasonableness of a settlement.  *See, e.g.*, *Torrisi v. Tucson Elec.*

26  *Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (finding "the cost, complexity and time of fully

27  litigating the case" a factor in concluding settlement was fair).  "Generally, unless the settlement is

28  clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation

1   with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

2   Securities-fraud cases are inherently complex and frequently take an exceptionally long time to

3   litigate, in part because they often involve significant post-trial motions and appeals.  *See*, *e.g.*, *In*

4   *re Vivendi Universal, S.A., Sec. Litig.*, 2012 WL 362028, at *1 (S.D.N.Y. Feb. 6, 2012) (noting

5   that, two years after jury verdict in plaintiffs' favor and ten years after the case was filed,

6   shareholders had still received no recovery).  Given the "notorious complexity" of securities class

7   actions, settlement is often appropriate because it "circumvents the difficulty and uncertainty

8   inherent in long, costly trials."  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL

9   903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at *5

10  (S.D. Cal. Dec. 6, 2018) (similar).

11          Here, continuing litigation through the conclusion of fact and expert discovery, the class

12  certification hearing, summary judgment, trial, and appeals would been very expensive and could

13  delay the Settlement Class Members' recovery, if any, for upwards of several years.[11]  *See Zynga*,

14  2016 WL 537946, at *10 (noting same); *Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at

15  *11 (C.D. Cal. Apr. 29, 2014) (similar).  Regardless of the certainty or uncertainty of the ultimate

16  outcome, there is no question that further litigation against the Defendants would likely have been

17  expensive, complex, and protracted.  *See*, *e.g.*, *Nobles v. MBNA Corp.*, 2009 WL 1854965, at *2

18  (N.D. Cal. June 29, 2009) (finding a proposed settlement proper "given the inherent difficulty of

19  prevailing in class action litigation"); *Heritage Bond*, 2005 WL 1594403, at *6 (class actions have

20  a well-deserved reputation as being the most complex).

21          The present value of a certain recovery now, as opposed to the mere *chance* for a greater

22  one years later, supports approval of this Settlement that eliminates the expense and delay of

23  continued litigation and the risk that the Settlement Class could receive little or no recovery.

24  Consequently, this factor supports approval of the Settlement.

25  _____

26  [11] Though only a few securities class actions have gone to trial, the time between verdict and final
    judgment has been up to seven years.  *See e.g.*, *Vivendi Universal, S.A. Sec. Litig.*, Case No. 02-
27  cv-5571 (RJH/HBP), Verdict Form, ECF No. 998 (S.D.N.Y. Feb. 2, 2010) (jury verdict issued on
    Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims,
28  ECF No. 1317 (S.D.N.Y. May 9, 2017).

1

### 5.      Other Factors Established by Rule 23(e)(2)(C) Support Final Approval

2

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class

3  is adequate in light of "the effectiveness of any proposed method of distributing relief to the class,

4  including the method of processing class-member claims," "the terms of any proposed award of

5  attorneys' fees, including timing of payment," and "any agreement required to be identified under

6  Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors support the Settlement's

7  approval or is neutral and thus do not suggest any basis for concluding the Settlement is

8  inadequate.

9

First, the method for processing Settlement Class Members' claims and distributing relief

10  to eligible claimants includes well-established, effective procedures for processing claims

11  submitted by potential Settlement Class Members and efficiently distributing the Net Settlement

12  Fund. Here, Epiq Class Action & Mass Tort Solutions, Inc. ("Epiq"), the Court-approved Claims

13  Administrator, will process claims under the guidance of Lead Counsel, allow claimants an

14  opportunity to cure any deficiencies in their claims or request the Court to review a denial of their

15  claims, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement

16  Fund (per the Plan of Allocation), after Court-approval.[12]  Claims processing like the method

17  proposed here is standard in securities class action settlements as it has been long found to be

18  effective, as well as necessary insofar as neither Lead Plaintiff nor Defendants possess the

19  individual investor trading data required for a claims-free process to distribute the Net Settlement

20  Fund.

21

Second, as discussed in the accompanying Fee and Expense Application, Lead Counsel is

22  applying for a percentage of the common fund fee award to compensate them for the services they

23  have rendered on behalf of the Settlement Class. The proposed attorneys' fees of 33% of the

24  Settlement Fund (which, by definition, includes interest earned on the Settlement Amount) is

25  reasonable in light of the work performed and the results obtained. More importantly, approval of

26

27

[12] This is not a claims-made settlement. If the Settlement is approved, Defendants will not have
28  any right to the return of a portion of the Settlement based on the number or value of the claims
submitted. *See* Stipulation ¶ 14.

1   the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may

2   not be terminated based on any ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

3        Third, in accordance with Rule 23(e)(2)(C)(iv), and as Lead Plaintiff noted in his

4   preliminary approval papers, the Parties entered into a confidential agreement which establishes

5   certain conditions under which K12 may terminate the Settlement if Settlement Class Members,

6   who collectively purchased a specific number of shares of K12 common stock, request exclusion

7   (or "opt out") from the Settlement.  This type of agreement is standard in securities class action

8   settlements and has no negative impact on the fairness of the Settlement. *See, e.g.*, *In re Carrier*

9   *IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (observing

10   that such "opt-out deals are not uncommon as they are designed to ensure that an objector cannot

11   try to hijack a settlement in his or her own self-interest," and granting final approval of class

12   action settlement).

13        **D.**    **The Settlement Treats Class Members Equitably Relative to Each Other**

14        Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members

15   equitable relative to one another.  Fed. R. Civ. P. 23(e)(2)(D).  Under the proposed Plan of

16   Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net

17   Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized

18   Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized

19   Claimants, multiplied by the total amount in the Net Settlement Fund.  ¶ 77.  Lead Plaintiff will

20   receive the same level of *pro rata* recovery, based on his Recognized Claim as calculated by the

21   Plan of Allocation, as all other similarly situated Settlement Class Members.

22        **E.**    **The Positive Reaction of the Settlement Class Supports Settlement Approval**

23        Though not included in Rule 23(e)(2), the reaction of the Settlement Class is also a

24   significant factor in assessing its fairness and adequacy.  *Hanlon*, 150 F.3d at 1026.  "[T]he

25   absence of a large number of objections to a proposed class action settlement raises a strong

26   presumption that the terms of a proposed class action settlement are favorable to class members."

27   *Omnivision*, 559 F. Supp. 2d at 1043.

28

1      Here, in accordance with the Court's Preliminary Approval Order, on March 15, 2019,

2      12,492 copies of the Postcard Notice were sent to potential Settlement Class Members and

3      nominees, and the Summary Notice was published both in the national edition of *Investor's*

4      *Business Daily* and transmitted over the *PR Newswire* on March 25, 2019.  *See* Villanova Decl. ¶¶

5      2-8, 9.  Epiq also established a dedicated website, www.K12SecuritiesLitigation.com, to provide

6      potential Settlement Class Members with information concerning the Settlement and access

7      downloadable copies of the full Notice and Claim Form, as well as copies of the Stipulation,

8      Preliminary Approval Order, and the Second Amended Complaint.  *Id.* ¶¶ 2, 14.  The website was

9      operational beginning on March, 15 2019.  *Id.* ¶ 14.   The website also lists the exclusion,

10     objection, and claim filing deadlines, as well as the date and time of the Court's Settlement

11     Hearing.   As of May 7, 2019, there have been no requests for exclusion received, and no

12     objections have been filed on this Court's docket.  Solish Decl. at ¶ 73; Villanova Decl. ¶ 15.

13       As provided in the Preliminary Approval Order, Lead Plaintiff will file reply papers in

14     support of the Settlement on June 26, 2019, after the deadline for requesting exclusions or

15     objecting has passed.  Lead Plaintiff's reply papers will address any requests for exclusion and

16     objections received and/or filed.

17                 *     *     *

18       As discussed in detail above, each of the Rule 23(e)(2) factors support a finding that the

19     Settlement is fair, reasonable, and adequate.  Final approval is, therefore, appropriate.

20     **V.**     **THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE**

21       In the Preliminary Approval Order, the Court preliminarily approved the Plan of

22     Allocation.  Lead Plaintiff now requests final approval of the Plan of Allocation.  A plan of

23     allocation in a class action "is governed by the same standards of review applicable to approval of

24     the settlement as a whole: the plan must be fair, reasonable and adequate."  *Omnivision*, 559 F.

25     Supp. 2d at 1045.  "It is reasonable to allocate the settlement funds to class members based on the

26     extent of their injuries or the strength of their claims on the merits."  *Id.*  An allocation formula

27     need only have a reasonable basis, particularly if recommended by experienced class counsel.  *See*

28     *Heritage Bond*, 2005 WL 1594403, at \*11.

The Plan of Allocation is detailed in the long form Notice and incorporated by reference into the Stipulation. *See* Stipulation, ¶ 1(kk); Notice attached as Exhibit B to the Villanova Decl. at pp. 10-14. The full Notice is posted online at www.K12SecuritiesLitigation.com, is downloadable, and may be mailed to Settlement Class Members upon request.

The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the price of K12 common stock was artificially inflated during the period from October 10, 2013, through and including October 27, 2015, due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decreases in the price of K12 common stock that followed the alleged corrective disclosures that occurred on June 27, 2014, August 14, 2014, October 9, 2014, and October 27, 2015 may be used to measure the alleged artificial inflation in the price of K12 common stock prior to these disclosures. ¶ 76; Notice at ¶ 53. The same methodology would have been proffered by Lead Plaintiff at summary judgment and trial had the Action not settled.

An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including how many shares of K12 common stock the Claimant purchased, acquired, or sold during the Settlement Class Period, when that Claimant bought, acquired, or sold the shares, and the number of valid claims filed by other Claimants. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in K12 stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. ¶ 79. The $10 minimum distribution is also reasonable, based on costs associated with distribution and Epiq's experience that checks for under $10 are less likely to be negotiated. *Id.* at ¶ 78; Villanova Decl. ¶ 16.

Lead Plaintiff and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members similar to the result if Lead Plaintiff prevailed at trial. ¶ 80.  As of May 7, 2019, no objections to the Plan of Allocation have been filed on this Court's docket.  ¶ 81.  For these reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Plan of Allocation.

## VI.  THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Supreme Court recognizes the utility and necessity of certifying settlement classes so long as absent class members' rights are protected.  *See Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 620 (1997).  The Ninth Circuit has also long recognized that class actions may be certified for the purpose of settlement.  *See Hanlon*, 150 F.3d at 1019.

Here, the Settlement Class agreed by the parties and preliminarily certified by the Court in the Preliminary Approval Order consists of:

> All persons who or which purchased or otherwise acquired K12 Securities between October 10, 2013 and October 27, 2015, inclusive (the "Settlement Class Period") and were damaged thereby. Excluded from the Settlement Class are K12, Nathaniel A. Davis, James J. Rhyu, the Officers and directors of K12 at all relevant times, member of their Immediate Families and their legal representatives, heirs, successors, or assigns; any entity in which Defendants have or had a controlling interest; any trust of which Nathaniel A. Davis and/or James J. Rhyu is the settlor or which is for the benefit of their Immediate Family members; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.  Also excluded from the Settlement Class are any Persons who or which exclude themselves by submitting a request for exclusion that is accepted by the Court.

(ECF No. 109, at 2-3).

For all the reasons stated in the Preliminary Approval Order and Lead Plaintiff's Unopposed Motion for Preliminary Approval of Settlement (ECF No. 105 at 14-18), Lead Plaintiff respectfully requests that the Court grant final certification of the Settlement Class under Rules 23(a) and (b)(3).  *See* Preliminary Approval Order (ECF No. 109) at 2-3.

## VII.  NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

For any class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice practicable under the circumstances, including individual

1   notice to all members who can be identified through reasonable effort."   Fed. R. Civ. P.

2   23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).

3        Courts routinely find that a combination of a mailed post card directing class to a more

4   detailed online notice sufficient to satisfy due process requirements.   *See In re Advanced Battery*

5   *Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 183 n.3 (S.D.N.Y. 2014) (citing cases); *Barani v. Wells*

6   *Fargo Bank, N.A.*, 2014 WL 1389329, at *10 (S.D. Cal. Apr. 9, 2014) (approving combination of

7   postcard and online notice in consumer class action).   In accordance with the Preliminary

8   Approval Order, Epiq mailed, via first-class mail, 12,492 individual copies of the Postcard Notice

9   to all Settlement Class Members who could be identified with reasonable effort, as well as

10  brokerage firms and other nominees who regularly act as nominees for beneficial purchasers of

11  stock.   Villanova Decl. ¶¶ 2-8.   The Postcard Notice directed potential Settlement Class Members

12  to   downloadable   versions   of   the   Notice   and   Claim   Form   posted   online   at

13  www.K12SecuritiesLitigation.com.   *Id.* ¶ 2.   In addition, Epiq arranged for the Summary Notice to

14  be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on March 25,

15  2019.   *Id.* ¶ 9.   Claims can be mailed to Epiq, and can also be submitted online.   *Id.* ¶ 17.

16       The Notice provides all the necessary information required per Rule 23(c)(2)(B) and this

17  District's Procedural Guidelines for Class Action Settlements.   The Notice sets forth in plain,

18  easily understandable language:  (a) the nature of the action (Notice, pp. 5-6 ("What Is This Case

19  About?"); *see also* Postcard Notice); (b) the Settlement Class Definition (Notice, p. 6 ("How Do I

20  Know If I Am Affected By The Settlement? Who Is Included In The Settlement?"); *see also*

21  Summary Notice; Postcard Notice); (c) a description of the claims at issue and the defenses to

22  those claims (Notice, pp. 5-6, 6-7 ("What Is This Case About?" and "What Are Lead Plaintiff's

23  Reasons For The Settlement?")); (d) the ability of Settlement Class Members to enter an

24  appearance through counsel (Notice, pp. 15-16 ("When And Where Will The Court Decide

25  Whether To Approve The Settlement? Do I Have To Come To The Hearing? May I Speak At The

26  Hearing If I Don't Like The Settlement?"); *see also* Postcard Notice); (e) the Settlement Class

27  Member's ability to be excluded and the process for exclusion from the Settlement Class (Notice,

28  pp. 14-15 ("What If I Do Not Want To Be A Member Of The Settlement Class? How Do I

MOTION FOR FINAL APPROVAL OF CLASS                                      Master File No. 4:16-cv-04069-PJH
ACTION SETTLEMENT AND PLAN OF ALLOCATION

Exclude Myself?"); *see also* Summary Notice; Postcard Notice); (f) the binding effect of a Class judgment (*see* Notice, pp. 7-8 ("How Are Settlement Class Members Affected By The Action And The Settlement?"); *see also* Summary Notice; Postcard Notice); (g) the contact information for Lead Counsel to answer questions (Notice, ¶ 6); (h) the address for the Settlement website (Notice, pp. 1, 4, 6, 9, 14, 16, 17; *see also* Postcard Notice); and (i) instructions on how to access the case docket via PACER or in person at any court location (Notice, p. 16).

Additionally, the notice program satisfies the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7), by setting forth in plain, easily understandable language: (a) a cover page summarizing the information in the Notice (Notice, pp. 1-3); (b) a statement of plaintiff recovery, and the estimated recovery per damaged share (Notice, pp. 3, 9-10 ("How Much Will My Payment Be?"); *see also* Postcard Notice); (c) a statement of potential outcomes of the case (Notice, p. 7 ("What Might Happen If There Were No Settlement?"); (d) a statement of attorneys' fees or costs sought (Notice, pp. 3, 14 ("What Payment Are The Attorneys For The Settlement Class Seeking? How Will The Lawyers Be Paid?"); *see also* Postcard Notice); (e) identification of lawyers' representatives (Notice, p. 17 ("Can I See The Court File? Whom Should I Contact If I Have Questions?"); *see also* Summary Notice); (vi) reasons for settlement (Notice, pp. 6-7 ("What Are Lead Plaintiff's Reasons For The Settlement?")).

In sum, the notice program fairly apprises Settlement Class Members of their rights with respect to the Settlement, and is the best notice practicable under the circumstances.

## VIII.  CONCLUSION

For the reasons stated in this memorandum and in the Solish Declaration, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the proposed Plan of Allocation.

Dated:  May 10, 2019

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Leanne H. Solish*
Joseph D. Cohen
Kara M. Wolke
Leanne H. Solish
Melissa C. Wright
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*and the Settlement Class*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On May 10, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 10, 2019, at Los Angeles, California.

*s/ Leanne H. Solish*
Leanne H. Solish